UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA         :
:
:         S3 15 Cr. 769 (AJN)
:
- v. -         :
:
ANTHONY MURGIO,         :
MICHAEL J. MURGIO,         :
YURI LEBEDEV, and         :
TREVON GROSS,         :
:
      Defendants.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# GOVERNMENT'S MOTIONS *IN LIMINE*


PREET BHARARA
United States Attorney for the
Southern District of New York


EUN YOUNG CHOI
DANIEL S. NOBLE
WON S. SHIN
Assistant United States Attorneys
    - Of Counsel -

## GOVERNMENT'S MOTIONS IN LIMINE

The Government respectfully submits these motions *in limine*: (i) to preclude Anthony Murgio from introducing evidence or making arguments relating to certain disclosures to regulators and law enforcement about Coin.mx; (ii) to preclude an advice-of-counsel defense by Anthony Murgio; and (iii) to admit testimony by National Credit Union Administration ("NCUA") officials and NCUA records relating to the examination, conservatorship, and liquidation of Helping Other People Excel Federal Credit Union ("HOPE FCU").

Trial is scheduled to begin on October 31, 2016.

## MOTION TO PRECLUDE EVIDENCE OF COIN.MX DISCLOSURES TO REGULATORS AND LAW ENFORCEMENT

The Government moves *in limine* to preclude Anthony Murgio from offering evidence or argument that he and others involved in Coin.mx disclosed to government regulators and law enforcement agencies that Coin.mx was a Bitcoin exchange. The Government expects Anthony Murgio may seek to argue that such disclosures show (1) that Murgio believed the disclosures satisfied state licensing and federal registration requirements for money transmitting businesses for purposes of Section 1960, and/or (2) that Murgio lacked any fraudulent intent for purposes of the wire fraud charges. Second Circuit precedent establishes that knowledge of the legal requirements for licensing and registering a money transmitting business is not an element of a violation of Section 1960. Thus, any purported belief by Anthony Murgio that he had satisfied such requirements through his communications with regulators is irrelevant. The Second Circuit has also repeatedly emphasized that specific instances of nonfraudulent conduct or statements are irrelevant to whether a defendant engaged in a charged fraud. Thus, truthful statements to regulators and law enforcement that Coin.mx was a Bitcoin exchange may not be used to defend

against charges that Anthony Murgio defrauded financial institutions by concealing Coin.mx's true nature.  Accordingly, Anthony Murgio should be precluded from offering any evidence or argument concerning these disclosures.

**A.      Relevant Facts**

Counts One and Two of the S3 Indictment charge Anthony Murgio with conspiracy to operate and operating an unlicensed money transmitting business, namely Coin.mx, in violation of Title 18, United States Code, Sections 371 and 1960, respectively.  These charges are based on Anthony Murgio's failure to properly register Coin.mx with the Financial Crimes Enforcement Network ("FinCEN") or to obtain a money transmitting license from the Florida Office of Financial Regulation, and his knowing operation of Coin.mx in furtherance of ransomware schemes.  Counts Six and Seven of the S3 Indictment charge Anthony Murgio with conspiracy to commit wire fraud and wire fraud, in violation of Title 18, United States Code, Sections 1349 and 1343, respectively.  These charges are based on Anthony Murgio's misrepresentations to financial institutions about the nature of Coin.mx's business in order to open bank accounts and process Bitcoin transactions.

In or about June 2013, around the time Coin.mx launched operations, Anthony Murgio sent letters to the Securities and Exchange Commission ("SEC") and the Florida Office of Financial Regulation's Division of Securities Management on behalf of Collectables Club, the front company for Coin.mx.  In these letters, Anthony Murgio purported to provide "Notice of Activities and Practices Involving Offering Participation of Funds in the Form of a Private Membership Fees in a Private 1st and 14th Amendment Private Memorabilia Membership Association."  The letter to the SEC stated, in part:

> Be on notice that any financial offerings made will be in the private domain into a
> private membership association under the 1st and 14th Amendments only, which

2

is outside of the jurisdiction, authority and legal standing of the U.S. Securities and Exchange Commission.  All prospective persons will be able to become private members of a private membership association in the private domain.

Unless your agency responds within ten (10) days with proper legal objections, the above program will be implemented.

Be it known that I will fully comply with U.S. Securities and Exchange Commission statutes, regulations and orders in the future, if applicable.  I am also aware that your jurisdiction and authority are limited to the public domain, except for clear and present danger of substantive evil per U.S. Supreme Court decisions.

Letter from Anthony Murgio to the SEC, dated June 25, 2013 (attached as **Exhibit A**).  The letter to the Florida Office of Financial Regulation similarly stated:

Be on notice that any financial offerings made in Florida will be in the private domain into a private membership association under the 1st and 14th Amendments only, which is outside of the jurisdiction, authority and legal standing of the Florida Office of Financial Regulation.  All prospective persons will be able to become private members of a private membership association in the private domain.

Unless your agency responds within ten (10) days with proper legal objections, the above program will be implemented.

Be it known that I will fully comply with Florida Office of Financial Regulation statutes, regulations and orders in the future, if applicable.  I am also aware that your jurisdiction and authority are limited to the public domain, except for clear and present danger of substantive evil per U.S. Supreme Court decisions.[1]

Letter from Anthony Murgio to Fla. Office of Fin. Reg., dated June 25, 2013 (attached as

**Exhibit B**).

In addition to the letters sent to federal and state regulators, Anthony Murgio and another

---

[1]      In a January 27, 2015 email proposing that a company, Optimal Payments, partner with Coin.mx, Anthony Murgio referenced these letters:  "As of now, Coin.mx is set up as a Private Membership Association.  We have the authority to keep operating this way.  This was the easiest way for us to get to market and protect ourselves.  We notified Federal & State authorities of what exactly we were doing with certified mail.  Now that things are cranking, we want to make strategic partnerships, create a vehicle and take it public.  We feel that having the MTL licenses will be a much more attractive approach when taking a company public. . . . Optimal has the ability to provide licenses in multiple countries which we find very attractive."

Coin.mx employee made reports to federal law enforcement concerning Coin.mx.  Specifically, the month before law enforcement took down Coin.mx, on or about June 5, 2015, Anthony Murgio completed a "Complaint Referral Form" with the Federal Bureau of Investigation's Internet Crime Complaint Center ("IC3") in which he claimed that he was the victim of an internet crime.  In the form, Anthony Murgio stated:

> We operate a Bitcoin company.  There are tons of scam artists that come through our site.  They have stolen identities.  They are able to verify peoples bank accounts, personal information etc.
>
> We have videos, recorded phone calls on all of them.  We would love to provide you with as much info to catch these bad people.

IC3 Complaint Referral Form dated June 5, 2015, at 2 (attached as **Exhibit C**).  Anthony Murgio claimed in the form that he had suffered $100 million in "[r]eported [l]oss."  *Id.* at 1.

In addition, on or about June 15, 2015, Jose Freundt, a manager at Coin.mx, disclosed to the United States Secret Service, in connection with a report of credit card fraud, that Coin.mx was a Bitcoin exchange.  Freundt reported to the Secret Service that certain customers of Coin.mx had purchased Bitcoins with credit cards but then disputed those credit card charges, resulting in chargebacks to Coin.mx.  Freundt reported that Coin.mx had experienced over $250,000 in losses as a result of these credit card frauds.  *See* Agent Notes of Conversation with Jose Freundt, dated June 15, 2015 (attached as **Exhibit D**).

**B.  Applicable Law**

**1.  *Mens Rea* under Section 1960**

The text and history of Section 1960 make clear that the statute does not require proof of the defendant's knowledge of state licensing or federal registration requirements for money transmitting businesses.  Prior to 2001, Section 1960 provided, in pertinent part:

> (a) Whoever conducts, controls, manages, supervises, directs, or owns all or part of a business, *knowing the business is an illegal money transmitting business*, shall be fined in accordance with this title or imprisoned not more than 5 years, or both.
>
> (b) As used in this section--
>
>> (1) the term "illegal money transmitting business" means a money transmitting business which affects interstate or foreign commerce in any manner or degree and--
>>
>>> (A) *is intentionally operated without an appropriate money transmitting license* in a State where such operation is punishable as a misdemeanor or a felony under State law; or
>>>
>>> (B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section[.]

18 U.S.C. § 1960 (2000) (emphases added).  Thus, as originally enacted, Section 1960 required the defendant to know that the business at issue was an "*illegal* money transmitting business."  *United States v. Velastegui*, 199 F.3d 590, 595 n.4 (2d Cir. 1999) (emphasis added).

In 2001, Congress acted to "clarif[y] the scienter requirement in § 1960."  H.R. Rep. No. 107-250, pt. I, at 54 (2001).  Specifically, Congress sought to "ma[k]e § 1960 stricter" by "'reduc[ing] the *mens rea* element,'" *United States v. Elfgeeh*, 515 F.3d 100, 132-33 (2d Cir. 2008) (quoting *United States v. Hopkins*, 53 F.3d 533, 539 (2d Cir. 1995)), and "mak[ing] clear that an offense under § 1960 is a general intent crime."  H.R. Rep. No. 107-250, pt. I, at 54.  Thus, Congress amended the statute, which now provides in pertinent part:

> (a) Whoever *knowingly* conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both.
>
> (b) As used in this section--
>
>> (1) the term "unlicensed money transmitting business" means a money transmitting business which affects interstate or foreign commerce in any manner or degree and--

(A) is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, *whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable*;

(B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section; or

(C) otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity[.]

18 U.S.C. § 1960 (as amended October 26, 2001) (emphases added).

As the Second Circuit has squarely held, with these amendments, the Government now "need prove only that the defendant had 'know[ledge]' that the business was 'an *unlicensed* money transmitting business.'" *Elfgeeh*, 515 F.3d at 132 (quoting 18 U.S.C. § 1960(a) (as amended)). As a result, "the government is no longer required to prove that [the defendant] knew the money-transmitting business was 'illegal.'" *Id.*

Accordingly, Section 1960, as amended, requires only proof that the defendant knew that the business was in fact "unlicensed" as defined by statute, *i.e.*, that it did not have a State money-transmitting license or was not a federally registered money-transmitting business. *See id.* at 133 (explaining that a prosecution under Section 1960(b)(1)(A) "require[s] proof that the defendant knew that the business was engaged in money-transmitting and also knew that the business had no money-transfer license"). But "the Government [does] not have to show that the defendant knew that a State license was required or that the Federal registration requirements promulgated pursuant to 31 U.S.C. § 5330 applied to the business." H.R. Rep. No. 107-250, pt. I, at 54; *accord United States v. Dimitrov*, 546 F.3d 409, 413 (7th Cir. 2008) ("Under the

amended § 1960, the government no longer need prove that a defendant was aware of state licensing requirements or that he knew about the federal registration requirements."); *United States v. Talebnejad*, 460 F.3d 563, 572 (4th Cir. 2006) (explaining that Section 1960 sets forth a general intent crime that does not require proof of the defendant's knowledge of the law); *United States v. Mazza-Alaluf*, 607 F. Supp. 2d 484, 489 (S.D.N.Y. 2009) (explaining that the 2001 amendments "removed a *mens rea* requirement that the defendant must be aware of the obligation to register a money-transmitting business").

### 2.   Irrelevance of Nonfraudulent Conduct or Statements

It is well established that "[a] defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on specific occasions." *United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000) (quoting *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990)). The Second Circuit has articulated two independent rationales for this bar.  First, such evidence is properly excluded "on relevancy grounds."  *Id.*  Second, such "prior good acts" constitute prior-act evidence used to prove the defendant's good character, which is inadmissible under Federal Rule of Evidence 404(b).  *United States v. Al Kassar*, 660 F.3d 108, 123 (2d Cir. 2011); *United States v. O'Connor*, 580 F.2d 38, 43 (2d Cir. 1978).

Thus, in the context of a fraud prosecution, specific instances of a defendant's "non-fraudulent" conduct or statements are "simply irrelevant" to the charged fraud.  *United States v. Walker*, 191 F.3d 326, 336 (2d Cir. 1999); *see also United States v. Boykoff*, 67 F. App'x 15, 20-21 (2d Cir. 2003) (recognizing, in a tax fraud case, that "evidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant").  Based on this "elementary" principle, *United States v. Fiumano*, 14 Cr. 518 (JFK), 2016 U.S. Dist. LEXIS 54862, at *22 (S.D.N.Y. Apr. 25, 2016), courts routinely preclude defendants from offering evidence of

7

nonfraudulent conduct or statements in fraud prosecutions.  For example, in a wire fraud case involving fraud in the defendants' moving businesses, the Second Circuit affirmed exclusion of evidence of non-fraudulent moves because such "past 'good acts'" were simply "not probative*." United States v. Damti*, 109 F. App'x 454, 455-56 (2d Cir. 2004).  Similarly, in a mail fraud and false statements case involving fraudulent asylum applications, the Second Circuit affirmed exclusion of evidence of honest applications because they were "simply irrelevant to whether the applications charged as false statements were fraudulent."  *Walker*, 191 F.3d at 336 (rejecting "the theory that the existence of these honest applications disproved his fraudulent intent in this case").  *See also, e.g.*, *United States v. Levin*, 15 Cr. 101 (KBF), 2016 U.S. Dist. LEXIS 3065, at *42-*43 (S.D.N.Y. Jan. 8, 2016) (recognizing that evidence of non-fraudulent sales conduct would be "improper" but accepting defendants' representations not to offer it); *United States v. Perez*, 09 Cr. 1153 (MEA), 2011 U.S. Dist. LEXIS 39399, at *3-*4 (S.D.N.Y. Apr. 12, 2011) (precluding as "irrelevant," in a mail fraud and false statements case, evidence of the defendant's truthful applications and accurate advice to clients).

**C.    Discussion**

The Court should preclude Anthony Murgio from offering evidence or argument that he and others involved in Coin.mx disclosed to regulators or law enforcement that Coin.mx was a Bitcoin exchange.

First, such evidence is irrelevant to the Section 1960 charges.  Because Section 1960 is a general intent crime, the Government need not prove that Anthony Murgio was aware of the legal requirements for licensing a money transmitting business under Florida law or registering such a business under federal law.  Thus, Anthony Murgio should not be permitted to offer evidence of disclosures to regulators or law enforcement that Coin.mx was a Bitcoin exchange in

support of a defense that he believed he had satisfied state licensing and federal registration requirements for money transmitters.

*United States v. Dimitrov*, a Section 1960 prosecution arising out of the Northern District of Illinois, is on point.  There, the district court ruled *in limine* that the defendant was precluded from testifying that "he believed his [license to do business in the city] sufficed" under state money transmitting license requirements.  546 F.3d at 415.  On appeal, the Seventh Circuit affirmed, holding that "[b]ecause a defendant's lack of knowledge of the state licensing requirement is not a defense to prosecution, the district court appropriately concluded that [the defendant's] proposed evidence would be irrelevant."  *Id.*  Statutory text, legislative history, and Second Circuit precedent compel the same conclusion here: because Anthony Murgio's lack of knowledge of Florida licensing requirements and federal registrations requirements is not a defense to the Section 1960 charge, he should be precluded from offering evidence of the disclosures at issue.

In addition, such evidence is irrelevant to the wire fraud charges.  As the Second Circuit has made clear, evidence of prior instances of truthful disclosures by Anthony Murgio and others involved in Coin.mx concerning Coin.mx's status as a Bitcoin exchange is both "simply irrelevant" to the charged wire fraud and also constitutes inadmissible prior-act evidence under Rule 404(b).  *See, e.g.*, *Walker*, 191 F.3d at 336; *United States v. Al Kassar*, 660 F.3d at 123.  The gravamen of the wire fraud charged in this prosecution is that Anthony Murgio made false statements to financial institutions to conceal Coin.mx's status as a Bitcoin exchange from those institutions, thereby tricking them into permitting Bitcoin transactions.  Whether, on a handful of occasions, Coin.mx disclosed its status as a Bitcoin exchange to unaffiliated *government*

*agencies* is wholly irrelevant to whether Anthony Murgio defrauded the financial institutions as charged.[2]

Finally, the Court should preclude Anthony Murgio from offering evidence of disclosures to regulators and law enforcement about Coin.mx under Rule 403. *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence"). The disclosures raise questions about the authority of government agencies to regulate private membership associations and the nature and scope of unrelated frauds for which Coin.mx claimed to be victimized. The evidence is thus likely to sow juror confusion and distraction that substantially outweighs any probative value—of which there is none—and accordingly should be precluded.

## MOTION TO PRECLUDE ADVICE-OF-COUNSEL DEFENSE

The Government moves *in limine* to preclude Anthony Murgio from asserting an advice-of-counsel defense. Specifically, Anthony Murgio may argue that he relied on the advice of counsel to conclude that he was in compliance with state licensing and federal registration requirements for a money-transmitting business. But reliance on the advice of counsel is a defense only if the charged offense requires proof that the defendant intended to violate the law. As discussed above, knowledge of legal requirements for licensing or registering a money-

---

[2]    Such evidence is irrelevant for the independent reason that, even on the far-fetched assumption that Coin.mx's disclosures had somehow made their way to the victim financial institutions, it would not serve as a defense to the fraud charges. As the Supreme Court has explained, the common-law requirement that a fraud victim actually relied on the defendant's misrepresentation "plainly ha[s] no place in the federal fraud statutes." *Neder v. United States*, 527 U.S. 1, 24-25 (1999) (construing the mail fraud, wire fraud, and bank fraud statutes).

transmitting business is not an element of Section 1960, and as a result any purported misunderstanding of those requirements is irrelevant. Accordingly, the advice-of-counsel defense is simply not available. Moreover, even if such a defense were available in theory, Anthony Murgio would not be entitled to assert it because there is no factual predicate for it.

## A.    Relevant Facts

Starting in or about April 2013, Anthony Murgio and representatives of an entity called "ProAdvocate Group" based in Texas communicated frequently regarding Coin.mx. On or about April 19, 2013, Anthony Murgio sent an email to ProAdvocate Group's email address (protection@proadvocate.org) that appeared to reference an initial conversation earlier that day. (The subject of the email was "Anthony from this morning.") The email contained two hyperlinks. The first link, which Anthony Murgio described as "Regulqtions [sic]," went to FinCEN's March 18, 2013 guidance on the "Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies." The second link, which Anthony Murgio described as "Membership docs I drafted," went to a document saved on the Google Docs website under the file name "Bitcoin PMA." The document was a draft "Membership Agreement" for a "Private Membership Association" named "Currency & Money Enthusiasts Association."

Shortly thereafter, ProAdvocate Group emailed Anthony Murgio an "Application for Membership." The application described ProAdvocate Group as a "fraternal organization" and set forth a fee schedule for various "membership levels." Later that day, Anthony Murgio emailed back a signed copy of the application, indicating his agreement to pay a $20,000 "Comprehensive Lifetime Membership Fee" for the "1st and 14th Amendment Private Membership Association" program.

11

Notably, ProAdvocate Group's Application for Membership included the following

"Declaration of Purpose" (emphases added):

This Association of members hereby declares that our main objective is to maintain and improve the civil rights, constitutional guarantees, and political freedom for every member and citizen of the United States of America. We believe that the Constitution of the United States is one of the best documents ever devised by man, and signers of the Declaration of Independence did so out of love for their country.

We believe that the First Amendment of the Constitution of the United States of America guarantees our members free speech, petition, assembly, and the right to gather together for the lawful purpose of advising and helping one another in asserting our rights under the Federal and State Constitutions and Statutes. We also declare the basic right of all of our members to select spokesmen from our number who could be expected to give wisest counsel and advise concerning the need for legal assistance.

The Association will limit its efforts in furthering these goals to use of the established judicial institutions, and procedures that have been established by common law, the United States Constitution and legislative actions by the Congress of the United States and the legislatures of its States.

The Association will recognize any person (irrespective of race, color, or religion) who is in accordance with these principles and policies as a member, and will provide a medium through which its individual members seek to make more effective the expression of their own views.

More specifically, our purpose is to educate and assist members in solving their legal concerns and problems as a preventative measure or as a solution to a present situation or condition through research, providing information and education, or directing the member to the proper resource.

*Due to the fact that the legal research, information, data and forms along with said benefits and services may not have been offered or prepared by a person licensed to practice law in the State that the Association is a resident or has domicile, be it known that the benefits and services of the Association are not a substitute for the advice of an attorney. The Association recommends to each member that any and all legal information, education, forms, benefits and services be reviewed by an experienced licensed member of a State Bar Association as a final check as to the legality and proper application to the member's situation.*

It is also recommended by the Association that each member be represented by a supervising attorney of their choice. If the member does not have or has not been

able to obtain a supervising attorney, the Association may provide a referral of a supervising attorney to the member. It will be the responsibility of the member to provide a copy of the product concerning the benefits and services of the Association to the designated supervising attorney.

*The Association does not act in a representative capacity in any protecting, enforcing, or defending the legal rights of a member. The member is always acting in his or her own legal capacity concerning any legal matters whatsoever.*

In addition, the email to which the application was attached described ProAdvocate Group as a "Private Legal Membership Association" but also contained the following disclaimer:

The information contained in this email and the supporting attachments provided by ProAdvocate Group are for educational purposes only.  Although we have performed extensive research regarding legal principles, our trustees, officers and supporting staff of ProAdvocate Group are not licensed members of the State Bar of Texas.  Information provided by members of ProAdvocate Group should not be considered a substitute for the advice of a licensed attorney in handling your legal affairs."

A copy of the email and the Membership Application are attached as **Exhibit E**.  A similar disclaimer was included in most of the emails sent from ProAdvocate Group to Anthony Murgio.

Two weeks later, ProAdvocate Group sent Anthony Murgio drafts of two letters to the SEC and Florida Office of Financial Regulation.  These draft letters were virtually identical to the letters that Anthony Murgio ultimately sent to those agencies in or about June 2013.  *See* Exhibits A and B.  As quoted above, the letters asserted, among other things, that Collectables Club was outside those agencies' "jurisdiction, authority and legal standing."

On July 10, 2013, Anthony Murgio emailed ProAdvocate Group with a copy of a response letter he received from the Florida Office of Financial Regulation.  The letter advised Anthony Murgio that his association's "acceptance of financial offerings for memberships in such associations may be within the jurisdiction and authority of this Office."  The letter also advised Anthony Murgio that state securities laws "are very complex and often require the assistance of a licensed attorney to determine whether or not there has been or will be a

violation" and accordingly "encouraged [Murgio] to seek out the advice of a licensed securities attorney prior to soliciting prospective investors for financial offerings in a private membership association."

On July 15, 2013, ProAdvocate Group advised Anthony Murgio that the drafting of a response would require the payment of additional fees.  Anthony Murgio responded, "I appreciate it, but at this time, I dont feel that this issue is anything but a precaution and no legal action has been brought forward.  Do you truly think it is a must to respond?"

Over the next year and a half, Anthony Murgio continued to communicate with ProAdvocate Group for assistance on various matters concerning Coin.mx.  For example, in November 2013, ProAdvocate Group helped Anthony Murgio fill out a form to register Collectables Club to do business in the state of New Jersey.  And in September 2014, Anthony Murgio sought assistance on how the business should be classified for tax purposes.

## B.    Applicable Law

As the Second Circuit has recognized, "the situations in which the advice-of-counsel defense may be employed are severely limited."  *Lurie v. Wittner*, 228 F.3d 113, 134 (2d Cir. 2000).  Perhaps most fundamentally, "[a] defense of reliance on advice of counsel is available only to the extent that it might show that a defendant lacked the requisite specific intent."  *Stichting Ter Behartiging Van De Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt International B.V. v. Schreiber*, 327 F.3d 173, 183 (2d Cir. 2003).  In other words, the advice-of-counsel defense is available only if "specific intent or willful intent is an element of the offense."  *Spirt v. Bechtel*, 232 F.2d 241, 255 (2d Cir. 1956) (quotation marks omitted).

Thus, the Second Circuit has repeatedly held that the advice-of-counsel defense is unavailable if the offense does not require proof that the defendant intended to violate the

law.  *See United States v. Sardana*, 101 F. App'x 851, 854-55 (2d Cir. 2004) (affirming rejection of advice-of-counsel evidence and jury instruction because the offense, international parental kidnapping, "does not require proof that the defendant knew his conduct was against the law"); *Stichting*, 327 F.3d at 183 (no jury instruction for claim that the defendant believed that its acts did not violate the Foreign Corrupt Practices Act, because "specific intent to violate the FCPA is not an element of an FCPA violation"); *United States v. Remini*, 967 F.2d 754, 757 (2d Cir. 1992) (affirming rejection of advice-of-counsel evidence and jury instruction because the offense, criminal contempt, has "no requirement that the defendant be shown to have known of, and intended to violate, the statute which makes it a crime to consciously disregard an order of the court"); *United States v. Quinones*, 06 Cr. 845 (FB), 2013 U.S. Dist. LEXIS 112699, at *9 (E.D.N.Y. Aug. 9, 2013) (advice-of-counsel defense "is irrelevant in cases where the government is not required to prove that the defendant knew that his conduct was illegal," as in the narcotics distribution charge in this case), *aff'd*, 582 F. App'x 17 (2d Cir. 2014).

Even if the advice-of-counsel defense is theoretically available, a defendant is not entitled to assert it "unless there are sufficient facts in the record to support the defense." *United States v. Quinones*, 417 F. App'x 65, 67 (2d Cir. 2011) (citing *United States v. Evangelista*, 122 F.3d 112, 117 (2d Cir. 1997)).  Thus, a defendant must show that he "(1) honestly and in good faith sought the advice of counsel; (2) fully and honestly laid all the facts before his counsel; and (3) in good faith and honestly followed counsel's advice, believing it to be correct and intending that his acts be lawful." *United States v. Colasuomo*, 697 F.3d 164, 181 (2d Cir. 2012) (quotation marks omitted).

**C.      Discussion**

As discussed above, Section 1960 does not require proof that Anthony Murgio knew that the money-transmitting business was illegal—in other words, the Government need not prove that Anthony Murgio was aware of state or federal money-transmitting licensing or registration requirements.  *See Elfgeeh*, 515 F.3d at 132.  Because a specific intent to violate the law is not required by Section 1960, Anthony Murgio cannot rely on the advice of counsel as a defense to the Section 1960 related charges.

Anthony Murgio may nevertheless attempt to invoke an advice-of-counsel defense with respect to Section 1960's limited knowledge element.  As discussed above, Section 1960 requires proof that the defendant knew that the business did not have a State money-transmitting license or was not a federally registered money-transmitting business.  But the advice-of-counsel defense "goes to unlawful intent not knowledge of the facts."  *United States v. King*, 560 F.2d 122 (2d Cir. 1977).  The knowledge required by Section 1960 relates to facts—whether the money-transmitting business is licensed or registered—and not the legality or illegality of the business.  Therefore, the advice-of-counsel defense is simply inapposite as to the knowledge element of Section 1960.

Anthony Murgio should be precluded from asserting an advice-of-counsel defense for the additional reason that there is no factual predicate for it.  ProAdvocate Group explicitly and repeatedly advised Anthony Murgio that it was *not* providing legal advice—and that it was not even qualified to do so.  For example, in the Application for Membership, ProAdvocate Group advised that its forms and services "may not have been offered or prepared by a person licensed to practice law" and "are not a substitute for the advice of an attorney."  ProAdvocate Group accordingly "recommend[ed] to each member that any and all legal information, education,

forms, benefits and services be reviewed by an experienced licensed member of a State Bar Association as a final check as to the legality and proper application to the member's situation." ProAdvocate Group also disavowed that it was "act[ing] in a representative capacity in any protecting, enforcing, or defending the legal rights of a member."  Furthermore, in its emails to Anthony Murgio, ProAdvocate Group repeatedly advised that its "trustees, officers and supporting staff of ProAdvocate Group are not licensed members of the State Bar of Texas," and that the information provided was "for educational purposes only" and "should not be considered a substitute for the advice of a licensed attorney in handling your legal affairs."

In light of these repeated warnings, Anthony Murgio cannot establish that he honestly and in good faith sought the advice of legal counsel from ProAdvocate Group, or that he honestly and in good faith followed ProAdvocate Group's advice believing it to be correct legal advice.  Accordingly, Anthony Murgio should be precluded from offering an advice-of-counsel defense.

## MOTION TO ADMIT EVIDENCE OF NCUA'S EXAMINATION, CONSERVATORSHIP, AND LIQUIDATION OF HOPE FCU

The Government moves *in limine* to admit testimony by NCUA examiners and NCUA records relating to the examination, conservatorship, and liquidation of HOPE FCU.  The NCUA is an independent federal agency that regularly examines credit unions, including HOPE FCU, for compliance with regulatory requirements.  The Government expects the NCUA evidence will show that after accepting $150,000 in bribes from Anthony Murgio, Michael Murgio, Yuri Lebedev, and their co-conspirators, Trevon Gross engaged in conduct and decision-making as the CEO and Chairman of HOPE FCU that benefitted Anthony Murgio and his co-conspirators to the detriment of the credit union and its members.  The NCUA testimony and records are, therefore, direct evidence of Gross's violation of Section 215(a)(2) because they are highly

probative of his corruption and intent to be influenced with respect to the operations of HOPE

FCU in accepting the bribes in question.

## A.      Relevant Facts

Count Five of the S3 Indictment charges that between May 2014 through 2015, Gross

corruptly agreed to accept and accepted payments with the intent to be influenced with respect to

the business of a financial institution, specifically HOPE FCU, in violation of 18 U.S.C.

§ 215(a)(2).  This charge is based upon Gross' acceptance of bribes from Anthony Murgio,

Michael Murgio, Lebedev, and their co-conspirators, in exchange for turning over leadership and

operational control of HOPE FCU to Anthony Murgio and Collectables Club, the front company

for Coin.mx.

The Government expects the evidence at trial will establish that in 2014, in an effort to

facilitate Coin.mx's operations and further evade scrutiny by financial institutions, Anthony

Murgio, with the assistance of his father, Michael Murgio, and Lebedev attempted to take control

of HOPE FCU, a small federal credit union chartered in Lakewood, New Jersey.  To obtain

control of HOPE FCU, Anthony Murgio and his co-conspirators paid $150,000 in bribes to

Gross, who served as the CEO and Chairman of the Board of the credit union.  More specifically,

evidence at trial will show that two payments of $15,000 each were made from a Coin.mx-

related bank account to the operating account of HOPE Cathedral, the church in Jackson, New

Jersey, where Gross served as pastor.  Later, Anthony Murgio arranged for a third bribe of

$120,000 to be paid to HOPE Cathedral through KapCharge, a Canadian payment processing

company with which Murgio worked that processed payments for Coin.mx through its front

company, Collectables Club.  Anthony Murgio and his co-conspirators also agreed to pay Gross

approximately $3,000 per month in "consulting fees." Gross, who was a signatory on the HOPE Cathedral operating account, used the bribe money to pay for a variety of personal expenses.

After receiving these bribes, Gross facilitated Anthony Murgio's takeover of the leadership and operations of HOPE FCU, including by arranging for the Board of Directors to nominate and elect Lebedev and a slate of other individuals hand-picked by Murgio to the Board. Gross further promised to hand over to Anthony Murgio control of the Board by orchestrating the resignations of the legacy Board members at a time of Murgio's choosing. In the meantime, Gross gave Anthony Murgio and his co-conspirators operational control of the credit union, including access to HOPE FCU's premises and computer systems. In particular, Gross permitted KapCharge to open a business account at HOPE FCU, which KapCharge began using to process millions of dollars' worth of ACH transactions for, among other businesses, payday lending companies. Between September and November of 2014, HOPE FCU processed as much as $3.8 million in ACH transactions per day. For comparison, HOPE FCU processed – in the aggregate – less than $50,000 in ACH transactions before Gross turned over control of the credit union to Collectables Club.

In or about September 2014, the NCUA began conducting a series of inspections at the credit union. During these inspections, NCUA examiners learned that Anthony Murgio's slate of Board members had been elected to the Board – information which Gross had withheld from the NCUA. The NCUA also learned that HOPE FCU was conducting a high volume of ACH transactions without sufficient capital reserves or adequate Bank Secrecy Act ("BSA") and Anti-Money Laundering ("AML") controls. The Government expects the evidence at trial will establish that Gross was aware of this high volume of ACH activity and the insufficient BSA/AML controls, but nevertheless continued to permit Anthony Murgio and KapCharge to

process the ACH transactions through HOPE FCU.  Gross also conspired with Anthony Murgio and individuals at KapCharge to try to manipulate HOPE FCU's net-worth ratio at the end of the quarter to trick the NCUA into believing that the credit union was adequately capitalized for the volume of ACH transactions it was processing.

In an examination report known as a Document of Resolution ("DOR") for the period ending March 31, 2014, which the NCUA transmitted to HOPE FCU on or about October 27, 2014, the NCUA informed HOPE FCU that the Collectables Club Board members were ineligible for HOPE FCU membership or Board service because they fell outside HOPE FCU's field of membership ("FOM").  (A copy of the DOR is attached as **Exhibit F**).[3]  Instead of simply removing these individuals from the Board, at the next Board meeting, the HOPE FCU Board voted to create an "advisory Board" and moved the Collectables Club members to it. Even after being made aware of the Collectables Club Board members' ineligibility, however, Gross continued to engage in discussions with Anthony Murgio, Michael Murgio, Yuri Lebedev, and their co-conspirators about relinquishing control of HOPE FCU to them.  Gross also engaged in a scheme with KapCharge and Anthony Murgio to obtain a phony office in Lakewood, New Jersey, to try to convince the NCUA that KapCharge, Collectables Club, and its members, were within HOPE FCU's FOM.  At a meeting in late November 2014, Gross agreed to accept an additional $50,000 bribe in exchange for arranging the resignations of the remaining legacy Board members and turning over all control of the credit union to Anthony Murgio.  At the same

---

[3]     The Government seeks to file the NCUA-related exhibits (Exhibits F through K) under seal in accordance with Paragraph 5 of the Amended Protective Order entered on May 16, 2016 (ECF 112).  These exhibits include references to confidential NCUA examination procedures. Further, the Government is informed by the NCUA that these documents contain material that may be subject to the bank examiners privilege.  The Government is providing copies of Exhibits F through K to the Court and defense counsel.

meeting, Gross admitted that he had been "negligent" in permitting the high volume of ACH activity to be conducted through HOPE FCU without adequate BSA/AML controls.  Although at least three of the legacy Board members subsequently submitted their resignations, the $50,000 bribe payment was not made, and Gross retained control of HOPE FCU.  Still, the credit union continued to process a high volume of ACH transactions for KapCharge.

On or about March 25, 2015, the NCUA issued a Letter of Understanding and Agreement ("LUA") to HOPE FCU addressing the NCUA's concerns about the credit union's ACH activity. A copy of the LUA, which was signed by Gross and other HOPE FCU Board members, is attached as **Exhibit G**.  The LUA called upon HOPE FCU to cease ACH processing for KapCharge and to implement additional BSA/AML controls to strengthen its oversight of ACH activity.  During an examination in September 2015, however, the NCUA discovered that in June 2015, HOPE FCU had started doing business with KapCharge again by processing payments for two of KapCharge's payday lending customers.  On or about September 23, 2015, the NCUA submitted a Preliminary Warning Letter ("PWL") to HOPE FCU, which required the credit union to cease all ACH activity for all business accounts.  (A copy of the PWL is attached as **Exhibit H**).  The PWL stated that HOPE FCU had failed "to implement action to correct unsafe and unsound conditions" noted in the LUA issued in March 2015.

On or about October 15, 2015, the NCUA issued an Order of Conservatorship placing HOPE FCU into conservatorship.  (A copy of the Order of Conservatorship is attached as **Exhibit I**).  In a Confidential Statement of Grounds for Conservatorship ("Statement of Grounds," attached as **Exhibit J**), the NCUA concluded that "HOPE [FCU]'s relationship with the Collectables Club P.M.A., its principals Michael and Anthony Murgio and related entities knowns as 'Currency Enthusiasts' and 'Coin.mx,' and KapCharge (USA), Inc. has put HOPE

21

[FCU]'s assets and members and the [National Credit Union Share Insurance Fund] at substantial risk."  Exhibit J at 1.  The NCUA further concluded that Gross had "failed to exercise sufficient independent judgment to play an effective role at HOPE [FCU]"; that HOPE FCU's "financial condition [was] deteriorating due to high operating expenses and its failure to take adequate action to mitigate [BSA/AML] risks"; that HOPE FCU had "intended to deceive NCUA concerning the membership eligibility of certain individuals and businesses"; and that HOPE FCU had "made plans to conceal HOPE [FCU]'s true net worth ratio from NCUA."  *Id.*

On or about November 20, 2015, the NCUA issued an Order of Liquidation placing HOPE FCU into involuntary liquidation and revoking its charter based on the NCUA's determination that HOPE FCU was insolvent as of October 31, 2015.  (A copy of the Order of Liquidation is attached as **Exhibit K**).

**B.     Applicable Law**

**1.     Elements of a Violation of Section 215(a)(2)**

The bank bribery statute, *see* 18 U.S.C. § 215, provides, in pertinent part, that whoever "as an officer . . . of a financial institution . . . corruptly accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business or transaction of such institution" is guilty of a felony.  18 U.S.C. § 215(a)(2).  To prove a violation of Section 215(a)(2), the Government must prove the following elements:

> (1) the defendant is an officer or employee of a bank; (2) the bank is a financial institution as defined by Title 18, United States Code; (3) during the period charged, the defendant solicited, demanded, accepted or agreed to accept something of value, either for his own benefit or the benefit of another; and (4) the defendant took this action knowingly and corruptly, and with the intent to be influenced or rewarded in connection with a transaction of the financial institution.

*United States* v. *Carrizo*, No. 95 Cr. 779 (HB), 1996 WL 208186, at *3 (S.D.N.Y. Apr. 26, 1996); *see also United States* v. *McElroy*, 910 F.2d 1016, 1022 (2d Cir. 1990) (explaining essential elements of a violation of Section 215(a)).

### 2.      Direct Evidence of the Charged Crime

If evidence is relevant to a charged offense, it is generally admissible at trial.  The Federal Rules of Evidence provide that all "[r]elevant evidence is admissible" unless its admission is contrary to the Constitution, statute, or rule.  Fed. R. Evid. 402.  Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.

It is well established that "other acts" evidence is admissible as relevant direct evidence of the crimes charged – and not considered Rule 404(b) evidence – if it (i) "arose out of the same transaction or series of transactions as the charged offense," (ii) "is inextricably intertwined with the evidence regarding the charged offense," or (iii) "is necessary to complete the story of the crime on trial."  *United States* v. *Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (citation and internal quotation marks omitted); *accord United States* v. *Hsu*, 669 F.3d 112, 118 (2d Cir. 2012).

### 3.      Rule 404(b)

Uncharged crimes, wrongs, or other acts may be admitted under Rule 404(b) for purposes other than proving propensity, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b). The Second Circuit "has adopted an 'inclusionary' approach to other act evidence under Rule 404(b), which allows such evidence to be admitted for any purpose other than to demonstrate criminal propensity."  *United States* v. *LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004) (citation omitted); *see also United States* v. *Curley*, 639 F.3d 50, 57 (2d Cir. 2011).  Other act evidence is properly

admitted where "(1) it was offered for a proper purpose; (2) it was relevant to a material issue in

dispute; (3) its probative value is substantially outweighed by its prejudicial effect; and (4) the

trial court gave an appropriate limiting instruction to the jury if so requested by the defendant."

*LaFlam*, 369 F.3d at 156; *accord Curley*, 639 F.3d at 56-57.

### 4.    Business Records Exception Under Rule 803(6)

Rule 803(6) of the Federal Rules of Evidence excepts from the rule against hearsay "[a]

record of an act, event, condition, opinion, or diagnosis" if (a) "the record was made at or near

the time by--or from information transmitted by--someone with knowledge;" (b) "the record was

kept in the course of a regularly conducted activity of a business, organization, occupation, or

calling, whether or not for profit;" (c) "making the record was a regular practice of that activity;"

(d) "all these conditions are shown by the testimony of the custodian or another qualified

witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting

certification;" and (e) "the opponent does not show that the source of information or the method

or circumstances of preparation indicate a lack of trustworthiness."  Fed. R. Evid. 803(6).

### 5.    Public Records Exception Under Rule 803(8)

Rule 803(8) of the Federal Rules of Evidence excepts from the rule against hearsay a

"records or statement of a public office" if (a) it sets out either (i) "the office's activities" or (ii)

"a matter observed while under a legal duty to report, but not including, in a criminal case, a

matter observed by law-enforcement personnel," and (b) "the opponent does not show that the

possible source of the information or other circumstances indicate a lack of trustworthiness."

Fed. R. Evid. 803(8).

The Second Circuit has held that "public records are nontestimonial, and not subject to

the strictures of the Confrontation Clause."  *United States* v. *Feliz*, 467 F.3d 227, 237 (2d Cir.

2006).  "[P]ublic records are generally admissible absent confrontation, not because they qualify

under an exception to the hearsay rules, but because—having been created for the administration

of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they

are not testimonial."  *United States* v. *James*, 712 F.3d 79, 90 (2d Cir. 2013)  (quoting *Melendez–*

*Diaz* v. *Massachusetts*, 557 U.S. 305, 324 (2009)).

## C.     Discussion

The anticipated testimony of NCUA examiners and the NCUA records relating to the

NCUA's examination, conservatorship, and liquidation of HOPE FCU are admissible because

they are direct evidence of Gross's violation of Section 215(a)(2) as charged in Count Five of the

S3 Indictment.  The NCUA evidence – all of which dates from the time period of the charged

crime – will show how, after receiving the $150,000 in bribes, Gross undertook a variety of

actions to assist Anthony Murgio, Michael Murgio, Yuri Lebedev, and their co-conspirators, to

take control of the leadership and operations of HOPE FCU in violation of Gross's fiduciary

duties.  In short, the evidence helps prove the "*quo*" that Gross exchanged for the $150,000

"*quid*."  For example, the evidence will show that Gross not only orchestrated the nomination

and election of individuals handpicked by Anthony Murgio to the Board of HOPE FCU – even

though these individuals were plainly ineligible for membership in HOPE FCU – but that Gross

tried to hide this information from the NCUA.  In addition, the evidence will show that Gross

permitted KapCharge – which, as a Canadian company, was also plainly outside HOPE FCU's

field of membership – to process millions of dollars in ACH transactions *per day* for Coin.mx

and payday lending companies even though Gross knew – and was repeatedly informed by the

NCUA – that HOPE FCU lacked adequate capital reserves and BSA/AML controls.  In other

words, the NCUA evidence is highly probative of how Gross operated the credit union in an

unsafe and unsound manner for the benefit of Anthony Murgio and his co-conspirators after receiving bribes from them.  Such evidence thus proves that Gross acted corruptly insofar as his conduct plainly breached the fiduciary duties of loyalty and care that Gross owed to HOPE FCU and its members.

To the extent the proffered evidence pertains to Gross's operation of HOPE FCU *after* the removal of the Collectables Club Board members in late 2014, such evidence is also admissible as direct proof of Gross's corruption.  Most of this evidence concerns HOPE FCU's dogged efforts to continue processing ACH and wire transfers on behalf of KapCharge in the face of NCUA warnings and enforcement actions.  It can reasonably be inferred from this evidence that Gross continued to permit KapCharge to process risky ACH transactions through HOPE FCU without adequate BSA/AML controls because it was through KapCharge that Anthony Murgio and his co-conspirators had arranged the $120,000 bribe payment to Gross. Moreover, evidence of Gross's continued operation of HOPE FCU in an unsafe and unsound manner in 2015, along with evidence of the NCUA's conservatorship and ultimate liquidation of HOPE FCU, is part of the same series of transactions, is inextricably intertwined with, and completes the story of, the charged bribery scheme.  It is, therefore, critical evidence of how Gross's acceptance of the payments from Anthony Murgio and his co-conspirators was corrupt.

Although the NCUA evidence should be admitted as direct proof of Gross's violation of Section 215(a)(2), to the extent such evidence is viewed as uncharged "other acts" evidence, it is nonetheless admissible for the proper purpose of proving Gross's knowledge and intent, pursuant to Rule 404(b).  Gross's knowledge and intent in accepting the $150,000 in payments and soliciting at least another $50,000 payment from Anthony Murgio, Michael Murgio, Yuri Lebedev, and their co-conspirators will undoubtedly be key disputed facts at trial.  The NCUA

evidence is highly probative on these issues because it shows how, after receiving the illicit payments, Gross engaged in conduct at HOPE FCU that directly benefitted Anthony Murgio and his co-conspirators, such as arranging for the nomination and election of Anthony Murgio's handpicked Board members and allowing KapCharge to process a high volume of ACH transactions in a manner that Gross himself acknowledged was "negligent." This evidence is, therefore, highly probative of Gross's knowledge and corrupt intent in agreeing to accept and accepting the payments in question, as well as Gross's intent to be influenced in connection with the business and operations of HOPE FCU. Indeed, by showing how Gross was, in fact, influenced in his decision-making and operation of HOPE FCU, this evidence is critical proof of Gross's intent in accepting the payments at issue. Further, the evidence will help rebut Gross's anticipated defense that the payments were simply legitimate donations or capital infusions to HOPE FCU.

In addition to testimony of NCUA examiners involved in the examinations of HOPE FCU, the Government seeks to introduce certain NCUA records pertaining to the NCUA's examination, administrative actions, conservatorship, and liquidation of HOPE FCU. The NCUA records in question are attached as Exhibits F through K.[4] These records fall with the exceptions to the hearsay rule because they are both business records, *see* Fed. R. Evid. 803(6); *see, e.g.*, *United States* v. *Gurr*, 471 F. 3d 144, 150-53 (D.C. Cir. 2006) (upholding admission in criminal case of NCUA Order of Conservatorship and Confidential Statement of Grounds for Conservatorship as business records under Rule 803(6)); *see also United States* v. *Aranjo*, 603 F.3d 112, 118 (1st Cir. 2010) (noting defense concession that NCUA examiner's report was

---

[4]        Should the Court grant the Government's motion *in limine*, the Government reserves the right to seek to introduce additional similar NCUA reports and documents as business records and/or public records.

admissible as business record), and public records, *see* Fed. R. Evid. 803(8); *see, e.g.*, *Short* v. *Conn. Community Bank*, No. 09 Cv. 1955 (VLB), 2012 WL 1057302, at *7 n.8 (D. Conn. Mar. 28, 2012) (holding Office of the Comptroller of the Currency ("OCC") report admissible as public record); *Remington Inv., Inc.* v. *Quintero & Martinez Co.*, 961 F. Supp. 344, 351 (D.P.R. 1997) (holding Federal Deposit Insurance Commission ("FDIC") report compiled from submitted bank reports admissible as public record). The Government anticipates that the NCUA examiners will establish through their testimony at trial that the NCUA records at issue qualify as both business records and public records.

Lastly, the probative value of the proffered NCUA evidence is not substantially outweighed by the danger of unfair prejudice. *See* Fed. R. Evid. 403; *Old Chief* v. *United States*, 519 U.S. 172, 180 (1997) (defining "unfair prejudice" in criminal context to refer to "the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged"). To the extent the NCUA evidence shows that Gross operated HOPE FCU in an unsafe and unsound manner and engaged in conduct that violated his fiduciary duties and Chairman and CEO of the credit union, such evidence is directly relevant to the charged violation of Section 215(a)(2). Further, the Government intends to introduce other evidence of these facts, including emails, chats, and a recorded conversation between Gross and Anthony Murgio and others. Moreover, such evidence is no more inflammatory than the crux of the charged crime: that Gross corruptly accepted bribes with the intent to be influenced in connection with his operation of HOPE FCU. *See generally United States* v. *Livoti*, 196 F.3d 322, 326 (2d Cir. 1999) (rejecting Rule 403 challenge where other-act evidence "did not involve conduct more inflammatory than the charged crime").

## **CONCLUSION**

For the foregoing reasons, the Government's motions *in limine* should be granted.

Dated:  September 12, 2016
        New York, New York

<div style="margin-left:40%">

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

</div>

By: _____/s/_____
    EUN YOUNG CHOI
    DANIEL S. NOBLE
    WON S. SHIN
    Assistant United States Attorneys