UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: OCT 1 8 2017

United States of America,

-v-

15-cr-769 (AJN)

OPINION & ORDER

Trevon Gross,

Defendant.

ALISON J. NATHAN, District Judge:

On March 17, 2017, Defendant Trevon Gross was convicted of two counts after a criminal jury trial: first, participating in a multi-object conspiracy to bribe Gross, the Chairman of a federal credit union, in connection with the business of that institution, obstruct an examination of the National Credit Union Administration ("NCUA"), and make false statements to the NCUA; and second, a substantive count of accepting bribes. *See* S6 Indictment ¶¶ 23-26, 30-31; Tr. at 4360. Gross now moves, under Federal Rules of Criminal Procedure 29 and 33, for acquittal or, in the alternative, a new trial. *See* Dkt. No. 524 ("Def. Br."); Dkt. No. 540 ("Gov't Opp."); Dkt. No. 565 ("Def. Reply"). He argues, first, that evidence and argument presented by the Government at trial constructively amended the conspiracy count as alleged in the indictment or, in the alternative, constituted a prejudicial variance from that indictment. Second, he argues that the Government presented insufficient evidence of venue. Finally, he argues that the Government failed to present sufficient evidence for a reasonable jury to find Gross guilty of either count beyond a reasonable doubt.

1

For the reasons that follow, the Court rejects each of these arguments, and DENIES Gross's motions.[1]

## I.    Background

### A.    Procedural History

As noted, Gross argues that the evidence at trial in concert with the Government's arguments constructively amended the conspiracy charge in the operative Indictment, or, in the alternative, constituted a prejudicial variance. The Court thus begins with a detailed description of the procedural history of this case relevant to these arguments, before describing the evidence and arguments presented at trial.

### 1.    The Initial Indictments and Discovery

On November 15, 2015, the Government filed the first indictment in this case, initially naming only one Defendant, Anthony Murgio. Dkt. No. 14. That Indictment's pre-amble included a discussion of Coin.mx – an illegal bitcoin exchange Murgio ran in Florida – as well as the Collectables Club – a sham front company for this bitcoin exchange purporting to help its members sell and trade valuable memorabilia. *See id.* ¶¶ 2, 4. In addition to alleging that Murgio ran this bitcoin exchange in violation of federal law, the Indictment alleged that Murgio and others bribed the head of a federal credit union so that he and his "co-conspirators" could "gain control of [that] Credit Union." *Id.* ¶ 8. The Indictment noted that this scheme was

---

[1] Gross's co-defendant at trial, Yuri Lebedev, was convicted of all counts asserted against him on March 17, 2017. The Court notes that together with Gross, Lebedev filed a placeholder motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 and for a new trial pursuant to Federal Rule of Criminal Procedure 33. *See* Dkt. No. 455. Unlike Gross, however, Lebedev never put forth any arguments to support such a motion. *Cf.* Dkt. No. 524 (Gross's memorandum of law in support of his Rule 29 and Rule 33 motions). To the extent that Lebedev's placeholder motion remains pending, the Court denies it.

Gross's other co-defendants in this case, Michael Murgio and Anthony Murgio, both pleaded guilty prior to the trial.

perpetrated "in an effort to evade potential scrutiny from financial institutions and others about the nature of his [bitcoin] business." *Id.* This first Indictment asserted seven counts: conspiracy to operate an unlicensed money transmitting business; operating such a business; conspiracy to make corrupt payments with the intent to influence the officer of a financial institution; making such payments; conspiracy to commit wire fraud; wire fraud; and money laundering. *See generally id.* On December 1, 2015, the Government filed a Superseding Indictment against Yuri Lebedev, charging him with conspiracy to bribe the head of a federal credit union – Count Three of the Murgio Indictment. *See* Dkt. No. 19.

On March 3, 2016, the Government filed its Second Superseding Indictment ("S2 Indictment"), this time adding Trevon Gross as a Defendant. Dkt. No. 57. As in the earlier indictment, the pre-amble to this indictment began with a description of Coin.mx scheme, and ultimately alleged that "in an effort to evade potential scrutiny from financial institutions and others about the nature of Coin.mx, . . . Murgio[,] . . . Lebedev . . . and their co-conspirators acquired control of [the Helping Other People Excel Federal Credit Union, or "HOPE FCU,"] a federal credit union in New Jersey with primarily low-income members," and that "Gross . . . allowed [them] to take control of HOPE FCU and assisted their efforts in exchange for bribes." *Id.* ¶ 9. The Indictment further alleged, again in pre-amble, that "Murgio, Lebedev, and their co-conspirators operated HOPE FCU as a captive bank for their unlawful Bitcoin exchange until at least early 2015." *Id.* The S2 Indictment added a single count not present in the original Indictment: it charged Gross with receiving corrupt payments as an officer of a financial institution with intent to be influenced, in violation of 18 U.S.C. § 215(a)(2). *Id.* ¶¶ 21-22. Under Count Three, conspiracy to make corrupt payments (a count with which Gross was not then charged), the Indictment listed a number of overt acts. These included a number of

3

specific bribe payments: a May 9, 2014, payment of $15,000, a May 21, 2014, payment, of $15,000, a June 20, 2014, payment of $120,000, a November 24, 2014, payment of $6,000, and a December 2, 2014, payment of $50,000. *Id.* ¶ 18.

The Government represents – and Gross does not dispute – that immediately after indicting Gross in the S2 Indictment in March of 2016, the Government began to produce discovery to the defense discussing an entity not cited by name in the S2 Indictment: KapCharge, a payment processing company based in Canada. Gov't Opp. at 2. Discovery produced as of May 2016 indicated that Kapcharge had funded many of the bribe payments explicitly alleged as overt acts in the S2 Indictment, and that Kapcharge was the payment processing company used by the Collectables Club and Coin.mx to process Coin.mx's automated clearing house ("ACH") transactions at HOPE FCU (including its bitcoin transactions). *Id.* On April 21, 2016, the Government filed a third superseding Indictment ("S3 Indictment). Dkt. No. 87. This Indictment added a new Defendant, Michael Murgio. As in the S2 Indictment, the S3 Indictment specified that both Murgios and Lebedev had conspired, with "others known and unknown" to bribe Gross for control of his credit union. *Id.* ¶ 18. Gross thereafter filed a motion to dismiss that Indictment, which the Court denied. *See* Sept. 19, 2016 Order.[2] Trial was initially set to

---

[2] Gross moved to dismiss this Indictment on the ground, *inter alia*, that it failed to allege that Gross himself was aware that the Collectables Club was in fact a company for an illegal bitcoin exchange, and thus that the Government had not alleged that Gross acted corruptly. *See* Dkt. No. 140 at 1; *see also United States v. McElroy*, 910 F.2d 1016, 1021 (2d Cir. 1990) (observing that "[t]he conduct prohibited by § 215(a) . . . is limited to acts that are done 'corruptly.'"). In denying that motion to dismiss, the Court acknowledged that "there are no allegations [in the Indictment] that Gross knew that Murgio, Michael Murgio, and Lebedev allegedly wanted to acquire HOPE FCU to facilitate the operation of an unlawful Bitcoin exchange." Sept. 19, 2016 Order at 22. The Court noted that this was "irrelevant," as the mens rea required could be shown by demonstrating that a defendant sought to accomplish "either an unlawful end or result, or a lawful end or result by some unlawful method or means." *McElroy*, 910 F.2d at 1021. Thus, the Court explained that "Gross need not have known the precise reasons for the alleged conspirators' interest in HOPE FCU to have known that he was accepting bribes in exchange for abusing his position as an officer of a federal credit union." Sept. 19, 2016 Order at 22.

begin on October 31, 2016, *see* Nov. 17, 2015 Minute Entry, but on October 11, 2016, the Court granted Anthony Murgio's motion for a continuance, moving the trial date to February 6, 2017 (a date the Court would later continue by one week), *see* Oct. 11, 2016 Minute Entry.

### 2. Relevant Motions in Limine

Prior to the original trial date, the parties filed various motions in limine, one of which is relevant to the instant motions.

On September 12, 2016, nearly six months before trial commenced, the Government moved to admit certain records of the National Credit Union Association relating to the examination, conservatorship, and liquidation of the HOPE FCU. Dkt. No. 191 at 1. As support for its motion, the Government laid out its theory of the case. The Government stated that "evidence at trial" would establish that Anthony and Michael Murgio, with Lebedev, "in an effort to facilitate Coin.mx's operations and further evade scrutiny by financial institutions" attempted to take control of the HOPE FCU. *Id.* at 18. As part of that effort, Murgio arranged for a $120,000 bribe to be paid directly to the Hope Cathedral – the church where Mr. Gross was the pastor – through "KapCharge, a Canadian payment processing company with which Murgio worked that processed payments for Coin.mx." *Id.* The Government claimed that the evidence would show that, in exchange for these payments, Gross "gave Anthony Murgio and his co-conspirators operational control of the credit union," and that "[i]n particular, Gross permitted KapCharge to open a business account at HOPE FCU, which KapCharge began using to process millions of dollars' worth of ACH transactions for, among other businesses, payday lending companies." *Id.* at 19. Adding detail to this narrative, the Government stated that "[b]etween September and November of 2014, HOPE FCU processed as much as $3.8 million in ACH transactions per day," an order of magnitude more than the "less than $50,000 in ACH

transactions before Gross turned over control of the credit union to [the] Collectables Club." *Id.*; *see also* Jan. 12, 2017 Op. at 5 (summarizing the Government's theory of the case as including the theory that Gross gave "Murgio control of the credit union's affairs, and in particular permitted Murgio to use the HOPE FCU to process a high volume of automated clearing house ("ACH") transactions, despite the fact that the HOPE FCU lacked sufficient capital reserves to facilitate such transactions."). The Government made explicit that it intended to show "at trial" that "Gross was aware of th[e] high volume of ACH activity," as well as "the insufficient . . . controls" under the Bank Secrecy Act and Anti-Money Laundering-Act (i.e. regulations governing ACH transactions), but that Gross "nevertheless continued to permit Anthony Murgio and KapCharge to process the ACH transactions through HOPE FCU." Dkt. No. 191 at 19-20.[3]

One of the documents that the Government sought to admit into evidence was a Confidential Statement of Grounds for Conservatorship, and its contours are further relevant to the instant motions. In that statement, the NCUA stated that Gross had "solicited and accepted payments to himself and his church in exchange for relinquishing control of the credit union to the Collectables Club and KapCharge in order to facilitate high-risk ACH activity with inadequate risk mitigation." Confidential Statement of Reasons at 2. The NCUA further stated that such activity was directly tied to Gross's decision to cede control of the credit union to Murgio and the Collectables Club. *See id.* (noting that, after turning control of HOPE FCU's Board over to the Collectables Club members, Gross "took no action to prevent the new Board members from operating the credit union in an unsafe and unsound manner by engaging in excessive, uncontrolled ACH transactions").

---

[3] The Government also represented that it would prove that "Gross conspired with Anthony Murgio and individuals at KapCharge to try to manipulate HOPE FCU's net-worth ratio at the end of the quarter to trick the NCUA into believing that the credit union was adequately capitalized for the volume of ACH transactions it was processing." Dkt. No. 191 at 20.

In contending that the documents the Government sought to admit, and in particular the Confidential Statement of Grounds, should not be admitted, Gross argued, *inter alia*, that the NCUA's narrative was "expressly based in large part upon the government's charges and evidence gathered in connection with the government's criminal investigation into the Collectables Club," and that the documents "consist[ed] largely of the NCUA's interpretation of selective evidence from 2014 that was spoon fed to them by the government and contains characterizations of the evidence that mirror the criminal complaints against Anthony Murgio and Yuri Lebedev, and the Indictment in this case." Dkt. No. 203 at 6; *see also id.* at 8 (arguing that the "NCUA's factual findings merely parrot the government's theories"); *id.* at 11 ("The NCUA records, and in particular the Confidential Statement of the Grounds for Conservatorship, simply adopt the government's theories in the Indictment. The suggestion that another government agency independently arrived at the *same factual conclusions* as the government would be enormously prejudicial to Mr. Gross . . . ." (emphasis added)). In other words, for purposes of his motion to exclude, Gross acknowledged that the NCUA document – which described KapCharge and ACH processing – mirrored the Government's theories of prosecution – an argument which strongly implied that such material was part of the charging instrument Gross argued the NCUA had simply parroted.

Gross also repeatedly referenced and acknowledged the allegations that HOPE FCU had engaged in unsafe ACH transactions in arguing against the admissibility of the records. *See id.* at 9 (noting that "[t]he government argues that these 2015 records are probative of Mr. Gross's corruption because they reflect evidence of '[his] continued operation of HOPE FCU in an unsafe and unsound manner in 2015' and because they are evidence of 'Hope FCU's dogged efforts to continue processing ACH and wire transactions on behalf of the KapCharge.'" (quoting

Gov. Op. at 26)). The Court ultimately agreed with Gross that placing the NCUA's narrative before the jury would be prejudicial, and that that narrative appeared to be influenced by the indictment itself. *See* Jan. 12, 2017 Op. at 35 ("[A]dmission of the Confidential Statement of Grounds would not only allow the Government to place the NCUA's imprimatur on the factual conclusions it wants the jury to reach, but also put its own charging instruments before the jury in the guise of corroborating evidence from an independent governmental agency."). Gross's arguments in this regard, as with his other arguments in the context of these motions in limine, made clear that – as early as September 2016, he understood that the Government's theory of the case included KapCharge and ACH.

Gross did not argue in his motions in limine (or in opposing the Government's motions) that the theory the Government made clear it intended to prove at trial described an impermissibly broad bribery count. Of course, the S3 Indictment did not include the conspiracy charge ultimately included in the S6 Indictment. Nevertheless, the S3 Indictment did include the substantive bribery charge, and Gross did not argue, as he does now, that the Government's evidence of KapCharge and its ACH transactions represented a distinct quid pro quo – i.e. a distinct bribery arrangement – from the one then charged in the S3 Indictment. And it is beyond question that the theory of the case the Government ultimately pursued at trial as to the conspiracy and bribery counts was that clearly enumerated in the Government's motions.

### 3.     The S6 Indictment

On December 22, 2016, the Government filed the operative Indictment in this case: the Sixth Superseding Indictment. *See* Dkt. No. 308 ("S6 Indictment").[4] Because this Indictment's

---

[4] Prior to the filing of this Indictment, on October 27, 2016, Defendant Michael Murgio pleaded guilty to a superseding information. *See* Dkt. No. 303; Oct. 27, 2016 Minute Entry.

precise contours are relevant to the Defendant's constructive amendment and variance claims, the Court describes its text in detail.

In the pre-amble, the S6 Indictment describes two "schemes" under different headings: first, "the Coin.mx scheme," and second, "the bribery scheme." *Id.* at 2, 6. As to the first scheme, the Indictment alleges that Anthony Murgio, Yuri Lebedev, and their co-conspirators knowingly operated an illegal bitcoin exchange, "engaged in substantial efforts to evade detection" of that exchange, and deceived banks into "authorizing credit and debit payment and [ACH] transactions to purchase Bitcoins through Coin.mx." *Id.* ¶¶ 5-11. As to the bribery scheme, the S6 Indictment's pre-amble alleges that Murgio and Lebedev "and their co-conspirators acquired control of HOPE FCU" "in an effort to evade scrutiny from financial institutions and others about the nature of Coin.mx[] and to facilitate the operation of the unlawful Bitcoin exchange." *Id.* ¶ 12. The pre-amble alleges that "Trevon Gross . . . assisted Murgio, Lebedev, and their co-conspirators in taking control of HOPE FCU in exchange for bribes, which Gross directed Murgio and his co-conspirators to pay to bank accounts under Gross's control." *Id.* It further alleges that Murgio, with Gross's assistance, "installed his co-conspirators, including . . . Lebedev, . . . on the Board of HOPE FCU," and that Murgio, Lebedev and their co-conspirators "operated HOPE FCU as a captive bank for their unlawful Bitcoin exchange until at least 2014." *Id.* ¶ 14.

The pre-amble also includes details as to an obstruction of an examination of HOPE FCU by the NCUA. As examples of such obstruction, the S6 Indictment alleges that the co-conspirators "made material misrepresentations to, and withheld material information from, the NCUA concerning the installation of Lebedev and other Board members selected by Murgio on the Board of HOPE FCU," "attempted to mislead the NCUA concerning the financial health of

9

HOPE FCU and the eligibility of Lebedev and the other Board members selected by Murgio to serve as Board members of HOPE FCU," and that Murgio and Lebedev "caused a letter to be drafted and sent to the NCUA" in January 2015 "which was signed by Lebedev and two other co-conspirators not named as defendants [in the Indictment], which falsely stated that the 'Collectables Club' was 'headquartered' in Jackson, New Jersey." *Id.* ¶ 15.

The S6 Indictment asserted the following counts: (1) conspiracy to operate an unlicensed money transmitting business in violation of 18 U.S.C. § 1960 (Murgio); (2) operation of such a business (Murgio); (3) conspiracy (Murgio, Lebedev, and Gross); (4) making corrupt payments with intent to influence an officer of a financial institution (Murgio and Lebedev); (5) receiving such payments with the intent to be influenced (Gross); (6) conspiracy to commit wire and bank fraud (Murgio and Lebedev); (7) wire fraud (Murgio and Lebedev); (8) bank fraud (Murgio and Lebedev); (9) conspiracy to commit money laundering (Murgio); (10) money laundering (Murgio); and (11) aggravated identity theft (Murgio). *See generally id.*

In particular, the S6 Indictment expanded on the conspiracy count previously alleged in the S3 Indictment, adding Gross as a defendant, and adding several objects. Count Three now charged all three defendants with a conspiracy with four objects: (1) first, that Murgio and Lebedev "and others known and unknown" "would and did corruptly give, offer, and promise a thing of value to a person, to wit, a sum of money greater than $1,000, with the intent to influence and reward an officer, director, employee, agent, and attorney of a financial institution, to wit, Trevon Gross . . . the Chairman of the Board of HOPE FCU, in connection with a business and transaction of such institution, in violation of [18 U.S.C. § 215(a)(1);" (2) that Gross "would and did corruptly solicit and demand for the benefit of a person, and corruptly accepted and agreed to accept, a thing of value from [Murgio and Lebedev] ... with the intent to

10

be influenced and rewarded in connection with a business and transaction of [HOPE FCU] in violation of [18 U.S.C. § 215(a)(2)]"; (3) that Murgio, Lebedev, and Gross "and others known and unknown ... would and did corruptly obstruct and attempt to obstruct an examination of ... HOPE FCU[] by an agency of the United States with jurisdiction to conduct an examination of such financial institution, to wit, the NCUA, in violation of [18 U.S.C. § 1517]"; and (4) that Murgio, Lebedev, and Gross "and others known and unknown, in a matter within the jurisdiction of the executive branch of the Government of the United States, to wit, the NCUA, knowingly and willfully would and did falsify, conceal, and cover up by trick, scheme, and device material facts, and make materially false, fictitious, and fraudulent statements and representations, and make and use false writings and documents knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in violation of [18 U.S.C. § 1001]." *Id.* ¶¶ 23-26.

The portion of the S6 Indictment describing Count Three, in addition to expressly incorporating the allegations in the earlier portions of the indictment, *see id.* ¶ 21, also listed a number of overt acts that "among others" it alleged "were committed in the Southern District of New York and elsewhere" in furtherance of the conspiracy, *id.* ¶ 27. These included an April 2014 communication between Murgio with Gross "in an effort to take over control of the Board of HOPE FCU in furtherance of Coin.mx's operations," an April 2014 agreement on behalf of the "Collectables Club" and Gross stating that "individuals chosen by the 'Collectables Club' would be nominated for positions on the Board of HOPE FCU," and various specified payments to Gross, including a May 9, 2014, payment of $15,000, a May 21, 2014, payment of $15,000, a June 20, 2014, payment of $120,000, a November 24, 2014, payment of $6,000, and a December 2, 2014, payment of $50,000. *Id.* ¶ 27. Nowhere in the S6 Indictment does the name

"KapCharge" explicitly appear, and the overt acts for the conspiracy charge do not expressly refer to unsafe levels of ACH transactions, although the pre-amble states, under the Bribery Scheme heading, that "Murgio and Gross attempted to mislead the NCUA concerning the financial health of HOPE FCU." *Id.* ¶ 15(b).

On December 29, 2016, Murgio, Lebedev, and Gross moved to dismiss the S6 Indictment, Dkt. No. 317, a motion the Court denied orally at the January 20, 2017 arraignment, Jan. 20, 2017 Tr. at 14-15. At that arraignment, the Court granted a one-week adjournment of the trial date, to February 13, 2017. *Id.* at 28.

## B. The Evidence at Trial

In resolving a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29, the Court views the "evidence in the light most favorable to the government and draw[s] all reasonable inferences in support of the jury's verdict." *United States v. Anderson*, 747 F.3d 51, 54 (2d Cir. 2014); *see also United States v. Daugerdas*, 837 F.3d 212, 221 (2d Cir. 2016) (assessing "[t]he evidence taken in the light most favorable to the government" in addressing both sufficiency-of-the-evidence and constructive amendment challenges). Viewing the evidence in the light most favorable to the Government, the evidence at trial proved the following.

### 1. Coin.mx and the Lead-up to the Bribery Scheme

In the fall of 2013, Anthony Murgio started Coin.mx, a bitcoin exchange, based in Florida. Tr. at 465-468, 1206. Around the same time, Murgio also created a front company, the Collectables Club, with which to disguise, when helpful, the true nature of Coin.mx and present it to the public as a group of like-minded individuals seeking to trade valuable memorabilia on the internet. Tr. at 488-89, 498, 1275-76. Such secrecy was necessary because of certain

difficulties faced by the bitcoin exchange: Murgio, Lebedev, and other individuals working for Coin.mx faced consistent difficulties in running bitcoin transactions through conventional banks, as the banks would generally shut down accounts when and if they discovered the accounts were being used to exchange bitcoin. *See* Tr. at 516 (in which an employee of Coin.mx, Jennifer Wotherspoon, observes that banks would frequently shut down accounts when they discovered that they were used for bitcoin transactions); *accord* Tr. at 1277-79. Murgio and Lebedev thus misled banks in various ways to hide the true nature of the bitcoin transactions, such as by making it appear that transactions were for the Collectables Club (and other, non-bitcoin businesses) and instructing customers to lie to banks. Tr. at 515, 517, 529-30, 1278-80.

### 2. The Bribery Scheme

Murgio and Lebedev's efforts to deceive the banks were not always effective. Banks, upon discovering that certain transactions were not what they seemed, frequently refused to process such transactions. Tr. at 516. Thus, Murgio developed a plan to go around the banks altogether, by taking control of a federal credit union, where he could run bitcoin transactions without scrutiny. Tr. at 1280-81. As the Government demonstrated at trial, to start a credit union requires an application process, whereby an individual would have to fill out an application that goes through the National Credit Union Association's Office of Consumer Financial Protection and Access. Tr. at 1057-58. Murgio did not attempt to found his own credit union. Instead, he decided to purchase one. As it happens, credit unions are member-owned not-for-profit entities that cannot, as a formal matter, be bought or sold. *See* Tr. at 1058; *see also* Tr. at 1054 (in which a witness from the National Credit Union Association testified that "[Credit unions] offer the same products and services [as banks], except a credit union is a member-

13

owned, not-for-profit [that] serve[s] their field of memberships").[5] Murgio thus crafted a plan to

pay the head of a federal credit union to take control of the credit union. In particular, he offered

payments—bribes—to Trevon Gross, the head of the Helping Other People Excel Federal Credit

Union ("HOPE FCU") in Lakewood, New Jersey, and the Pastor of a closely-affiliated church,

the Hope Cathedral, to take full control of Mr. Gross's credit union. Tr. at 1281, 1283. As the

jury ultimately determined, Gross accepted those payments and joined this scheme.

The details of the agreement between Murgio and Gross, as fleshed out in witness

testimony and e-mail communications, were as follows: Murgio would provide to Gross a

$150,000 payment, denoted a "donation," and given not to Gross directly, but to the Hope

Cathedral, in exchange for the relinquishment of control of the credit union. *See* Tr. at 1283-85;

Ex.[6] 1081-D (e-mail communications between Gross and Murgio). In return, Gross promised to

hand control of the credit union's Board to Murgio, who would select his chosen candidates to be

appointed to the credit union's Board of Directors. Tr. at 1284. Gross would initially nominate

these individuals, although they would be chosen entirely by Murgio. Tr. at 1284. Several

months later, the rest of the "legacy Board members" (currently running the credit union) would

resign. Tr. at 1285.[7] The plan was for the new board members to be elected in June 2014. Tr. at

---

[5] The HOPE FCU bylaws explicitly reflected this principle, stating that HOPE FCU "[was] a member-owned, democratically-operated, not-for-profit organization managed by a volunteer board of directors with the specified mission of meeting the credit and savings needs of consumers, especially persons of modest means." Tr. at 1112.

[6] Unless otherwise noted, "Ex." refers to a Government exhibit admitted at trial.

[7] Gross informed Murgio that the legacy board members should not resign immediately, so as to avoid sending up any red flags for the NCUA. *See* Tr. at 1001 (in which Gross, in a May 12, 2014 e-mail states: "At the conclusion of June annual meeting, current board members, except me, will tender their resignations effective September 1st. This date is set because we have our annual examination on July 7th. [The NCUA] like[s] to come back and meet with the board about a month afterwards to discuss findings, and we don't want them to see an entirely new board at that meeting. That normally happens in August. All members have agreed to see this through to September 1. After the June meeting, you all will have majority vote on the board, so there is no turning back at that point.").

1293. As to the payments, of the $150,000, $15,000 would be due immediately, after which time Gross would ensure that members of the Collectables Club would be nominated to the HOPE FCU Board. Ex. 1092-B; Ex. 1108-A; Ex.1081-D. Another $15,000 would be due later, at which time the Board would ratify the proposed members. Ex.1092-B; Ex. 1108-A; Ex. 1081-D. Finally, after the annual election installed Murgio's chosen Board members, the balance of the $120,000 would be due.[8] As this deal suggested, and as the evidence at trial clearly established, each act Gross would take to assist the Collectables Club in taking control of HOPE FCU was tied to a particular payment. *See, e.g.*, Ex. 1108-A (in which, on May 12, 2014, Gross tells Murgio: "The [Credit Union's] Executive board has placed in nomination the six names. This Saturday, they will be confirmed to be placed on the ballot for the June Annual Meeting. A couple of things need to happen asap: . . . Final installment on Current [Memorandum of Understanding] (wired to PNC Bank) [Hope Cathedral's operating and payroll account]."). Finally, although evidence at trial made clear that Murgio initially *sought* control of a credit union in order to further the ends of his bitcoin exchange,[9] it was also clear from the inception of

---

[8] The Government introduced numerous emails among and between co-conspirators, providing the details of this agreement. *See, e.g.*, Ex. 1092-B; Tr. at 994 ("Upon receiving these funds by Friday, May 9th, the executive board will meet and recommend for election to the board six (6) people from your organization. The six seats will give you the majority position on the board. The whole board will ratify your nomination on May 17th, by which time we would like to have received the second 15K dollars donation. Once your names are placed in nomination, the six people will be officially elected to the board at the June annual meeting. This is the only time when we can change board members. You will have to designate who among your new board will serve as chairman, secretary, treasurer, and supervisory committee chair. The existing board members will tender their resignations to be effective at your choosing. Before this vote happens, the remainder of the donation to assume control of the CU would need to be received.").

[9] Gross concedes that the Government proved that he knew Murgio was interested in "virtual currency" and that Gross "had heard of Coin.mx," but he disputes that the evidence showed that Gross "had any knowledge that Coin.mx was an unlawful bitcoin exchange, or that the Collectables Club was a sham front company for an unlawful Bitcoin exchange." Def. Br. at 10. He similarly notes that Ricardo Hill never testified that he told Gross "that the purpose of Coin.mx taking control of the HOPE FCU was to process Bitcoin transactions." *Id.* In fact, there was evidence that Gross was aware that the Collectables Club was a bitcoin exchange: Hill testified that Anthony Murgio described the "Collectables Club [as] an association . . . [with] a platform that our members can buy, sell, and trade digital currency and digital assets" during a meeting among Gross and prospective board members. Tr. at 1292. Hill testified that Murgio, on those calls, spoke about his "plan going forward, and why [he] wanted a credit union," and specifically described how the credit union "would extend the functionality of Coin.mx." Tr. at 1292. Evidence

the plan that he did not simply want to pay Gross for the ability to do bitcoin transactions. Instead, he agreed to pay Gross for "full control of the credit union" – control which he would then wield at his and his Board members' discretion. Tr. at 1283-84. The parties memorialized their agreement in writing. *See, e.g.*, Ex. 1071; Ex. 2510-A.[10]

After agreeing to the overall contours of this deal, Murgio, Gross, and other co-conspirators, including Lebedev, proceeded to put it in motion. Murgio, in keeping with the agreement, selected a set of prospective Board members consisting of his "friends and colleagues." Tr. at 1283.[11] It was a requirement of the credit union that members lived, worked,

---

further suggested that Gross was aware of Coin.mx and that at least one Collectables Club member had been involved in it. *See* Tr. at 1285 (where Hill testified that Murgio never asked him not to mention Coin.mx or bitcoin to anyone at HOPE Federal Credit Union, suggesting the existence of Coin.mx and Murgio's involvement was not a secret to Gross); Tr. at 1356 (in which Hill discussed his work on Coin.mx with Gross, and Gross did not seem surprised). In short, there was evidence that Gross knew that the Collectables Club in fact dealt in digital currency, and that Murgio hoped to forward the operations of Coin.mx at HOPE FCU. Gross is correct, however, that there was no direct evidence that he was aware that Coin.mx or the Collectables Club was an *illegal* bitcoin exchange.

[10] As further evidence that Gross entered this deal corruptly – i.e. with the intent to be influenced as a result of accepting a financial payment, rather than simply out of a good-faith belief that the arrangement was in the best interests of his credit union – the Government pointed to several facts in its closing that demonstrated a marked lack of due diligence on Gross's part. The Government noted correctly that the facts indicated that Gross signed a memorandum of understanding outlining a deal to give Murgio extensive control of the HOPE FCU only two weeks after Murgio first approached him about purchasing a credit union. *Compare* Ex. 1071, *with* Ex. 2510-A; *see also* Tr. at 3910 (Gov't Closing). Further, evidence at trial established that Murgio had had prior legal troubles with taxes and bankruptcy, and that these had culminated in at least one arrest. Tr. at 531-32. More than one witness testified that he or she had been able to easily find this information on the internet through a google search in 2012. Tr. at 532, 1270-71. Such evidence, however interpreted by the jury, also suggested corrupt intent on Gross's part: if the jury inferred that Gross must, given the ease with which such information could be gleaned, have discovered this information on his own, it would suggest that Gross entered into a deal with an individual with no vetting and in spite of evidence he was not financially trustworthy. If, on the other hand, Gross failed to discover this information, it underscored how little diligence he performed prior to agreeing to hand over control of his credit union – with its numerous low-income members – to a stranger (in exchange for a $150,000 payment to Gross's church). Either way this evidence, as with other evidence, supported the jury's verdict that Gross understood the money to be a bribe, rather than a good-faith payment by a legitimate business partner.

[11] The Government introduced evidence that Gross did no material vetting of the individuals Murgio selected to the board. Ricardo Hill, an employee of Coin.mx, testified that the prospective board members engaged in a conference call with Gross prior to nomination to introduce themselves. Tr. at 1291-92. The topic of their professional or financial experience did not come up at these meetings. Tr. at 1292. Hill further testified that at no point prior to becoming a board member of HOPE FCU did Trevon Gross or anyone else from the credit union ask him for his qualifications, , though he had two prior convictions for armed robberies, Tr. at 1211, and that he never visited the credit union in New Jersey, Tr. at 1293. Meg Flok, an NCUA examiner, testified that employees of credit unions were required to go through a background check to ensure they did not have criminal histories, in particular to ensure that such backgrounds did not have access to non-public credit union information. Tr. at 2319-20.

or worshipped in Lakewood, NJ.[12] Tr. at 1067. Nevertheless, at the time that Murgio entered into his initial deal with Gross, none of these individuals lived, worshipped, or worked in Lakewood. *See* Tr. at 1286-87.[13] Notwithstanding this issue – and consistent with the financial agreement in place between the parties – Gross opened accounts at HOPE FCU for each of the prospective Board members. Tr. at 1296-97.

Pursuant to the agreement, Murgio caused the contemplated payments to be sent to Hope Cathedral. On May 9 and 21, 2014, he made two $15,000 wire transfers from a Bank of America account used by the Collectables Club into Hope Cathedral's account at PNC Bank. Ex. 800-B; Ex. 800-H; Ex. 853-B; Ex. 900 at 15-22); Tr. at 1250-52 (testimony of Andrew Levy, a Bank of America employee).

On June 21, 2014, the HOPE FCU had a Board meeting at which various members of the Collectables Club attended virtually. Tr. at 1298. At that meeting, the members were elected to the Board. *See* Tr. at 1299-1300. Trevon Gross remained the Chairman. Tr. at 1322.[14] On June

---

Nevertheless, Gross did not vet Ricardo Hill prior to giving him access to the backend of the credit union. *See* Tr. at 1293, 1298-1301, 1345; *see also* Tr. at 1349 (where Hill testifies that he was responsible for various HOPE FCU functions including "changing passwords for customers of the credit union").

[12] HOPE FCU's field of membership was limited to "(1) persons who live, work, worship or attend school in, and other businesses, and other legal entities in Lakewood, New Jersey; (2) spouses of persons who died while in the field of membership of this credit union, volunteers in the community, employees of the credit union, and organizations of such persons." Tr. at 1067.

[13] Ricardo Hill testified that the Collectables Club did not have a formal presence in Lakewood, New Jersey or any employees who worked there, and that the proposed board members did not live there. Tr. at 1287. Evidence indicated that Gross was aware that these individuals did not live in Lakewood, and that such would be required for membership. *See* Ex. 1108A (in which, on May 12, 2014, Gross e-mails Murgio: "Final nomination and ratification of the change of the board will happen this Saturday. We then have one month to put all the pieces in place as to the operations, setting up a branch in Florida, establishing a presence in Lakewood . . . ."). Ricardo Hill testified that the fact that none of the nominated directors lived in New Jersey, in concert with the payments made to Gross, suggested to him that the deal was not "legitimate." Tr. at 1287.

[14] Once elected to the Board, Board members received payment not from HOPE FCU, but directly from the Collectables Club. Tr. at 1318-19. Gross himself also received additional funds, denoted "consulting fees." *See, e.g.*, Tr. at 1323, 1330, 1338 (Hill discussing Gross's consulting fees). These payments, ultimately totaling more than $12,000, were made by both the Collectables Club and Kapcharge. *See, e.g.*, Tr. at 1338.

23, 2014, Murgio arranged for the $120,000 payment to be made to Hope Cathedral. Ex. 1317-B; Ex. 1317-E; Ex. 1317-F; Ex. 1317-H; Ex. 800-B; Ex. 800-D. Thereafter, Murgio and his co-conspirators continued to pay Gross fees, denominated consulting fees and ultimately totaling more than $12,000, for his continued service as chairman, through at least November 24, 2014. *See, e.g.*, Tr. at 1323, 1330, 1338 (Hill discussing Gross's consulting fees).[15]

### 3. Kapcharge and ACH Processing

The Government also introduced evidence at trial that a third entity was involved in the bribery scheme described above: KapCharge, a payment processing company based in Montreal, Canada. *See* Ex. 1317-B; Ex. 1317-E; Ex. 1317-F; Ex. 1317-H; Tr. at 1155 (describing "Kapcharge [a]s a third-party payment processor, which means they are a third party that processes various types of electronic payments on behalf of other merchants or businesses, companies, or individuals, through their own account at a particular financial institution."); Tr. at 1376. KapCharge, although based in Canada, had an account at the HOPE FCU. Tr. at 1155. Like the Collectables Club, KapCharge had no office in Lakewood, NJ, nor employees there. Tr. at 1379. Its principals were friends and colleagues of Anthony Murgio. Tr. at 1376.

The evidence demonstrated that Kapcharge was interconnected with the central bribery scheme – i.e. the agreement between the Collectables Club and Gross to pay Gross to further the ends of the Collectables Club – in multiple ways.

First, KapCharge funded the majority of the bribery payments offered to transfer power of the credit union to the Collectables Club and Murgio: KapCharge reimbursed Murgio after the

---

[15] These payments included an August 2014 $1,750 payment to Hope Cathedral, Ex. 800-B; an October 6, 2014, $1,500 payment to Hope Cathedral, Ex. 6206; an October 7, 2014 payment of $3,000 to Hope Cathedral, Ex. 790-B; and a November 24, 2014 $6,000 transfer to Hope Cathedral, Ex. 807; Ex. 856-B; Ex. 6206.

Collectables Club wired the first two $15,000 payments to Hope Cathedral. *See, e.g.*, Ex. 1316-A; Ex. 1316-B; Ex. 1321. After the Collectables Club took over the Board, Murgio arranged for KapCharge to directly send the $120,000 corrupt payment to Hope Cathedral, where Gross was the pastor. Ex. 1317-B; Ex. 1317-E; Ex. 1317-F; Ex. 1317-H. The Government introduced evidence at trial that Gross was aware that KapCharge was the source of this payment. *See* Ex. 1317-E; Ex. 1317-F (email from Kapcharge dated June 20, 2014 for payment of $120,000 forwarded by Murgio to Gross).[16] KapCharge also paid a portion of Gross's consulting fees, and evidence demonstrated that Gross was aware that his consulting fees were paid by the collectables club *and* Kapcharge. *See, e.g.*, Tr. at 1331 (discussing an e-mail in which Gross directs that a payment be sent from KapCharge to the Collectables Club and then to his account at the credit union). Evidence suggested that Murgio himself lacked the money to fund these bribe payments on his own and that Kapcharge, then, with its more substantial financial resources, served as a key player in ensuring that the deal could go forward. *See, e.g.*, Ex. 1316-A (in which Murgio, seeking reimbursement from Kapcharge for the first $30,000 in bribe payments, notes that "[b]ecause of [his] personal financial situation due to [him] not taking a salary and paying for things out of [his] own pocket for this project and other[s] . . ., [he] would appreciate if [he could] be reimbursed for the remaining $5,000" of the early bribe payments from Kapcharge).

As the Government argued in its opening statement, in exchange for funding these bribery payments – which, as noted, were the very payments Murgio had promised Gross in exchange for Gross furthering the ends of the Collectables Club – Kapcharge itself stood to

---

[16] Gross himself testified that he did not know Kapcharge was the source of any of these payments or had any business relationship with Murgio until November 2014, Tr. at 3598-99, although he admitted he ultimately learned this information at that time, *id*.

receive a benefit: it was permitted to use the credit union to process ACH transactions.[17] *See* Tr. at 337; Ex. 1316-A (in which Murgio explains to Kapcharge that ACH processing is just beginning at the credit union, and recommends "treading very lightly" prior to the NCUA's annual inspection so as not to set off red flags and jeopardize the future ability to run ACH transactions through the credit union).

Although Kapcharge's motive was its ability to use HOPE FCU to further its own ends – the processing of ACH transactions – evidence at trial made evident that it stood to gain from – and *funded* – the central scheme between Murgio and Gross: to pay Gross to transfer control of the HOPE FCU to Murgio. This conclusion flowed from numerous facts in the record. First, KapCharge's fate appeared – at least prior to 2015 – bound up with Murgio's: Murgio kept KapCharge apprised of the progress of the scheme to take over the Board of the credit union (which Kapcharge was funding), *see* Tr. at 1301 (in which Murgio blind copied Kapcharge's principals, Sheila Cohen and Mark Francis, on an e-mail to the new board members); Murgio communicated with Kapcharge about how best to start ACH transactions at the credit union and ensure KapCharge could successfully run those transactions through it, Ex. 1316-A; and Murgio used his influence and increasing power at the credit union – purchased with KapCharge's money – to help Kapcharge in multiple ways. To name the two most significant: "Shortly after [the Collectables Club] had taken over the board" in June 2014, Kapcharge formally became a member. Tr. at 1377. And it was Murgio – and employees of Coin.mx – who worked closely with Gross to process ACH transactions for KapCharge after they gained control of the credit union's board. *See* Tr. at 1206, 1345 (in which Ricardo Hill, an employee of Coin.mx and ultimately the operations officer of HOPE FCU from the summer of 2014 through November

---

[17] KapCharge processed transactions for various companies, including Transferwise, a money transmitting business, as well as various payday lenders. Tr. at 1155-56.

2014, testified about processing ACH transactions KapCharge); Tr. at 1384-85 (in which Hill testified that, at first, processing such transactions for KapCharge took very little time, but as volume increased, it began to take up hours of each of his work days).

Further, evidence made clear that Murgio was the key driving force in pushing the credit union to process these ACH transactions: indeed, Gross himself argued in his opening statement that Murgio was "very aggressive and reckless about" ACH transactions, insisting upon increasing volume at an unsustainable rate. Tr. at 378-79. The evidence provided multiple explanations for why Murgio wanted to serve Kapcharge's interests, although the most obvious was the simplest: that KapCharge's participation helped Murgio gain control of the credit union. *See* Ex. 2587 (in which, in a May 8, 2014 whatsapp exchange with his father, Murgio and his father debate exactly what percentage of KapCharge's processed funds Murgio should ask for, before Murgio states "eh, whatever, as long as I have control, this is a great opportunity and im happy for it, don't want to push too much.").

Kapcharge was also interconnected with the central scheme in another way: in addition to processing a high-volume of ACH transactions for its own purposes, KapCharge processed transactions for the Collectables Club itself. *See* Ex. 781 (Spreadsheet of KapCharge's ACH transactions through HOPE FCU). Record evidence made clear that Kapcharge processed hundreds of thousands of dollars in ACH transactions for the Collectables Club, and further made evident that such transactions – in keeping with Murgio's stated reasons for entering the deal in the first place – included bitcoin transactions for Coin.mx. *See id.* (including many transactions for the Collectables Club for an individual named "Phong Le"); Tr. at 557-58 (establishing that Phong Le was a customer of Coin.mx).[18]

---

[18] The Defendant correctly notes that record evidence made clear that the vast majority of KapCharge's ACH transactions were not for Coin.mx or the Collectables Club. *See* Def. Br. at 11. The Defendant nevertheless

In addition to proving that Kapcharge funded the bribe payments designed to put Murgio and other Collectables Club members on the board of the credit union and that Kapcharge, in exchange for these payments, received the right to use the credit union for its ACH transactions, the Government offered substantial evidence that the credit union's processing of ACH transactions was unsafe for the credit union.

First, Hill—for whom Gross served as a supervisor, *see* Tr. at 1392-93—testified that he made no effort to comply with various regulations governing how credit unions process, report, and inspect ACH transactions, *see* Tr. at 1506. Those regulations included the Bank Secrecy Act and regulations of the Office of Foreign Asset Control. *See* Tr. at 1506; *see also* Tr. at 1900-03 (describing those legal regimes). More generally, the Government introduced evidence that the volume of ACH transactions at the credit union throughout the fall of 2014 reached unsafe levels.

Second, the Government introduced evidence that over the course of the fall (through November 2014), the volume of ACH transactions at the credit union began to increase exponentially at Murgio and KapCharge's urging – notwithstanding increasingly urgent

---

also suggests in his brief that the evidence did not establish that KapCharge – or even HOPE FCU – processed bitcoin transactions for Coin.mx. *Id.* at 10-11. As noted above, spreadsheets of ACH transactions for KapCharge provided sufficient evidence for the jury to reasonably find that KapCharge did process bitcoin transactions for Coin.mx – to the degree that such a finding was, in any event, ultimately necessary or relevant to its verdict.

    Gross further argues that, even if KapCharge processed some bitcoin transactions for the Collectables Club, most of its ACH transactions for Murgio and his cohorts were not related to bitcoin, but payroll transactions. *Id.* at 11. Putting aside the relevance of this point, it too is not a required inference. Gross points out that the transfers detailed in the spreadsheet of HOPE FCU ACH transactions were "in small dollar amounts and the records show repeat payments to employees [of the Collectables Club] like Jen Wotherspoon and Rico Hill, consistent with payroll transactions." *Id.* at 11. Some of the ACH payments fit this bill – but, as noted, many are for individuals whose names did not appear in the trial transcript, some are for an individual identified as a Coin.mx customer in that transcript, and the values range from several hundred dollars to many thousands of dollars – transaction amounts that are perfectly consistent with bitcoin transactions. *See* Ex. 160-A (featuring screenshots of the Coin.mx web-site that lists recent bitcoin purchases ranging from $6.81 to $2775.52). In short, given Murgio's clear plan to use the credit union to further the operations of Coin.mx, a reasonable jury could easily have concluded based on the evidence that he did *just* that – and that Kapcharge's involvement was important to that mission.

warnings from HOPE FCU's corporate credit union that these volumes were unsafe. *See, e.g.,*

Tr. at 1423-28 1431; Ex. 2215; Ex. 4507. In a September 18, 2014 conversation, Michelle

McDowell, a manager at Alloya (the corporate credit union processing financial transactions for

HOPE FCU), expressed to Gross concern about the increasing volume of ACH transactions

given the level of capitalization at the credit union. *See* Ex. 791-T; *see also* Tr. at 1396-97 (in

which Hill testified that Gross informed him that, in general, a credit union should have "at least

10 percent of [its] transaction volume on [its] operating account"). In particular, McDowell

expressed concern that the NCUA – when it inspected the credit union – would object to the

volume of ACH transactions. Ex. 791-T at 4. Gross indicated that he understood the main

concern of the NCUA would be whether the credit union was sufficiently capitalized and

whether it was complying with relevant regulations, such as the Bank Secrecy Act. *Id.*

Ultimately, Alloya expressed concerns that the credit union did not have sufficient capitalization

or credit to be able to process increasingly high volumes of ACH transactions – including $1.8

million in ACH transactions per day – and that the credit union officers lacked sufficient

experience and adequate protocols to comply with relevant standards and regulations. *See* Tr. at

1848-50. Absent such capitalization, the high volume created a risk that, if something went

wrong, the credit union would foot the bill, and also risked violating NCUA regulations. When,

after this meeting, volume continued to increase at the credit union – to the point where Gross

authorized the credit union to process up to $5 million in ACH transactions for Kapcharge per

day, Tr. at 1424 – Alloya ultimately ceased processing ACH transactions for the credit union on

November 10, 2014, Ex. 2228; Tr. at 1850-51. At that point, Gross secured a replacement

processor, the United Advantage Northwest Credit Union, to process ACH transactions, by

greatly understating the volume of ACH transactions he anticipated the credit union would process. *See* Tr. at 1439, 2373-77; Ex. 2300; Ex. 3559.

The Government repeatedly made clear at trial that it did not want the jury to convict Gross for negligently processing ACH transactions, and that ACH transactions were perfectly legal. *See, e.g.*, Tr. at 3949. Instead, the Government argued that the ACH transactions – given their danger to the credit union – were evidence that Gross was acting under the influence of bribes, rather than in the best interest of his credit union. *See, e.g.*, Tr. at 4142 (Gov't Rebuttal: "Now, defense counsel also argued that there is nothing inherently illegal about nominating people to the board of a federal credit union, that there's nothing inherently illegal about processing ACH transactions. Of course, there's not. That's besides the point. Standing alone, those are perfectly legal activities, but you have to look at all the circumstances. You have to look at all the facts about why Trevon Gross and Yuri Lebedev did what they did. What makes the defendants' conduct illegal is that the decisions were being made concerning the ACH processing and the board nominations as a result of the bribes.'); *see also* Tr. at 3949 ("[T]he fact that both Gross and Lebedev ignored those rules and, thus, undermined the safety and soundness of HOPE FCU as board members so that they could enrich themselves is evidence that you can consider in determining whether or not they acted corruptly."). A reasonable jury could certainly have so concluded based on the trial evidence.

### 4. The Fallout Between Gross and the Collectables Club

The scheme ultimately hit a rough patch. The Government introduced evidence of a meeting on November 22, 2014, in New Jersey at Hope FCU's office (located at the Hope Cathedral) which included Hill, Freundt, Murgio, and Gross. Tr. at 1507. Although one legacy Board member briefly appeared at the location, no other legacy board members were in fact at

the meeting itself. Tr. at 1507. At this meeting, the parties agreed to fully and finally relinquish control of the HOPE FCU to the Collectables Club, with Gross himself stepping down. Tr. at 1509 (Hill: "We eventually came to an agreement to take complete control of the credit union and have the rest of the -- well, the old board members as well Trevon step down."). Hill testified that such resignation was contingent upon a $50,000 final payment as well as payment for Gross's previous two months of consulting work. Tr. at 1509, 1523.

The recording of this meeting was introduced into evidence at trial. Ex. 2506-T. It included extensive evidence of every element of the alleged scheme. In that recording, Gross discusses ongoing membership problems associated with members of the Collectables Club not living in New Jersey. *Id.* at 5-7. He admits that he had been "tap danc[ing]" with the NCUA, given the increased regulatory scrutiny the credit union was facing. *See id.* at 12 ("To have all of these examiners, one after another after another after another, come through here. *And the tap dances we've been doing* . . . ." (emphasis added)). He states that all of the members of the Board, including him, had been "negligent" in allowing the high volumes of ACH transactions, which he suggested both threatened the credit union because of capitalization issues and because of insufficient regulatory controls, *id.* at 16; *see also id.* at 15 ("We don't even have enough to cover one day of something going wrong."); *id.* at 14 ("[W]e can't certify that all the people we let money pass through this credit union to go to weren't doing something illegally with the money."). He makes clear that it was *Murgio* who insisted on the high volume of ACH transactions – and that Gross *allowed* such volume, although was uncomfortable with it, because of an understanding that Murgio had control of the credit union, and because he had been *paid* to acquiesce in Murgio's plans. *Id.* at 18 ("My point is, the direction with KapCharge[,] the volume with KapCharge, even though you know I did not agree with all that volume, I never called a

25

board meeting, which I could have done. There are a whole bunch of things I could have done in the whole process if I really wanted to derail this, and get, and *steal your money* if that's what you're, you know." (emphasis added)). Gross made clear that, since the initiation of the deal, he had understood the credit union to be Murgio's, and had acted accordingly. *Id.* at 25 ("And I, I'm gonna say, 'your credit union.' Because I believe how I've operated from day one is it's your credit union."). Finally, growing increasingly frustrated, Gross indicates that to continue the plan, he wants additional money given to the church: "Honestly, what I want, what I want is, give the donation to the church like you said." *Id.* at 31; *see also id.* (Murgio: "OK"); *id.* at 34 (affirming that, for the legacy board members to resign, the $50,000 donation to the church "should . . . happen immediately"). Finally, lest anything in the meeting had been unclear, Gross sums up the final resolution: "Just so we're clear. Monday, by Monday, there will be emails sent in to the secretary of the board, who right now is Ricardo, stating resignations from the board. Correct. And upon receipt of those, Monday, the 50k that the church is due, will be sent in." *Id.* at 36. After this statement, Murgio, asking Gross to remain on the Board, notes, "[Y]ou get your, your 6k on top of that too." *Id.* at 38.

Despite this meeting of the minds, the deal ultimately fell apart. Shortly after the meeting, resignation letters began to roll in from various board members. Tr. at 1525. Nevertheless, the members of the Collectables Club – although they made a $6,000 final consultant payment as agreed – failed to make the $50,000 payment on time. Tr. at 1526. The Collectables Club members attempted to wire the untimely payment, but Gross rejected it. Tr. at 1528. Over the next few days, Gross terminated the Collectables Club board members' access to the credit union's back end and email accounts. Tr. at 1528-29. The Collectables Club members continued to correspond with Gross, hoping to change his mind, but were ultimately

26

unsuccessful. Tr. at 1529-30. Although he had not accepted the $50,000, Gross did not return the $6,000 "consulting" payment. *See* Tr. at 2130-32, 1526.

### 5. Gross Continued to Work with KapCharge after the Fallout

The Government also introduced evidence that, after the fallout with the Collectables Club, Gross continued to work with KapCharge and sought to do ACH transactions with it. *See, e.g.*, Tr. at 2920. Ultimately, the credit union processed ACH transactions for KapCharge, notwithstanding explicit instructions from NCUA examiners not to do so. Tr. at 2924-25. The Government also introduced evidence that Kapcharge made two additional payments to the Hope FCU after the fallout: a $50,000 payment on May 5, 2015, and a $30,000 payment on October 9, 2015. Ex. 806-B at 34, 45.

### 6. The Cover-up

Finally, the Government also introduced extensive evidence of misrepresentations Gross and other co-conspirators made to the NCUA that, individually and collectively, concealed the true nature of the relationship of Gross, the Collectables Club, and KapCharge, and facilitated Gross's transfer of control to the Collectables Club (including, but not limited to, the processing of ACH transactions). Such misrepresentations began in 2014 (well prior to the fallout between the Collectables Club and Gross) but continued into 2015 (well after this fallout).[19]

---

[19] Such evidence of ongoing misrepresentations – including misrepresentations disguising Gross's relationship with the Collectables Club – were significant to the Government's theory that Gross, although refusing to work further with the Collectables Club in 2015, did not withdraw from a conspiracy whose objects included not only bribery, but also false statements and obstruction. *See United States v. Berger*, 224 F.3d 107, 118 (2d Cir. 2000) ("[R]esignation from [an] enterprise does not, in and of itself, constitute withdrawal from a conspiracy as a matter of law . . . [as] even if the defendant completely severs his or her ties with the enterprise, the defendant still may remain a part of the conspiracy if he or she continues to do acts in furtherance of the conspiracy and continues to receive benefits from the conspiracy's operations." (quoting *United States v. Antar*, 53 F.3d 568, 583 (3d Cir. 1995))); *id.* at 119 (finding that "[e]ven if [a defendant] truly severed all ties to [a] conspiracy after his resignation ... lies [to law enforcement] . . . reestablished his link by helping to conceal the conspiracy from investigators."); *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1199 (2d Cir. 1989) ("[T]he trial court found that the

Most broadly, the Government introduced evidence that Gross and other co-conspirators misled the NCUA about the formation of the relationship among the Collectables Club, HOPE FCU, and KapCharge – or, put simply, that they lied about the bribery scheme. For example, Meg Flok, the examiner for the NCUA, visited the credit union on December 1, 2014. Tr. at 2460. She testified that she visited 216 River Avenue in Lakewood, NJ – the address provided to the NCUA for both Kapcharge and the Collectables Club to establish their eligibility for membership in the credit union – in part because she did not feel Gross had provided her clarity as to "how [Hope FCU] g[o]t in touch with [Kapcharge, and h]ow . . . they g[o]t in [a] relationship with this business?" Tr. at 2461-63. Later, at the credit union, Flok asked Gross how KapCharge, a Canadian company, came to partner with the credit union. Tr. at 2466. Gross did not, at that time or any other, tell Flok what the jury ultimately found to be the truth: that he met KapCharge as a result of a deal with Murgio in which KapCharge and Murgio paid large sums to Gross's church in exchange for Gross handing control of his credit union to the Collectables Club. Tr. at 2466. ("And again, at that point I had asked, 'How did this business from another country come to this tiny town in New Jersey and start doing business with and wants to do all those ACH transactions with you?' And [Gross] said, 'It was a blessing. And it was one person told another person and another person,' and I never really got the straight answer of how did they got in touch with them."); Tr. at 2467 ("Now, to be clear, over the course of your examination of the HOPE Federal Credit Union, all your conversations with Mr. Gross,

---

statements . . . were in furtherance of the conspiracy because they were designed to 'cover up' [certain conspiratorial matters]."); *see also* Tr. at 2815-16 (In which counsel for Gross stated: "[To] the extent that there are allegations that there is evidence that suggests a cover up of what happened in 2014, that might fairly be within the scope of the conspiracy."); Tr. at 2816 ("Court: [T]here's not withdrawal if there's continued attempts to cover up the conspiracy, right? . . . [Counsel for Gross]: I don't disagree with that as a legal framework . . . .").

did he ever disclose to you that payments had been made to his church by KapCharge or Collectables Club? A: No.").

Second, and relatedly, Gross and his co-conspirator made misrepresentations as to when and whether the Collectables Club members had been added to the Board of directors – again, to prevent raising red flags with the NCUA. In an email to members of the Collectables Club, Gross made evident two facts: first, that he understood it would raise red flags if the NCUA discovered a sudden and complete change in the board of the credit union, and second, that it was necessary to take steps to prevent that from occurring. *See* Ex. 1108-A ("At the conclusion of June Annual Meeting current board members (except me) will tender their resignations effective September 1. This date is set because we have our annual [NCUA] examination on July 7th. [The NCUA examiners] like to come back and meet with the board about a month afterwards to discuss findings and we don't want them to see an entirely new board at that meeting. That normally happens in August."). To that end, the credit union's June 30, 2014, NCUA profile, filed on July 25, 2014, made no mention of the new board members – notwithstanding the requirement, listed on the first page of the profile, that "each operating insured credit union must update their credit union profile within 10 days after the election or appointment of senior management or volunteer officials, or within 30 days of any change of the information in the profile." Ex. 6111. The September 30, 2014 profile (filed on October 24, 2014) did include the names of the new board members, Ex. 6112 – although the Government introduced evidence that those names were included only after Gross became concerned that the NCUA was paying special attention to the credit union's membership, *see* Ex. 1216-A (in which Gross expresses such concern).

More saliently, Gross and his co-conspirators made misrepresentations designed to prevent the NCUA from finding out that various members and officers of the credit union, as well as the Collectables Club and KapCharge, were not eligible for membership on the basis of the field of membership rules. Gross suggested to Murgio, on June 17, 2014, that he begin to list the Collectables Club's address as 216 River Avenue, in Lakewood, NJ – notwithstanding the fact that there was no functioning, physical office at that location for the Collectables Club or KapCharge, and no employees worked there. *See* Tr. at 495, 1491-92, 1505-06, 2461-63, 2521-22; Ex. 1167-A.[20] Hill also testified that, at Gross's instruction, he changed the address of the Collectables Club as listed in HOPE FCU's electronic records to reflect the Lakewood address. Tr. at 1493. In October 2014, Gross also represented to an NCUA examiner that employees of the Collectables Club worked part-time at the Lakewood, NJ, location, Tr. at 2585-86, notwithstanding the fact that that was not the case, *see* TG 53.[21] In a September 2014 meeting with NCUA examiners, Gross represented that Ricardo Hill – a new member – would soon be moving to New Jersey. Tr. at 1447. Hill testified that he had no intention of moving. Tr. at 1448.

---

[20] Murgio and the Collectables Club ultimately had a document created, in August of 2014, stating that the Collectables Club not only had an address at 216 River Avenue, but had had one there since April 2014 (when Michael Murgio first e-mailed Gross initiating a relationship, *see* Ex. 1071). Ex. 1352-C. Ricardo Hill testified that they kept the document in case it was necessary to present it to NCUA regulators. Tr. at 1495.

[21] One notable misrepresentation occurred when NCUA examiner Meg Flok came to the credit union for an examination in November 2014 and requested the account opening documents for Kapcharge. Tr. at 2327. Gross represented that they were in storage. *Id.* In fact, record evidence permitted the reasonable inference that a completed account opening document had never been made, *see* Ex. 1235 (in which, in August 2014, Gross appears to forward an incomplete account form for Kapcharge, backdated to May 23, 2014, to Murgio), and it was clear that, as Flok waited for the file, Gross, Murgio, and others simultaneously worked to create and backdate the application – as well as to help KapCharge add the Lakewood, NJ address to its web-site and simultaneously list that address in Hope FCU's electronic system, *see* Ex. 4506 at PK 4083-4212; Ex. 1665; Ex. 6131; Ex. 1291. Gross eventually provided the just-created file to Flok, claiming it had been retrieved from a storage facility. Tr. at 2328. Admitting the truth – that no file had ever existed – would not only have suggested that Gross and his co-conspirators were not running the credit union with care and diligence, but would have raised questions about how KapCharge came to be a member of the credit union – questions Gross, as already noted, generally evaded when Flok asked them. *See* Tr. at 2467.

Gross and others also worked to conceal the existence of the Tallahassee Florida branch

of the credit union, in which Coin.mx employee Ricardo Hill worked to process ACH

transactions for KapCharge and, as noted, the Collectables Club and Coin.mx. The existence of

this office was not included in the credit union's September 30, 2014 NCUA profile (filed on

October 24, 2014). Ex. 6112 at 27. Meg Flok, the NCUA examiner, testified that she was

unaware of the existence of this location when she visited HOPE FCU for an inspection in

November 2014. Tr. at 2317-19. She testified that there were numerous reasons why she would

want to know if individuals could access the back end of the credit union from Florida. *See* Tr.

at 2318-19.[22] A reasonable jury could have concluded that the failure to divulge the existence of

the Florida location served to hide the true nature of the credit union's relationship with the

Collectables Club.

Finally, the Government introduced evidence that Gross and his co-conspirators

misrepresented the true net worth ratio of HOPE FCU to hide the fact that it lacked sufficient

capitalization to safely handle the volume of ACH transactions it was processing for KapCharge.

In a September 15, 2014 conversation among Gross, Murgio, Hill, and the principals of

Kapcharge, Gross explained that the volume of ACH transactions relative to the level of

---

[22] Flok testified that "Well, there's several concerns with having remotely somebody else accessing the core system. There's a physical concern. What type of device are they using? Is there device encrypted? Where is this device stored? There is obviously the security of the network. What type of connection are they using to connect to the credit union's core? Also, network security. Is this device credit union's own device or is it personal device? In general, personal devices should be prohibited from using because the credit union doesn't have any control over this device, which means they cannot make sure that this device has up-to-date antivirus. There is no control of installing security patches. They can't make sure that is there a web filtering to make sure that nobody goes on any type of websites that are known for malicious software and installing different things on this device. And as soon as you connect to the core of the credit union, all those viruses can automatically infect the credit union." Tr. at 2318-19. Flok also testified that she would be concerned as to who was accessing the credit union's back end at such a location, and in particular concerned as to whether such an individual had a criminal history. Tr. at 2319; *see also* Tr. at 1345 (in which Ricardo Hill, who had a criminal record, testified that he accessed the credit union's back end – including issues that went well beyond ACH transactions, such as "account creation for new members," from the location in Florida).

capitalization in the credit union at the end of a month could raise a red flag if capitalization fell below seven percent. Ex. 2502-T at 10. Ultimately, evidence suggested that Gross and his co-conspirators then took steps, at the end of the month, to misrepresent the true amount in the KapCharge account – in order to make it appear to the NCUA that there was sufficient income in Hope FCU's own account to adequately capitalize the credit union. In particular, Gross and other members of the Collectables Club delayed posting an incoming wire of $2.25 million from Kapcharge until October, Ex. 2163; Ex. 2166, and then processed a request to transfer out of the account more than $619,000 on September 30, 2014, which Kapcharge then reversed on October 6, Ex. 2173. In short, Gross manipulated the numbers in order to hide the credit union's true level of capitalization from the NCUA and thereby facilitate the continued processing of ACH transactions for KapCharge and cover up, generally, the Collectables Club's activities at the credit union.[23]

## C. Jury Instructions

During the course of the trial, the parties debated the necessity and contours of multiple jury instructions. As several of those instructions are relevant to the Defendants' arguments as to constructive amendment and variance, the Court highlights them here.

### 1. Defining the Conspiracy

First, several weeks into trial – well after the Government had already introduced extensive evidence detailing the existence of KapCharge and the ACH transactions at HOPE FCU – the issue of constructive amendment first arose. Counsel for Lebedev –not Gross –

---

[23] The Government also introduced evidence at trial that, in 2015, a conservator for the NCUA requested access to all of the email accounts associated with the credit union, and that Gross, in complying with the request, did not turn over accounts associated with members of the Collectables Club. *See, e.g.*, Tr. at 2942-44.

initially raised the issue in the context of a debate over a limiting instruction detailing the relevance of several categories of evidence, including evidence of Gross's continued work with KapCharge *after* the fallout. *See* Dkt. No. 426. Lebedev argued that the conspiracy in Count Three of the Indictment "relate[d] to the efforts of the Collectables Club members to take over HOPE FCU." *Id.* at 2. He agreed that KapCharge was a relevant player in the charged conspiracy. *See* Tr. at 3171 ("I think that Kapcharge is . . . encompassed within the conspiracy"). Counsel for Lebedev argued, however, that Gross's work with Kapcharge *after* the fallout was no longer related to this central conspiracy, and thus outside of its scope. Tr. at 3171.

Over the course of the next several days, the parties debated the proper contours of limiting instructions to address the relevance of certain categories of evidence against each defendant (including material that would come in post-fallout), and, relatedly, the precise scope of the conspiracy alleged in the indictment. Ultimately, the Court adopted the following formulation of the conspiracy to provide to the jury:

> Count One charges Yuri Lebedev and Trevon Gross with conspiring with others, from in or about April 2014 to in or about 2015, to achieve four unlawful objectives in an effort to further the operations of Coin.mx or the Collectables Club: Number one, to make corrupt payments to Trevon Gross with the intent to influence Trevon Gross in connection with the business of HOPE FCU; number two, to have Trevon Gross receive or agree to receive corrupt payments with the intent to be influenced in connection with the business of HOPE FCU; number three, to obstruct an examination of HOPE FCU by the NCUA; and number four, to make false statements to the NCUA in connection with the NCUA's examinations of HOPE FCU.

Tr. at 4182. The purpose of this instruction – in concert with other limiting instructions addressing certain categories of evidence the jury could consider for limited purposes, *see* Tr. at 4200-01, was simple. The Government sought to introduce what was inarguably *relevant* evidence, including evidence of Gross's involvement with KapCharge *after* the falling out with the Collectables Club. To the degree that any of this evidence described conduct that was not

itself *part* of a narrowly-constructed understanding of the conspiracy in the Indictment, however, the Court sought to ensure that the jury would understand the relevance of this evidence properly, and not rely on it as *direct* evidence of that conspiracy. *See* Tr. at 3187 (Court: "I'm looking for assistance from all sides as to if part of the instruction to the jury really constrains their understanding of the charged conspiracy in some narrow terms, how then to appropriately limit their consideration of any postfalling out evidence.").

The debate among all three parties as to the proper limiting instructions revealed a number of disagreements. First, the Government consistently argued for a broader definition of the conspiracy, and maintained that the language of the Indictment supported the conclusion that the conspiracy charged as Count Three was properly defined as a conspiracy "to make corrupt payments to Trevon Gross with the intent to influence Gross's decisionmaking in connection with the business of HOPE FCU in favor of members of Coin.mx and the Collectables Club and other individuals." Dkt. No. 438 at 1; *see also* Tr. at 3497-99. In the Government's estimation, Count Three fully and unambiguously encompassed any agreement between Gross and KapCharge for Gross to allow the credit union to process ACH transactions – regardless of the relationship of such an agreement to the Collectables Club. In support of this contention, the Government made numerous – and reasonable – arguments about the scope of the language of the S6 Indictment. *See, e.g.,* Tr. at 3497 ("[T]he statutory allegations in our indictment are, in fact, broader than the Court's proposal.").

Lebedev, in contrast, endorsed the precise formulation of the conspiracy count as articulated by the Court. *See* Tr. at 3491. He objected, however, to an alternative proposal by Gross to simply point the jury to the Indictment, fearing such an instruction would be confusing

and fail to adequately protect him from being convicted of acts that – although probative of the existence of the conspiracy – were not in fact part of it. Tr. at 3500-01.

Gross asked that the Court point the jury to the Indictment or, in the alternative, offer a narrower understanding of the conspiracy. *See, e.g.*, Tr. at 3489-90. Focusing on specific speaking language from the Indictment (as well as language included in the first alleged overt act, but not the others), Gross argued that the conspiracy should be defined more narrowly as one to facilitate "the takeover [of] HOPE FCU in furtherance of an unlawful Bitcoin exchange." Tr. at 3487. In other words, in Gross's estimation, the core of the conspiracy was not simply one to pay Gross bribes in order to cede control of his credit union to Murgio and the Collectables Club (for which Murgio's *motive* might be the furtherance of an unlawful bitcoin exchange), but a conspiracy in which all parties, including Gross, explicitly agreed to work together to further the operations of an unlawful bitcoin exchange. Seeing no basis for such a narrowing, the Court rejected it. *See* Tr. at 3175.[24]

In sum, the Court adopted an understanding of the conspiracy that required that, to convict Gross or Lebedev, the jury had to find that Gross and others agreed for Gross to accept bribe payments to make decisions at his credit union in order to assist the Collectables Club – and that Gross and others made false statements and obstructed an NCUA examination for the purpose of concealing and facilitating this plan. As Lebedev himself repeatedly acknowledged,

---

[24] Gross also argued that the Court's language "in connection with the business of HOPE FCU" should be narrowed further, to state that the conspiracy was entered into "to facilitate the takeover [of] the HOPE credit union." Tr. at 3489. The Government argued that such a framing might "unduly narrow the jury's consideration to just literally the change of the board membership" – i.e. the June vote – rather than understanding the conspiracy as broader – to offer Gross bribe payments to generally cede control of his credit union to Murgio and the Collectables Club and to operate the credit union on their behalf. Tr. at 3503. The Court, noting that the statutory allegations in the conspiracy included a timeframe that extended into 2015 (long past the June nominating process), and that the overt acts included numerous payments from May 2014 through December 2014, concluded that the conspiracy described an ongoing process of paying Gross for control of the credit union, and was not framed around a distinct, temporally limited "takeover," and thus rejected Gross's suggestion. *See* Tr. at 3503.

nothing in this formulation – by design – limited the possibility that another player might have been involved – to the degree that that other player sought the same objective: to pass control of the credit union to the Collectables Club. *See* Tr. at 3171 ("The shared goal [of the conspiracy] was the takeover, I think, of HOPE FCU by Coin.mx – I mean the Collectables Club. And to the extent Kapcharge is involved in that, those activities are certainly encompassed there.").

In adopting this formulation of the conspiracy, the Court did *not* hold that failure to adopt this instruction would lead to a constructive amendment of the Indictment, nor reject as overly broad the Government's framing. The Court made clear that its instruction was prophylactic. *See* Tr. at 3187 ("[I]f I'm concerned that the government's drawing of the conspiracy *could be construed* as a constructive amendment . . .. and I think a limiting instruction with the conspiracy more narrowly defined *can* effectively solve any potential problem in that regard, I'm inclined to do it." (emphases added)); Tr. at 3504 ("[T]o the extent there is a distinction between the language proposed and what I am going with, it's, at most, a variance, if that, and not – I can't see it as a constructive amendment."); Tr. at 3867 (in which the Court noted that it had defined the conspiracy in a particular, prophylactic way, but that "there's an argument that [it] could be read more broadly than that").

In other words, the Court adopted a narrower understanding of the conspiracy as a prophylactic to ensure the Defendants' grand jury rights were protected.

### 2.    Other Relevant Jury Instructions

The Court also issued a number of other jury instructions relevant to the instant motions.

First, the Court agreed, over the Government's objection, to include multiple-conspiracies and withdrawal charges. *See* Tr. at 3505-06; *see also* Tr. at 4196 (withdrawal charge); Tr. at 4198 (multiple conspiracies charge). As all parties acknowledged, these

instructions were designed to – in concert with the narrowly defined conspiracy framework –

make it easier for the defense to make arguments to the jury that certain evidence presented by

the government, even if relevant, was not itself part of the conspiracy as charged. *See* Dkt. No.

390 at 2 (in which Gross suggests, in opposing the Government's second motions in limine, that

evidence of ACH and KapCharge go beyond the conspiracy as charged, and argues solely that as

a remedy for such a problem he "will likely seek a multiple conspiracies jury instruction as the

government's case unfolds"); Tr. at 3862 (in which the Government acknowledges that the

"withdrawal and multiple-conspiracies instructions that were included over the government's

objection . . . permit the defense to make . . . arguments [that certain statements or other conduct

are not overt acts in furtherance of the charged conspiracy], that what we're doing is beyond the

scope of the conspiracy and, therefore, is something different");

Second, the Court, in providing a jury instruction describing the overt act requirement,

instructed the jury as follows: "[T]he overt act need not be one that is alleged in the indictment.

Rather, it can be any overt act that is substantially similar to those acts alleged in the indictment,

if you are convinced beyond a reasonable doubt that the act occurred while the conspiracy was

still in existence and that it was done in furtherance of the conspiracy as described in the

indictment." Tr. at 4193. In so instructing, the Court essentially adopted the Defendant's

preferred framing of this instruction over the Government's objection. *See* Dkt. No. 367 at 59-60

(in which the Defendant, over the Government's objection, requests an instruction that an overt

act must be "substantially the same" as one charged in the Indictment). The Court again adopted

this language as a safeguard against constructive amendment. *See United States v. Frank*, 156

F.3d 332, 338 (2d Cir. 1998) (noting, in rejecting a constructive amendment challenge, that "the

district court's use of the 'substantially the same' language *avoided* prejudice to the defendants

by ensuring that they would not be convicted on the basis of an overt act that differed in any significant way form the overt acts specified in the indictment."); Tr. at 3869 (Court: "And I do think that the charge, in multiple ways, safeguards against any confusion [as to the contours of the conspiracy] on this point. That was the exercise in defining the conspiracy. That was the exercise in the limiting instructions and the like. That's the exercise in the substantially similar overt act language. So I think we're guarded against it."). This instruction was particularly significant given because Gross – although he objected to the precise language of the Court's ultimate limiting instruction defining the scope of the conspiracy – sought, instead, to have the Court instruct the jury to look to the indictment – the precise directive that this particular limiting instruction urged. Tr. at 3490.

In sum, the Court issued numerous limiting instructions to the jury that, collectively, defined the scope of the conspiracy and ensured that the jury would not consider, as overt acts, any acts that were not taken in furtherance of the conspiracy as defined.

### D.    Closing Arguments

Finally, after all parties had presented their cases, and the Court had settled on the final jury instructions, the parties made their closing arguments.[25]

In its closing, the Government made its theory of the case clear:

This is . . . a case about a scheme in which Gross helped Lebedev and his cronies get elected to the board of directors of HOPE Federal Credit Union, so long as

---

[25] Prior to closing arguments, counsel for Gross raised a concern that the Government – in citing to evidence the Court had admitted as relevant but that was arguably not in furtherance of the conspiracy as narrowly defined in the Court's limiting instruction – might suggest to the jury that such evidence was not simply relevant but itself described *overt* acts in furtherance of the conspiracy. *See* Tr. at 3868. After agreeing with counsel for Gross that such a distinction existed, the Court asked counsel – should the Government cross the line in its closing and invite the jury to convict Gross on the basis of overt acts not in furtherance of the conspiracy as prophylactically defined – that counsel make a contemporaneous objection. *See* Tr. at 3868 ("I think with my appreciation for trying to avoid objections during the closing, I think I will ask if you think this line has been crossed, I will ask you to make the contemporaneous objection, so I can consider it."). No such objection was made.

> Gross' church got over $150,000 in corrupt payments, a scheme which Lebedev joined, so that Coin.mx could use HOPE FCU as a captive credit union to process its financial transactions without having to use any banks, and a scheme that allowed for Kapcharge, a Canadian-based processing company, to run tens of millions of dollars in ACH transactions, including for Coin.mx, through that small credit union.

Tr. at 3875. As this description made evident, the Government emphasized the central element of the conspiracy – the deal to hand control of the HOPE FCU Board to the Collectables Club. *See* Tr. at 3899 ("[Y]ou know that the scheme was pretty simple, for the Collectables Club members from Florida to bribe Gross so that he could join HOPE FCU, a small credit union in New Jersey, to take control of that credit union so that they could use it to process their own transactions through a Canadian-based payment processing company called KapCharge."); Tr. at 3901 (noting that the relevant payments were "bribes to get Trevon Gross to handover control of HOPE FCU to the Collectables Club"); *id.* ("[I]n return for those payments, Gross agreed to give control of the board of directors to the credit union, and thus control over operation of the credit union, to the Collectables Club and its members"). Nevertheless, the Government made clear that KapCharge, and its ACH transactions, were an important part of this story – and provided key evidence of corrupt intent. *See, e.g.*, Tr. at 3900 ("KapCharge ....and its president . . . were involved in the scheme from the very beginning."); Tr. at 3904 ("Directors are not supposed to put their own interests or the interests of specific members, such as Collectables Club or KapCharge ahead of all the other members of the credit union.").

In response, Gross's defense focused largely on a single, highly disputed question: whether, in accepting payments from the Collectables Club and KapCharge for his church, he acted with corrupt intent, or whether he instead made business decisions (even certain ultimately mistaken ones) in good faith – i.e. not in exchange for bribes. In particular, Gross echoed an argument he had also made in his opening statement: "If Trevon Gross is a bribe taker, why did

he give back in early December 2014 $50,000 that he received?" Tr. at 4048-49; *see* Tr. at 4065 ("If you're accepting a bribe, if you're soliciting a bribe, if you're acting with corrupt intent, do you turn away $50,000, an amount almost equal to a full year's salary, salary that some years he never received? $50,000, by any measure, is a lot of money. It can be a corrupting amount of money to people, and, yet, he turned it down. What does that tell you about corrupt intent, bad faith, or his good faith?"); *see also* Tr. at 380-81 (Opening Statement: "And you're going to know that the $50,000 that was discussed at this meeting wasn't a bribe because Anthony Murgio, within a week, tries to send Pastor Gross that $50,000 again, and Pastor Gross says, no, I don't want it, I'm done with you, I want no part of you, you're a bad business partner, you've lied to me, and I'm moving on. He rejects it and he turns it back. If you're going to take a bribe on Monday but you're not going to take it a week from Monday? That doesn't make any sense."). His closing thus echoed the basic theory he had laid out in his opening: "[w]hat the government . . . called a bribe . . . was actually a business transaction that started with the best of intentions, took a lot of unexpected turns, and was ended by Pastor Gross himself, within six months, when he realized that he couldn't trust Anthony Murgio and the Collectables Club. It was not a bribe." Tr. at 368.[26]

In its rebuttal, the Government addressed Gross's argument that his return of the $50,000 payment was proof that he lacked corrupt intent as follows: "Now, Mr. Klingeman also asked: If Trevon Gross is a bribe-taker, why did he return that $50,000 to Anthony Murgio in November

---

[26]In his opening, Gross's counsel also addressed Gross's relationship with KapCharge after the fallout with the Collectables Club, arguing that the Board of Directors of the credit union "didn't think [their problem] was ACH processing . . . [or] Kapcharge," but Anthony Murgio. Tr. at 382-83.

2014? You now know why - because at that point, Trevon Gross had already struck another deal behind Anthony Murgio's back to work directly with Kapcharge . . . ." Tr. at 4138.

On March 17, 2017, the jury convicted Gross of all counts with which he was charged. Tr. at 4359-60.

## II. Legal Standard

Under Federal Rule of Criminal Procedure 29, a district court "will grant a motion to enter a judgment of acquittal on grounds of insufficient evidence if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (citing Fed. R. Crim. P. 29(a), (c)). The Second Circuit has stated that "[a] defendant who challenges the sufficiency of the evidence to support his conviction 'bears a heavy burden.'" *Id.* (quoting *United States v. Finley,* 245 F.3d 199, 202 (2d Cir.2001)). "Not only must the evidence be viewed in the light most favorable to the Government and all permissible inferences drawn in the Government's favor, but the jury verdict must be upheld if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)).

Under Federal Rule of Criminal Procedure 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Nevertheless, although a "trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, . . . it nonetheless must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'" *United States v. Ferguson,* 246 F.3d 129, 134 (2d Cir. 2001) (quoting *United States v. Sanchez,* 969 F.2d 1409, 1414 (2d Cir.1992)). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *Id.*

41

In challenging his convictions on several grounds, Gross does not specify whether, as to each, he seeks a judgment of acquittal or a new trial. *See generally* Def. Br. Regardless of the precise contours of Gross's challenges, the Court holds that each is without merit.

## III.    Constructive Amendment and Prejudicial Variance

Gross argues, first, that evidence and argument presented at trial related to KapCharge's membership at HOPE FCU, and the processing of ACH transactions for KapCharge (including transactions that were not for the Collectables Club, but for other companies, including payday lenders) constructively amended the conspiracy as described in the S6 Indictment. In the alternative, he argues that such evidence constituted a prejudicial variance from allegations presented in that indictment. *See* Def. Br. 22-33.

### A.    Constructive Amendment

### 1.    Legal Framework

"To prevail on a constructive amendment claim, a defendant must demonstrate that 'the terms of [an] indictment are in effect altered by the presentation of evidence and jury instructions which so modify *essential elements* of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *United States v. D'Amelio*, 683 F.3d 412, 416 (2d Cir. 2012) (quoting *United States v. Mollica,* 849 F.2d 723, 729 (2d Cir. 1988)). Because the doctrine of constructive amendment protects a defendant's Grand Jury Clause rights, a constructive amendment constitutes a "per se violation" of the defendant's constitutional rights – i.e. there is no requirement that a defendant make a specific showing of prejudice. *Id.* at 417. In contrast to a constructive amendment, "[a] variance occurs when the charging terms of the indictment are left unaltered, but the evidence at

trial proves facts materially different from those alleged in the indictment." *Id.* (quoting *United States v. Salmonese,* 352 F.3d 608, 621 (2d Cir. 2003)). The Second Circuit has "consistently permitted significant flexibility" in how the Government proves the essential crime alleged, "provided that the defendant was given notice of the core of criminality to be proven at trial." *Id.* (quoting *United States v. Rigas*, 490 F.3d 208, 228 (2d Cir. 2007) (emphases omitted); *see also Salmonese*, 352 F.3d at 619 ("[A]s long as [a] defendant is 'given notice of the core of criminality to be proven at trial,' this court has afforded the prosecution 'significant flexibility' to prove the conspiracy's operation through both unalleged and alleged overt acts." (quoting *Frank,* 156 F.3d at 338)).

In determining whether a constructive amendment has occurred, a court begins by delineating the "core of criminality" of the crime alleged. The "core of criminality . . . involves the essence of a crime, in general terms." *United States v. Daugerdas*, 837 F.3d 212, 225 (2d Cir. 2016) (alteration in original) (quoting *D'Amelio*, 683 F.3d at 418). It does not, however, include "the particulars of how a defendant effected the crime." *Id.* (quoting *D'Amelio*, 683 F.3d at 418); *see also id.* ("[T]here is no constructive amendment when the proof at trial does no more than supply the particulars.").

The Second Circuit has, on several occasions, explicated how a court defines the core of criminality of a charge alleged in an indictment. The Second Circuit has held that "the object of a conspiracy constitutes an essential element of the conspiracy offense." *United States v. Roshko*, 969 F.2d 1, 5 (2d Cir. 1992). It has also stated that, although an indictment "drawn in general terms" may articulate a broad core of criminality, an indictment that is drawn in specific terms may be read to specify a narrower set of facts – such that the proof of completely distinct facts at trial could lead to a constructive amendment. *See United States v. Wozniak*, 126 F.3d

105, 109-10 (2d Cir. 1997) ("[T]he indictment could have charged Wozniak generally with offenses involving controlled substances in violation of 21 U.S.C. § 841(a)(1) without mention of any specific drug. Had all the counts of the indictment not specified cocaine and methamphetamine, the conviction based solely on marijuana evidence might stand."). On the other hand, the Second Circuit has made clear that the mere existence of specificity in an indictment does not automatically narrow the core of criminality to the precise facts alleged; instead, factual allegations that do not prove essential elements of a charge are not part of the conspiracy. *See United States v. Danielson*, 199 F.3d 666, 670 (2d Cir. 1999) (holding that "[t]he essential element of the offense charged was that [the defendant] possessed ammunition that had traveled in interstate commerce, not the precise nature of that ammunition," notwithstanding a to wit clause in the indictment that provided clear factual specificity as to the precise nature of the ammunition); *United States v. Mucciante*, 21 F.3d 1228, 1235 (2d Cir. 1994) ("We acknowledge that Paragraph 17 contains boilerplate language that 'repeated and realleged' earlier background paragraphs. . . . [B]ecause the allegations that Mucciante gave Berger the counterfeit bonds need not be proved to convict Mucciante of violating section 479, they cannot fairly be read to limit the basis for convicting Mucciante under counts 6 though 9."); *see also D'Amelio*, 683 F.3d at 422 ("[T]he *specific means* used by a defendant to effect his or her crime does not constitute an 'essential element' of the offense and, therefore, proof of specific means apart from those charged in the indictment does not constructively amend the indictment."). Further, although allegations of overt acts in an indictment may narrow the scope of the core of criminality, general factual allegations leading into the statutory allegations "add nothing but gloss," and thus "need not be proved." *United States v. Attanasio*, 870 F.2d 809, 816-17 (2d Cir. 1989).

After identifying the core of criminality, a court must then determine whether the evidence or jury instructions at trial created a substantial likelihood that the defendant was not convicted of the crime described in that core, but of a crime "distinctly different" from the one alleged. *D'Amelio*, 683 F.3d at 419-21. The Second Circuit has "consistently permitted significant flexibility in proof, provided that the defendant was given *notice* of the *core* of criminality to be proven at trial." *United States v. Banki*, 685 F.3d 99, 118 (2d Cir. 2012) (quoting *Rigas*, 490 F.3d at 228). To that end, to demonstrate a constructive amendment, a defendant cannot simply show that the facts diverged greatly from those alleged in the indictment.[27] Instead, to demonstrate a constructive amendment, a defendant must show that the evidence and jury instructions created a substantial likelihood that a defendant was convicted for "behavior *entirely separate* from that identified in the indictment." *United States v. Bastian*, 770 F.3d 212, 223 (2d Cir. 2014) (quoting *Danielson*, 199 F.3d at 670); *United States v. Rosenthal*, 9 F.3d 1016, 1022 (2d Cir. 1993) ("The danger, in all [constructive amendment] cases, [is] that the defendant could have been convicted for conduct entirely different from that charged in the indictment.").

As this standard suggests, the Second Circuit has made clear that a constructive amendment does not occur where the facts at trial involve not a "distinctly different complex set of uncharged facts" but "a single set of discrete facts consistent with the charge in the indictment." *D'Amelio*, 683 F.3d at 419; *see also id.* at 421 (distinguishing cases where the facts at trial "fell completely outside th[e] core of criminality" from those where there was merely a

---

[27] Indeed, to even show a *variance* – which represents a divergence of *lesser* significance than a constructive amendment – a defendant must demonstrate that "evidence at trial proves facts *materially* different from those alleged in the indictment." *D'Amelio*, 683 F.3d at 417 (quoting *Salmonese*, 352 F.3d at 621); *see also Frank*, 156 F.3d at 337 n.5 ("When dealing with proof of an essential element of the offense, the difference between a 'constructive amendment' and a variance seems to us to be merely one of degree.").

variance). To that end, the Second Circuit has found a constructive amendment only in such circumstances: where an *entirely distinct* set of facts was proved at trial. A review of Second Circuit cases explicates this conclusion.

In *United States v. Roshko*, an indictment charged the defendants with a conspiracy to change the immigration status of "an alien." 969 F.2d at 4. The Government contended at trial, however, that the conspiracy involved *two* aliens – and attempted to prove a conspiracy with an entirely distinct object (although some involving overlapping players). *See id.* at 5-6.[28] The Court, concluding an entirely different crime may have been proven, reversed the conviction. *See id.* at 6.

In *United States v. Zingaro*, the indictment described a "series of unlawful gambling debt collections at various Yonkers social clubs." *Rosenthal*, 9 F.3d at 1022 (describing *United States v. Zingaro*, 858 F.2d 94 (2d Cir. 1988)). At trial, the Government, instead, "introduced proof of the unlawful collection of a debt that was not mentioned in the indictment and that was *unrelated* to the activities of the identified social clubs." *Id.* (emphasis added) (citing *Zingaro*, 858 F.2d at 94). The *Zingaro* Court concluded that evidence of an uncharged debt "'fell entirely outside the criminal scheme alleged' in the indictment, and the defendant had no 'inkling' that he was charged with this criminal act." *Rosenthal*, 9 F.3d at 1022 (quoting *Zingaro*, F.3d at 103). Again, the Circuit reversed.

In *Wozniak*, "the defendant was charged with conspiracy to possess with intent to distribute cocaine and methamphetamines as part of a seventy-six-count superseding indictment involving eight individuals," but "[t]he evidence at trial connecting the defendant to the drug ring

---

[28] The constructive amendment argument was particularly relevant given that the defendant argued that if the indictment *did not* encompass a second object – to change the immigration status of a distinct alien – then the prosecution was now time-barred, as the conspiracy had accomplished its object at a much earlier date. *See Roshko*, 969 F.2d at 6-7.

showed only his *use* of cocaine and marijuana and his possession with intent to distribute

marijuana, but not possession with intent to distribute cocaine and methamphetamines as charged

in the indictment." *D'Amelio*, 683 F.3d at 420 (describing *Wozniak*, 126 F.3d at 106-08)).

Again, the Court found this to be a constructive amendment. *See id.*

Finally, in *United States v. Milstein*, an indictment alleged that a defendant had

"misbrand[ed]" drugs "due to his repackaging of" those drugs – one of a number of specific

ways the Government could prove the essential element of misbranding under 21 U.S.C. § 352.

401 F.3d 53, 65 (2d Cir. 2005). At trial, the Government added an entirely distinct theory of

misbranding: that the defendant had misbranded the drugs "because they were not sterile." *Id.*

The inclusion of this entirely distinct theory of misbranding – i.e. a totally different way of

proving an essential element of the charge not referenced in the indictment – constructively

amended the charge. *See id.* at 65-66.

In contrast, the Second Circuit has repeatedly rejected claims of constructive amendment

where the facts – even to the degree that they materially differed from those in the indictment –

ultimately proved the same overall scheme. In *United States v. Knuckles*, "the defendants [were]

charged with distribution of heroin, but at trial, the evidence showed that the substance

distributed was cocaine." *D'Amelio*, 683 F.3d at 419 (citing *United States v. Knuckles*, 581 F.2d

305, 308-09 (2d Cir. 1978)). The charge informed the jury that it could convict if it found "that

the substance involved was either heroin or cocaine." *Knuckles*, 581 F.2d at 308. Nevertheless,

the Second Circuit rejected the claim that such a divergence created a constructive amendment,

and highlighted the fact that the government's proof described a "single set of facts": the "tabling

operation for a controlled substance at a particular time and place." *Id.* at 312. Because these

"operative facts" were the same, the variance in the narcotic itself "was not substantial" and did

not create a constructive amendment. *See id.*; *see also id.* (rejecting the idea that there had been a constructive amendment, as the divergence did not create a "complex of facts distinctly different from that which the grand jury set forth in the indictment" (internal quotation marks omitted)).

In *United States v. Dupre*, 462 F.3d 131, 140-41 (2d Cir. 2006), the Second Circuit noted that, even where "the only wire transfer actually alleged in the indictment was not proven," *Rigas*, 490 F.3d at 228 (describing *Dupre*), "the evidence at trial concerned the same elaborate scheme to defraud investors as was described in the indictment," *Dupre*, 462 F.3d at 140-41; *see also Rigas*, 490 F.3d at 229 ("The indictment and the evidence at trial contained the same starting and ending dates of the conspiracy, and the prosecution demonstrated the same overall scheme—that defendants misled investors into believing that they would eventually be able to obtain certain funds belonging to family members of former Philippine president Ferdinand Marcos."). Again, no constructive amendment. *See Dupre*, 462 F.3d at 140-42.

In *D'Amelio*, an indictment charged a defendant with "us[ing] a facility and means of interstate commerce to persuade, induce, entice, and coerce [a minor] to engage in sexual activity. . . to wit, . . . [the defendant] used a computer and the Internet," to entice the minor." *D'Amelio*, 683 F.3d at 414. The district court concluded that its jury instructions allowing the jury to convict the defendant for using "both the Internet and telephone" constructively amended the indictment. *Id.* at 415-16. The Second Circuit reversed, and held that, because the Government – in proving that the defendant had used a telephone, and not simply the internet, to effect his crime – had proved "a single course of conduct" as charged in the indictment – a deviation in the facts of that course of conduct did not "meaningfully broaden the indictment." *Bastian*, 770 F.3d at 221 (quoting *D'Amelio*, 683 F.3d at 423)).

Finally, in *United States v. Banki*, the indictment alleged that the defendant had made false statements to the Government as to the source of certain wire transfers, identifying his cousin – a non-citizen – rather than his father – a citizen – as the source of the transfer. 685 F.3d 99, 119 (2d Cir. 2012). The implicit theory of materiality as to this lie was that, in identifying a non-citizen, the defendant suggested that the transfers were outside the jurisdiction of the relevant government agency, which could "only regulate the conduct of U.S. citizens and residents." *Id.* at 118. After the defense argued that the true source of the funds was the defendant's uncle – not a U.S. Citizen – the Government shifted its theory of materiality, and argued that, even if that were so, the statements were material as the uncle "had been under investigation." *Id.* The Second Circuit held that such a shift did not constitute a constructive amendment, even as it added a distinct theory of materiality in response to a shifted fact. That was because "[e]ven assuming there was a cha[n]ge in theory at trial to the extent that the government suggested an additional motive for the false statement . . . the proof at trial and brief reference in the government's rebuttal summation related to the same statements in the same letters as described in the Indictment." *Id.* at 119.

In short, as these cases make clear, to prove a constructive amendment, a defendant must show that the evidence and jury instructions at trial completely shifted the core of criminality – i.e. proved "behavior *entirely separate* from that identified in the indictment." *Bastion*, 770 F.3d at 223 (quoting *Danielson*, 199 F.3d at 670)).

Finally, and as that standard suggests, a district court's jury instructions are of primary importance in a constructive amendment analysis. The Second Circuit has repeatedly stated that, "constructive amendment to occurs when the government's presentation of evidence *and* the district court's jury instructions combine to modify essential elements of the offense

charged . . . ." *Wozniak*, 126 F.3d at 109 (emphasis added) (quoting *United States v. Vebeliunas*, 76 F.3d 1283, 1290 (2d Cir. 1996)).[29] Thus, in the context of constructive amendment decisions, the Court has, at times, reversed a conviction where the district court either *refused* to give a limiting instruction defining the scope of a conspiracy or relevance of certain evidence, or where it gave an instruction defining the conspiracy too broadly. *See, e.g., id.* ("Wozniak argues that while the indictment specifically charged him with offenses involving cocaine and methamphetamine, the thrust of the prosecution's case, which consisted almost entirely of marijuana evidence, and the court's jury charge completely changed the theory of the case."); *Roshko*, 969 F.2d at 6 ("While the district court did not explicitly instruct that the alteration in Irene's status was an object of the conspiracy, it refused a defense request that the court charge that the 'alien' referred to in the indictment be identified as Meir alone. Moreover, the district court admitted the evidence relating to Irene's application to the INS without any limiting instruction."). In contrast, the Second Circuit has emphasized the power of limiting instructions to *prevent* constructive amendment even where the evidence points to the potential of multiple conspiracies. *See, e.g., Frank*, 156 F.3d at 338. So too has it emphasized "the almost invariable assumption of the law . . . that jurors follow their instructions." *United States v. Joyner*, 313 F.3d 40, 47 (2d Cir. 2002) (quoting *Shannon v. United States*, 512 U.S. 573, 585 (1994)).

2.    **Analysis**

---

[29] The Sixth Circuit has explicitly held that a constructive amendment cannot happen *solely* because of the evidence presented at trial, but that *both* the evidence and the jury instructions must amend the indictment. *See United States v. Mize*, 814 F.3d 401, 409 (6th Cir. 2016) ("[W]e have held that a constructive amendment requires a showing 'that the important functions of an indictment were undermined by both the evidence presented *and* the jury instructions.'" (quoting *United States v. Hynes*, 467 F.3d 951, 962 (6th Cir. 2006)).

Gross, as noted, argues that evidence and argument presented at trial relating to KapCharge's membership at HOPE FCU, and the processing of ACH transactions for KapCharge (including, in particular, transactions that were not for the Collectables Club, but for other companies, such as payday lenders) constructively amended the conspiracy as described in the S6 Indictment. *See* Def. Br. 22-31. In Gross's estimation, the S6 Indictment alleged a "specific *quid pro quo* bribery scheme" – that "members of the Collectables Club" would pay "Trevon Gross to facilitate taking over the board of Hope FCU." *Id.* at 24. He argues that evidence that Gross accepted money from KapCharge in exchange for processing ACH transactions constituted a *distinct* quid pro quo – and that evidence of false statements related to this quid pro quo (misrepresenting KapCharge's eligibility to be a member of the credit union, and facilitating the ACH processing by misrepresenting the credit union's net worth ratio) were not in furtherance of or part of the narrow conspiracy for which Gross was indicted. *Id.* at 29.

The Court holds that, defining the core of criminality of the conspiracy charge as the Court did at trial – as a scheme by the Collectables Club and others to bribe Gross to cede control of his credit union to the Collectables Club and to cover up and facilitate that scheme – there is no "substantial likelihood that [Gross] may have been convicted of an offense other than that charged in the indictment." *D'Amelio*, 683 F.3d at 416 (quoting *Mollica*, 849 F.2d at 729). The Court reaches this conclusion for two reasons. First, the Court's limiting instructions ensured that the jury convicted Gross only if it concluded he had indeed conspired to corruptly accept money from the Collectables Club and KapCharge to pass control of his credit union to the Collectables Club and to cover up and facilitate that scheme. And second, the evidence at trial, properly understood, created no danger that the jury ignored these limiting instructions and convicted Gross of a "distinctly different" crime from the one alleged. *Id.* at 419.

### i. The Core of Criminality of Count Three of the S6 Indictment.

The Court begins by defining the core of criminality of the S6 Indictment. *See Salmonese,* 352 F.3d at 619 ("[A]s long as [a] defendant is 'given notice of the core of criminality to be proven at trial,' this court has afforded the prosecution 'significant flexibility' to prove the conspiracy's operation through both unalleged and alleged overt acts." (quoting *Frank,* 156 F.3d at 338)).

As already noted, during the trial, the parties disputed the appropriate scope of the conspiracy as described in the S6 Indictment. The Government argued that the conspiracy was simply one by various parties – including the Collectables Club and KapCharge – to bribe Gross to influence his actions at the HOPE FCU. In opposing Gross's Rule 29 and Rule 33 motions, the Government maintains that the core of criminality is this broad and argues, not unpersuasively, that "the core of criminality of the S6 Indictment['s Count Three] is a scheme to pay Gross bribes to influence his decisionmaking with respect to HOPE FCU's business." Gov't Opp. at 39. If the Government were correct, it would follow that there is no question that all of the evidence relating to KapCharge and ACH processing – including all post fallout evidence – was squarely at the heart of the conspiracy.

As already noted, the Court has never held that the Government is incorrect as to this core, nor that a failure to charge the jury with a *narrower* understanding of the conspiracy would result in a constructive amendment. *See* Tr. at 3187, 3504. Nevertheless, the Court did not adopt the Government's construction of the conspiracy at trial. Instead, it defined the conspiracy as follows:

> Count One charges Yuri Lebedev and Trevon Gross with conspiring with others, from in or about April 2014 to in or about 2015, to achieve four unlawful objectives in an effort to further the operations of Coin.mx or the Collectables Club: Number one, to make corrupt payments to Trevon Gross with the intent to

influence Trevon Gross in connection with the business of HOPE FCU; number
two, to have Trevon Gross receive or agree to receive corrupt payments with the
intent to be influenced in connection with the business of HOPE FCU; number
three, to obstruct an examination of HOPE FCU by the NCUA; and number four,
to make false statements to the NCUA in connection with the NCUA's
examinations of HOPE FCU.

Tr. at 4182. For purposes of these motions, the Court assumes, *arguendo*, that its construction –

although narrower than the Government's – captures the core of criminality in the conspiracy

charge. Even assuming that the core of criminality is as the Court defined it (rather than the

broader one for which the Government argues), there was no constructive amendment.

Additionally, as already noted, Gross argued at trial that the core of criminality in the

conspiracy was even narrower: that it was a scheme not simply to transfer control of HOPE FCU

to the Collectables Club, but more narrowly to facilitate "the takeover [of] the HOPE FCU *in*

*furtherance of an unlawful Bitcoin exchange.*" Tr. at 3487 (emphasis added). In the context of

the instant motions, Gross purports not to challenge the Court's decision to define the core of

criminality more broadly – although he reserves his right to make such a claim of error on

appeal. *See* Def. Br. at 23. Yet, a review of his subsequent arguments makes clear that – even as

he purports to assume the correctness of the Court's limiting instruction – many of his arguments

as to why the evidence created a constructive amendment implicitly rely on his own narrower

construction of the conspiracy as described. *See* Def. Br. at 25 (where Gross suggests that

"[t]here is a substantial difference between alleging that [he] accepted a donation from the

Collectables Club . . . in exchange for board control of Hope FCU and alleging that he accepted a

donation from Kapcharge, a payment processing business, in exchange for processing ACH

transactions" because "[w]hile . . . Collectables Club was a phony front company for Coin.mx

[whose] sole business was to operate as an unlawful Bitcoin exchange," ACH transactions were

perfectly legal); *id.* at 39 ("Since the evidence failed to show that Mr. Gross had any knowledge

of the unlawful objectives of the conspiracy [to further illegal bitcoin transactions], the government . . . failed to present sufficient evidence that [he] had a corrupt intent in accepting payments from members of the Collectables Club to permit them to become members of the Hope FCU."). Thus, the Court begins by explaining why it rejected Gross's narrowly defined core of criminality at trial: i.e. why, even if a fair reading of Count Three of the S6 Indictment describes a scheme designed to pass control of the credit union to the Collectables Club, it unduly narrows the core of criminality to suggest that the collective goal *of furthering an illegal bitcoin exchange* is essential to this scheme.

First, an analysis of the allegations in the overt acts section of the indictment's conspiracy charge makes this conclusion evident. *See Attanasio*, 870 F.2d at 816 (noting that the overt acts are relevant to defining the scope of the conspiracy). The overt acts alleged under Count Three of the S6 Indictment describe payments provided to Gross in exchange for his ceding control of his credit union to members of the Collectables Club. *See* S6 Indictment ¶ 27. They do not suggest that the nature of the agreement described was to pay Gross to allow Murgio to run an illegal money transmitting business. The only reference, under the overt acts section of the indictment, to the illegal money transmitting business arises in the first overt act. *See id.* ¶ 27(a) ("In or about April 2014, Anthony R. Murgio, the defendant, and a co-conspirator not named herein . . . , communicated with Trevon Gross . . . in an effort to take over control of the Board of HOPE FCU in furtherance of Coin.mx's operations."). In the very next paragraph, however, the Indictment states that an unnamed co-conspirator "executed an agreement on behalf of 'Collectables Club' with Gross" – i.e. *not* on behalf of Coin.mx – and the remaining allegations discuss the payment of bribes to Gross in exchange for control of the credit union. *Id.* ¶ 27(b). The overt acts alleged in the indictment, then, fairly read, at most limit the conspiracy's core of

54

criminality to an agreement whereby Gross would accept bribes to transfer control of his credit union to the Collectables Club. These allegations do not suggest that it was *essential* to this conspiracy why Murgio sought to gain such control, nor how he would use the credit union upon taking it over.

Other allegations in the Indictment do not alter this conclusion. It is true that *earlier* portions of the Indictment – as well as its earlier descriptions of the "relevant persons and entities," "the Coin.mx scheme," and "the bribery scheme" – consistently reference Murgio's interest in acquiring HOPE FCU "to facilitate the operation of the unlawful Bitcoin exchange." S6 Indictment ¶ 12. And of course the Indictment, as a whole, clearly alleges the violation of a distinct crime – operation of an illegal money transmitting business – and suggests, factually, that the conspiracy charge was related to this earlier illegal charge. But the Second Circuit has made clear that such allegations are "gloss," and has held that they do not affect the "essential nature of the charged conspiracy" even if incorporated by reference into the section of the indictment addressing the alleged crime itself. That was the precise holding in *Attanasio*, where the Second Circuit held that – although allegations of a distinct crime (money laundering) permeated the gloss language in an indictment, the actual conspiracy to defraud the IRS of income taxes that came later did not itself require proof of those allegations, notwithstanding the allegations' incorporation by reference into the conspiracy charge. *See Attanasio*, 870 F.2d at 816 ("Because the references to money laundering lie within the 'Means' portion of the indictment, the essential nature of the charged conspiracy is not affected by the laundering allegations. The allegations of money laundering add nothing but gloss to the alleged conspiracy, and they need not be proved."). Such a rule accords with the Second Circuit's subsequent holding that an alleged *motive* for committing a crime described in an indictment

does not form a part of the core of criminality of the crime – even where specifically alleged. *See Banki*, 685 F.3d at 118-19 (rejecting a constructive amendment challenge as "[e]ven assuming there was a cha[n]ge in theory at trial to the extent that the government suggested an additional motive for the false statement—avoiding identifying the uncle who had been under investigation, the proof at trial and brief reference in the government's rebuttal summation related to the same statements in the same letters as described in the Indictment.").

In short, the language of the Indictment makes clear that the allegations that Murgio wanted to take control of the credit union to further the illegal ends of Coin.mx, and that he in fact did so upon acquiring the credit union, are *ancillary* to the core of criminality of the conspiracy charge. In other words, even if the Government proved Murgio and the Collectables Club sought and acquired control for other reasons – say, to facilitate ACH transactions – and then used the credit union to facilitate such transactions – it would not alter the essential nature of the scheme as alleged in the S6 Indictment: as one to transfer control of the credit union to the Collectables Club.

This conclusion also follows from the legal contours of the bribery and conspiracy charges themselves and what, in fact, the Government had to prove to secure a conviction on such charges. As noted, in the present motions, Gross repeats an argument he has long maintained in challenging his conviction: that, if the Government failed to allege he had knowledge of the illegal bitcoin exchange, such a failure would be fatal to the Government's theory that Gross accepted payments *corruptly* – a necessary element of the bribery count and bribery object of the conspiracy charge. *See* 18 U.S.C.A. § 215(a)(2); Tr. at 4179 (in which, in the jury charge, the Court specified that corrupt intent was an essential element of the bribery charge); Def. Br. at 39 (making this argument in the context of Gross's sufficiency-of-the-

evidence challenges in the instant motions); Dkt. No. 140 at 10 (in which, in challenging the sufficiency of the allegations in the S3 Indictment, Gross argued that, while that indictment includes "an allegation that Anthony Murgio, Michael Murgio and Yuri Lebedev attempted to acquire control of HOPE FCU to facilitate the operation of an unlawful Bitcoin exchange, there are no allegations that Mr. Gross had any knowledge of their unlawful purpose, or any intention of furthering its unlawful end," and thereby argued that the Government had not alleged that Gross himself acted with corrupt intent in accepting payments from his co-conspirators). As the Court noted in rejecting Gross's motion to dismiss that earlier indictment, the Government had no obligation to allege Gross's knowledge of Murgio's illegal bitcoin exchange to prove he accepted Murgio's payments corruptly. That is because, to show corruption, it was not necessary to prove that Gross accepted money with the intent to accomplish an inherently unlawful purpose – it was enough to show that, as the head of a federal credit union, Gross accepted money with the intent to be influenced in his decision-making – i.e. to accomplish a potentially lawful end via illegal *means. See United States v. McElroy*, 910 F.2d 1016, 1021 (2d Cir. 1990) ("The term 'corruptly' is ordinarily understood as referring to 'act[s] done voluntarily and intentionally and with the bad purpose of accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means." (alteration in original) (quoting *United States v. Brunson*, 882 F.2d 151, 154 n.2 (5th Cir. 1989)); Dkt. No 198 at 22 (in which, in rejecting Gross's motion to dismiss, the Court noted as follows: "[Gross] claims that there 'is nothing *inherently* corrupt or unlawful about placing the names of individuals in nomination for a position on the Board of Directors of a credit union.' Gross Br. 11 (emphasis added). Perhaps. But Gross is not charged with nominating individuals to serve on HOPE FCU's board. He is charged with doing so *in exchange for more than $150,000 in bribes*. Section 215 does not criminalize the actions that

Gross allegedly took in the abstract; it criminalizes them in the context of a *quid pro quo* bribery arrangement.").

The contours of the corruption element are thus also relevant to understanding the core of criminality in the indictment, and distinguishing gloss from the alleged core. Because it is not necessary, to show that the payments described in the Indictment were *corrupt*, to prove that they furthered an inherently illegal end, the Indictment's factual allegations that Murgio sought the credit union to further the ends of his illegal money transmitting business added nothing *essential* to the conspiracy as alleged. For that reason, as well, they do not define the core of criminality, but are ancillary to it. *See Mucciante*, 21 F.3d at 1235 ("We acknowledge that Paragraph 17 contains boilerplate language that 'repeated and realleged' earlier background paragraphs. . . . [B]ecause the allegations that Mucciante gave Berger the counterfeit bonds need not be proved to convict Mucciante of violating section 479, [however,] they cannot fairly be read to limit the basis for convicting Mucciante under counts 6 though 9.").

Finally, the Court notes one additional argument, derived from the procedural history of this case, which supports its reading of the S6 Indictment. As noted, in seeking dismissal of the S3 Indictment (an indictment whose allegations, for purposes of the instant question, are nearly identical to those in the S6 Indictment), Gross argued that "there [were] no allegations" in that Indictment that he "had any knowledge of [the illegal money transmitting business], or any intention of furthering its unlawful end." Dkt. No. 140 at 10; *see also* Dkt. No. 390 at 2 (in which, in describing the S6 Indictment, Gross argued that "[t]here are no allegations in the [S6] Indictment about what Pastor Gross's intent was for entering into this conspiracy, as he had no role in any bitcoin exchange"). Even as the Court rejected this motion to dismiss, it agreed that the indictment included no such allegations. *See* Dkt. No 198 at 22 ("[Gross] notes that there are

no allegations that [he] knew that Murgio, Michael Murgio, and Lebedev allegedly wanted to acquire HOPE FCU to facilitate the operation of an unlawful Bitcoin exchange. Gross Br. 10. This is true but irrelevant."). This argument, too, supports the Court's rejection of the Defendant's construction of the conspiracy. Gross would have the Court hold that an indictment that he claims effectively failed to allege his knowledge of an illegal money transmitting business can be read to include such knowledge in the core of criminality of a conspiracy charge – notwithstanding that a conspiracy is an *agreement* among co-conspirators on the essential nature of a plan. It makes little sense to at once argue that the language of the indictment fails to allege such knowledge, and that the language of the indictment can fairly be read to describe a conspiracy in which all parties had such an understanding.

Distinguishing the alleged overt acts from the preliminary factual allegations – i.e. distinguishing the essential nature of the conspiracy from gloss – thus reveals the following necessary conclusion: the core of the conspiracy was one to pay Gross bribes for passing control of his credit union to the Collectables Club, irrespective of how, precisely, Murgio would use that credit union. Allegations making clear that Murgio sought control of the credit union to further the operations of Coin.mx, then, were not *essential* to that conspiracy: they were simply explanations as to Murgio's motive in entering the conspiracy, and examples of what Murgio did once he acquired control. Nor was it essential that the conspiracy include only those players expressly named. As the Court also concluded in defining the conspiracy, nothing in the indictment limited the conspiracy to the co-conspirators described therein, to the degree that those co-conspirators sought the same objective. The Indictments' repeated references to "others known and unknown" require this conclusion. *See United States v. Olmeda,* 461 F.3d 271, 283-84 (2d Cir. 2006) ("We recognize the frequency with which expansive language such as 'and

elsewhere' or 'and others' is used in indictments to provide prosecutors with flexibility in proving their cases. We do not, however, assume from the fact that certain expansive pleading language is routine that it equates to 'mere surplusage.' Rather, we assume that, in general, when such language is included in an indictment, it is supported by a reasonable good faith belief that places or persons other than those specifically alleged are involved in the charged conduct, even if the particulars of those places or persons are not yet known."); *Fama v. United States*, 901 F.2d 1175, 1177 (2d Cir. 1990) (rejecting a constructive amendment charge predicated on the addition of new parties, as "[t]he six individuals named by [the defendant] as persons he gave drugs to on consignment qualified as 'others known and unknown'" under the indictment, and "[t]hus the indictment never stated that the only people Fama managed as part of the CCE were members of his family, and the court's acceptance of his guilty plea on the basis of an admission to managing five persons not in his family was in no way inconsistent with the indictment as handed up by the grand jury.").

In sum, then, the Court determined at trial that, under the most prophylactic reading, the core of criminality in the Indictment's conspiracy charge was a conspiracy wherein Gross agreed to accept money in exchange for ceding control of his credit union to the Collectables Club, and the co-conspirators collectively worked to cover up and facilitate this scheme. For what Murgio intended to – and ultimately did – with that credit union (i.e. bitcoin transactions or, as the Government showed, ACH transactions for a third co-conspirator, Kapcharge), and the precise players (Murgio and Lebedev alone, or the principals of KapCharge as well) were not essential elements of this scheme – they constituted, instead "particulars" explicating the core transaction alleged. *See Daugerdas*, 837 F.3d at 225 ("[T]here is no constructive amendment when the proof at trial does no more than supply the particulars.").

### ii. The Evidence and Jury Instructions at Trial Did Not Create a Substantial Likelihood that Gross May Have Been Convicted of an Offense Other than that Charged in the Indictment

Having defined prophylactically the core of criminality as a scheme wherein Gross agreed to accept money in exchange for ceding control of HOPE FCU to the Collectables Club, the Court holds that the evidence and jury instructions at trial did not create "a substantial likelihood" that Gross was, instead, convicted of a "distinctly different" crime. *D'Amelio*, 683 F.3d at 416-21.[30]

### a. The Limiting Instructions Ensured the Jury Convicted Gross of Only the Conspiracy Alleged

First, as noted, the Court gave multiple limiting instructions ensuring the jury convicted Gross *only* if it found, beyond a reasonable doubt, that he had participated in a conspiracy to accept payments in exchange for working to help transfer control of his credit union to the Collectables Club, and to cover up and facilitate that scheme. The entire premise of Gross's present motions is that, notwithstanding these limiting instructions, the jury may have convicted him of an essentially distinct conspiracy. Yet, although Gross identifies cases where the Second Circuit has concluded that jury instructions were insufficient to cure certain forms of prejudice, *see* Def. Reply at 21-22 (collecting cases), he cites no case – and the Court is aware of no case – in which the Second Circuit has ever found a constructive amendment when a district court issued limiting instructions properly defining the scope of the alleged crime. Indeed, it is not evident that a constructive amendment is possible when the jury instructions clearly define the core of criminality. *See United States v. Mize,* 814 F.3d 401, 409-10 (6th Cir. 2016).

---

[30] The Court reiterates that it is not holding that the Government is incorrect about the breadth of the conspiracy charge in the S6 Indictment, nor that failure to give the Court's limiting instruction *would have* resulted in a constructive amendment.

The Court thus concludes that, if the jury determined, as Gross contends, that evidence of KapCharge and ACH processing – although inarguably *relevant* evidence to the existence of the conspiracy charged – described a *different* conspiracy, the jury instructions ensured that the jury would not convict Gross of *this other conspiracy*. Given that there was plainly sufficient evidence that Gross was guilty of participating in the conspiracy described in the limiting instruction, the limiting instructions were sufficient to avoid any possibility of a constructive amendment. *Cf. United States v. Vazquez*, 113 F.3d 383, 386 (2d Cir. 1997) ("In order to secure a reversal on the ground that the court failed to give a multiple conspiracy charge, a defendant must prove there were two or more groups operating separately from one another, although membership in the groups might overlap, and that failure to give the requested charge prejudiced defendant. A refusal to give a multiple conspiracy charge does not prejudice defendant where there was ample proof before the jury for it to find beyond a reasonable doubt that defendant was a member of the conspiracy charged in the indictment." (internal citations omitted)).

**b.    Analysis of the Evidence Gross Claims Constructively Amended the Indictment Further Underscores that the Limiting Instructions Were Sufficient**

Even assuming, however, that the admission of evidence expanding the scope of a charged conspiracy can constructively amend an indictment *even when* a Court issues prophylactive curative limiting instructions, there is no danger a constructive amendment happened in this case. That is for two, interlocking reasons.

First, Gross's argument that evidence of KapCharge's membership in the credit union, evidence of ACH processing for KapCharge for clients other than the Collectables Club, and misrepresentations designed to facilitate the credit union's relationship with KapCharge, created a substantial likelihood that the jury convicted him of a crime not charged rests on an incorrect premise: that, if the jury found this evidence to be part of the conspiracy, it necessarily *ignored*

62

the Court's limiting instructions. However, analysis of this evidence makes clear that a reasonable jury could have concluded that the evidence described and contextualized "the same elaborate scheme" narrowly alleged in the Indictment, *Dupre*, 462 F.3d at 140, rather than describing "behavior entirely separate from that identified in the indictment," *Bastion*, 770 F.3d at 223 (internal quotation marks and emphasis omitted), or a "set of facts wholly unrelated to the facts charged," *Knuckles*, 581 F.2d at 312. It thus follows that, if the jury did find the evidence to be part of the conspiracy alleged, no constructive amendment occurred.

Second, and relatedly, the evidence Gross cites – whether or not a reasonable jury concluded it was part of the same conspiracy alleged – was inarguably probative of the existence of that conspiracy. Given the evidence's relevance, the appropriate course of action was not to exclude it, but to admit it subject to the precise limiting instruction the Court gave. For that reason as well, the Court finds no constructive amendment.

These two points are further explicated below.

1. **A Reasonable Jury Could Have Concluded that Evidence of KapCharge and its ACH Transactions Was Direct Evidence of the Conspiracy, Even as Narrowly Defined**

First, a reasonable jury could have found that much of the evidence Gross laments as prejudicial – including evidence of KapCharge's membership in the credit union, evidence of ACH processing for KapCharge for clients other than the Collectables Club, and misrepresentations designed to facilitate the credit union's relationship with KapCharge (and its ACH transactions) – concerned "the same elaborate scheme" alleged in the Indictment, *Dupre*, 462 F.3d at 140, rather than describing "behavior entirely separate from that identified in the indictment," *Bastion*, 770 F.3d at 223 (internal quotation marks omitted).

In his Rule 29 and Rule 33 motions, Gross argues as follows: in his estimation, the "S6 Indictment . . . charged a specific *quid pro quo* bribery scheme – payments by members of the Collectables Club to Trevon Gross to facilitate taking over the board of Hope FCU," but the evidence at trial included *two* distinct quid pro quo arrangements: "both [the] taking [of] payments from the Collectables Club in exchange for board control of Hope FCU, and [the] taking [of] payments from Kapcharge in exchange for influencing ACH processing." Def. Br. at 24 (emphases omitted). To the degree a reasonable jury agreed with this construction of the facts, there is no basis to conclude that it disregarded the Court's limiting instruction and convicted Gross of an *entirely* distinct conspiracy – especially given the extensive evidence of the record of the first so-called quid pro quo. *Cf. Vazquez,* 113 F.3d at 386-87. Nevertheless, a reasonable jury could have rejected this framing altogether, and concluded that Kapcharge's involvement in the conspiracy – far from proving a *distinct* quid pro quo – was instead part of the precise transaction at the core of the conspiracy charge: the agreement to pass control of the credit union to the Collectables Club.

This conclusion flows from an analysis of the evidence at trial, as the Court has already described it above. *See infra* I.B(3) (describing KapCharge's relationship to the conspiracy and its ACH transactions). The Court summarizes the key points as follows: First, the evidence would permit a reasonable jury to conclude that KapCharge funded – at Murgio's request – the majority of the bribe payments at the heart of the conspiracy scheme – i.e. the very payments offered to Gross in exchange for him transferring power over the credit union to the Collectables Club. *See* Ex. 1316-A; Ex. 1316-B; Ex. 1321; Ex. 1317-B; Ex. 1317-E; Ex. 1317-F; Ex. 1317-H. Indeed, these were the precise payments alleged as overt acts in the S6 Indictment. *Cf. Banki,* 685 F.3d at 119 (finding no constructive amendment where "the proof at trial and brief reference

64

in the government's rebuttal summation related to the same statements in the same letters as described in the Indictment"). In other words, the evidence did not suggest that, at least prior to the fallout, Gross entered a distinct agreement with KapCharge to process its ACH transactions: instead, the evidence suggested that KapCharge conspired with Gross, Lebedev, and Murgio towards the same end – the takeover of HOPE FCU by the Collectables Club – and that it would receive the ability to process ACH transactions not in spite of, but by accomplishing, this object.

Second, evidence further suggested that Murgio did not have the funds to pay for the takeover of the credit union himself – i.e. to satisfy his arrangement with Gross. *See* Ex. 1316-A. The processing of ACH transactions for KapCharge, then, could have been understood as essential to the success of the basic bribery scheme alleged in the conspiracy: i.e. the way that Murgio acquired the necessary money to pay for the takeover of the credit union. By this same token, a reasonable jury could have concluded that the processing of ACH transactions for KapCharge for companies *other* than the Collectables Club was not an act *unrelated* to the central end of the conspiracy, but a necessary act in furtherance of its success. *See United States v. Tzolov*, 642 F.3d 314, 320 (2d Cir. 2011) ("A reasonable jury could have concluded that Butler and Tzolov's travel through the Eastern District was in furtherance of the conspiracy because, had they not done so, the face-to-face meetings with potential investors, which was a regular part of their fraudulent scheme, would not have occurred.")

Third, and relatedly, a reasonable jury could have concluded that it was *Murgio* who brought KapCharge to the table, and that it was he and other members of the Collectables Club who pushed to have the credit union process unsafe volumes of ACH transactions for

KapCharge. *See infra* I.B(3) (collecting evidence for this proposition).[31]  It would follow that evidence that Gross failed to intervene to stop Ricardo Hill from processing unsafe volumes of ACH transactions did not prove the existence of some distinct agreement between Gross and KapCharge; instead it proved that Gross had accepted money in exchange for passing control of his credit union to *Murgio* and the Collectables Club, the central agents of this ACH processing.

On the basis of these and other arguments, then, a reasonable jury could have concluded that evidence of KapCharge's involvement in the conspiracy, including ACH processing and false statements designed to facilitate such processing, did not describe a *distinct* quid pro quo or, to use the appropriate doctrinal language, describe "behavior entirely separate from that identified in the indictment." *Bastion*, 770 F.3d at 223 (internal quotation marks omitted). Instead, such evidence provided the "particulars" as to the conspiracy as charged. *Daugerdas*, 837 F.3d at 225 (internal quotation marks omitted).  Even if such evidence thus created a *variance* from the allegations in the Indictment, the Government did not rely on it to prove a *distinct* crime, but to prove the one described in its charging instrument.

### 2. To the Degree the Court Admitted Evidence that Was not *Part* of the Alleged Conspiracy Itself, Such Evidence Was *Relevant* to the Existence of the Conspiracy and its Admission Did not Constructively Amend the Indictment

In any event, the Court also finds that the evidence and argument at trial did not constructively amend the Indictment for a second reason: that, to the degree that some of the evidence – and in particular some (although certainly not all) of the post-fallout evidence – may have described acts that were not themselves in furtherance of the more narrowly defined

---

[31] The jury could have concluded that Murgio understood KapCharge's participation as essential for multiple reasons – including its ability to supply capital, and the fact that it would also conduct bitcoin transactions for Coin.mx – and thus wanted the credit union to process ACH transactions to ensure KapCharge's participation.

conspiracy – such evidence was nevertheless relevant to proving the existence of the conspiracy as charged and there was no basis to exclude it.

Implicit in Gross's argument that the admission of evidence describing ACH processing and KapCharge constructively amended the Indictment, notwithstanding the Court's limiting instructions, is that the Court should, instead, have excluded such evidence – and that failure to do so prejudiced him. The Court assumes, *arguendo*, that Gross indeed sought exclusion of any of this evidence on the grounds that including it would lead to a constructive amendment.[32] Even if that were the case, however, there is no question that the evidence was *relevant* and admissible to proving the Government's case, and to rebutting Gross's defense. Given its relevance, the appropriate avenue for the Court was clearly to issue a limiting instruction – and *not* to exclude the evidence.

To take a key example: even assuming, *arguendo*, that no reasonable jury could find evidence of Gross's work with KapCharge after his fallout with the Collectables Club to describe the *same* conspiracy alleged in the Indictment, such evidence was still highly relevant to proving the Government's case and rebutting Gross's central argument: that his agreement with *the Collectables Club* was intended to be legitimate. Analysis of the parties' argumentation throughout the trial explains this conclusion.

In his opening, Gross argued that "[w]hat the government . . . called a bribe . . . was actually a business transaction that started with the best of intentions, took a lot of unexpected turns, and was ended by Pastor Gross himself, within six months, when he realized that he

---

[32] Gross notes, correctly, that at various points in trial he objected to the quantum of evidence describing KapCharge and ACH processing. *See* Def. Reply at 20 (citing the record). However, it is not evident that at any of these points – prior to counsel for Lebedev flagging the issue in seeking a limiting instruction related to post-fallout evidence – Gross in fact raised the issue of constructive amendment directly. The Court does not, however, and need not, base its decision on any finding of forfeiture.

couldn't trust Anthony Murgio and the Collectables Club. It was not a bribe." Tr. at 368. Gross did not deny that he had a relationship with KapCharge, and that it continued after his fallout with Murgio. He argued, however, that the Board of Directors of the credit union "didn't think [their problem] was ACH processing . . . [or] Kapcharge," but Anthony Murgio. Tr. at 382-83. Gross's counsel also discussed the $50,000 payment Murgio offered to Gross shortly before the fallout. Gross argued that his refusal to accept this payment was key evidence of his good faith. *See* Tr. at 380-81 ("And you're going to know that the $50,000 that was discussed at this meeting wasn't a bribe because Anthony Murgio, within a week, tries to send Pastor Gross that $50,000 again, and Pastor Gross says, no, I don't want it, I'm done with you, I want no part of you, you're a bad business partner, you've lied to me, and I'm moving on. He rejects it and he turns it back. If you're going to take a bribe on Monday but you're not going to take it a week from Monday? That doesn't make any sense."). The Government offered, in its rebuttal, a concise response to Gross's interpretation of the facts: "Now, Mr. Klingeman also asked: If Trevon Gross is a bribe-taker, why did he return that $50,000 to Anthony Murgio in November 2014? You now know why - because at that point, Trevon Gross had already struck another deal behind Anthony Murgio's back to work directly with Kapcharge . . . ." Tr. at 4138.

As these competing views of the facts suggest, the nature of Gross's relationship with KapCharge – both *before* the fallout and after it – whether or not *part* of the conspiracy alleged, was highly probative of Gross's corrupt intent as to the narrowly constructed conspiracy. If the Government could prove Gross's relationship with KapCharge was corrupt, it would follow that, in returning Murgio's payment and exiling the Collectables Club from the credit union, Gross simply elected to seek a simpler, more lucrative corrupt relationship, rather than the increasingly fraught one in which he found himself. In contrast, if Gross could prove that his relationship

with KapCharge – both before and after the fallout – was legitimate, it would follow that, in returning Murgio's payment, he was, in good faith, repudiating an unsavory element, and seeking to *protect* his credit union from corruption. In other words, the return of the money would be significant evidence that Gross had never been in it for the money. In short, the precise nature of Gross's relationship with KapCharge was highly probative – to both sides – in proving the precise nature of Gross's relationship with *Murgio*.

Even if, again assuming *arguendo*, some of this evidence described a *distinct* conspiracy, it was still relevant evidence to proving the one charged in the indictment. To hold that admission of such evidence constructively amended the indictment *even when the Court issued a limiting instruction* would thus transform the doctrine of constructive amendment from a shield protecting a defendant's grand jury rights to a sword, preventing the Government from validly, and constitutionally, proving the charges alleged in the Indictment. There is no basis for such a conclusion under the law of constructive amendment. *See Salmonese*, 352 F.3d at 619 ("[T]his court has afforded the prosecution 'significant flexibility' to prove the conspiracy's operation through both unalleged and alleged overt acts." (quoting *Frank,* 156 F.3d at 338)); *see also D'Amelio*, 683 F.3d at 416 ("The district court recognized that the telephone conversations would have been admitted into evidence at trial, whether the indictment had mentioned them or not, and noted that D'Amelio had not objected to their admission."); *United States v. Fawwaz*, No. 15-1731-CR, 2017 WL 2399329, at *1 (2d Cir. June 2, 2017) (noting that, in the context of a conspiracy count with multiple objects, a conviction will be upheld provided there was sufficient evidence as to any one object, unless "'an overwhelming amount of evidence relevant only to the unproved part of the conspiracy may have [so] prejudiced the jury' that a conviction cannot stand," but then noting that this caveat does not apply if "the evidence admitted was relevant to

proving the crime charged" (quoting *United States v. Papadakis*, 510 F.2d 287, 289 (2d Cir. 1975))).

In sum, the jury, at trial, convicted Gross of participating in a conspiracy to accept payments to use his position to assist the Collectables Club in taking control of his credit union, and in obstructing an investigation of the NCUA and making false statements to the NCUA to facilitate that scheme. The Court sees no basis whatsoever to conclude the evidence and jury instructions created "a substantial likelihood that [Gross] may have been convicted of an offense other than that charged in the indictment." *D'Amelio*, 683 F.3d at 416.

## B.    Prejudicial Variance

In the alternative, Gross argues that, because the S6 Indictment did not mention KapCharge or ACH transactions, the Government's reliance on such evidence to prove the existence of the conspiracy alleged constituted a prejudicial variance from the charging instrument. Def. Br. at 31-33. The Court disagrees.

In contrast to a constructive amendment, "[a] variance occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *Salmonese*, 352 F.3d at 621-22 (quoting *Frank*, 156 F.3d at 337 n.5). "A defendant alleging variance must show 'substantial prejudice' to warrant reversal." *Rigas*, 490 F.3d at 226 (quoting *United States v. McDermott*, 918 F.2d 319, 326 (2d Cir. 1990)). The determination of whether a "variance between an indictment and the proof at trial is prejudicial" turns on "whether the variance infringes on the 'substantial rights' that indictments exist to protect—'to inform an accused of the charges against him so that he may prepare his defense and to avoid double jeopardy.'" *Dupre*, 462 F.3d at 140 (quoting *United States v. D'Anna*, 450 F.2d 1201, 1204 (2d Cir. 1971).

70

For purposes of this analysis, the Court assumes that the Government's introduction of proof describing KapCharge and ACH processing for KapCharge constituted a variance from the allegations in the Indictment. The Court finds that the Defendant has not met his burden, however, of showing that he was "substantial[ly] prejudice[d]" by this evidence. *Rigas*, 490 F.3d at 226 (internal quotation marks omitted).

## 1.    The Defendant Had Notice of the Government's Theory of the Case

First, the Court holds that Gross had sufficient notice of the Government's theory of the case to avoid substantial prejudice.

The Second Circuit has repeatedly held that, so long as a defendant receives notice of the Government's theory of the case before trial, he is not prejudiced by a variance. *See, e.g., United States v. Kaplan*, 490 F.3d 110, 129-30 (2d Cir. 2007) ("The alleged variance here in issue . . . does not justify reversal. Before trial, the government gave [the defendant] the FBI report detailing all of his [false] statements."); *Banki*, 685 F.3d at 119 (holding that, because the Government requested a jury instruction that gave notice of a particular legal theory, the defendant "was on notice before trial of this potential theory" and was not substantially prejudiced by any variance). Here, analysis of the procedural history makes evident that Gross had notice of the overall contours of the Government's theory *long before* the S6 Indictment – at the earliest stages of this case. *See* Gov't Opp. at 2. Indeed, whether or not it had *already* explained that theory by the time it filed its first motions in limine on September 12, 2016, at that time the Government laid out the entire contours of its theory of the case, including KapCharge's participation in the charged conspiracy, the processing of ACH transactions for, *inter alia*, payday lenders, the dangerous quantity of ACH transactions, "the insufficient . . . controls" under the Bank Secrecy Act and Anti-Money Laundering-Act (i.e. regulations governing ACH

transactions), and the existence of misrepresentations related to Hope FCU's net-worth ratio. Dkt. No 191 at 19-20. As part of its motion, the Government further sought admission of a number of NCUA documents, including a vast factual summary of the conspiracy by the NCUA; in excluding this document, the Court agreed with Gross that the document was so close to the Government's theory of the case that its admission would do "little more than inform the jury that an independent governmental agency, reviewing the same evidence that the jury must review, has concluded that Gross is guilty of the charges in the Indictment." Dkt. No. 353 at 35.

Notwithstanding the fact that Gross *clearly* had notice of the contours of the Government's theory months before the trial began (and did not, at that time, make any argument as to constructive amendment or variance), Gross makes narrower arguments that he was unaware of *specific* facts or theories the Government would seek to show. *See* Def. Br. at 32-33. Even assuming, *arguendo*, that such arguments are relevant to the variance analysis – rather than simply generalized objections unrelated to the any variance in the Indictment – they are without merit.

Gross first argues that he received insufficient notice that the Government would seek to prove he misrepresented the net worth ratio of his credit union by relying on evidence that he and his co-conspirators agreed to void a $619,000 check on October 6, 2014. *See, e.g.*, Def. Br. at 30; *see also* Ex. 2173 (emails discussing that check). There is no merit to this objection. At trial, the Court rejected Gross's argument that he had insufficient notice that the Government, as a general matter, would seek to prove that one category of misrepresentations pertained to the net worth ratio of the credit union. Tr. at 1760; *see also* Dkt. No. 191 at 19-20 (in which, in its motions in limine, the Government addressed this theory of misrepresentation). Nevertheless, Gross argues in his brief that the Government's specific argument relating to the approximately

$619,000 check – introduced as one piece of evidence, among others, designed to demonstrate that Gross and his co-conspirators took affirmative steps to misrepresent the net worth ratio of the credit union – unfairly surprised him, as the Government did not mention this check until closings. Def. Reply at 19-20; *see* Tr. at 3997-98 (Government closing). Even assuming this argument sounds in variance, it is without merit: The exhibits on which the Government relied to make these factual arguments came in, by stipulation, during the trial. *See* Ex. 10001, at 9 (admitting by stipulation Ex. 2163 and Ex. 2173); Tr. at 4106-07. When the Government discussed the check in its closing, Gross did not object to the Government's reference, nor ask the Court to give an instruction to the jury to disregard the argument on the basis of unfair surprise. *See* Tr. at 3997-98. Instead, in Gross's counsel's closing argument, he addressed the Government's reference to the $619,000 check, and noted strategically that it was the first mention of the check in the trial (as a result of its admission by stipulation) – thereby inviting the jury to read the evidence's probity in light of its late introduction. Tr. at 4115 ("There were no witnesses called about this issue. There was no effort to explain this issue during the course of the trial. Pastor Gross wasn't confronted about this when he testified and wasn't given an opportunity to explain."). He also strategically used the late introduction of the evidence to make a broader point: that it underscored that the Government had no real evidence to prove corrupt intent. *Id.* ("This is something the government has presented to you, the prosecutor has presented to you at the end of the case in the hopes that somehow it will make up for the utter lack of evidence that Pastor Gross acted with corrupt intent, that he deliberately deceived the NCUA and that he deliberately obstructed their investigation."). Any argument that the Government unfairly surprised Gross is thus without merit.

Second, Gross argues that he was prejudiced by the introduction of evidence related to payday lending but, again, it is more than evident that he was long on notice that the Government understood such evidence to be relevant to its case. *See* Dkt. No 191 at 19-21, 25.

In his reply brief, for the first time, Gross argues that he also received insufficient notice relating to certain regulatory violations associated with ACH transactions. *See* Def. Reply at 18-19. The argument does not appear in his opening brief – which argues not that Gross lacked, for purposes of variance, notice that the Government would establish such violations as evidence of corrupt intent, but only that the regulatory violations are nowhere found in the Indictment. *See* Def. Br. at 27-28. The Court may thus disregard that argument. *See McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009); *American Hotel Int'l Grp., Inc. v. OneBeacon Ins. Co.*, 611 F.Supp.2d 373, 375 (S.D.N.Y. 2009). In any event, it is more than evident that the Government made clear to Gross that it would show, *at trial*, that he was aware of ACH-related regulatory violations, as early as the Government's first motion in limine. *See* Dkt. No. 191, at 19-20 ("The Government expects the evidence at trial will establish that Gross was aware of this high volume of ACH activity and the insufficient [Bank Secrecy Act/Anti-Money Laundering] controls, but nevertheless continued to permit Anthony Murgio and KapCharge to process the ACH transactions through HOPE FCU.").

Finally, Gross argues that, even if he was aware of much of the cited evidence, he was not "on notice" that the Government's case would center on it. *See* Def. Reply at 17-18. But it is evident from the recitation of facts in the Government's September 2016 motion in limine that the Government intended to prove at trial precisely what it ultimately proved. *See* Dkt. No. 191

74

at 19 (noting, *inter alia*, that "[t]he Government expects the evidence at trial will establish that Gross was aware of this high volume of ACH activity").[33]

The Court, in sum, finds that Gross has not shown "substantial prejudice" meriting reversal on the basis that he received insufficient notice of the Government's theory of the case. *Rigas*, 490 F.3d at 226 (internal quotation marks omitted).

### 2. The Defendant's Double-Jeopardy Rights Have Not Been Substantially Prejudiced by Any Variance

Nor has Gross shown "substantial prejudice" to his Double Jeopardy rights. *Id.*

In addressing whether ambiguity in an Indictment creates substantial prejudice to a defendant's Double Jeopardy rights, courts ask whether, in a future proceeding, a defendant will be able to avoid a second prosecution for conduct that was in fact part of the charge. *See, e.g.*, *United States v. Jaswal*, 47 F.3d 539, 542-43 (2d Cir. 1995). Two principles are key to this assessment: first, when a government attempts to bring a prosecution for a crime that was *arguably* encompassed by a previous indictment, a reviewing court, protecting a Defendant's Double Jeopardy rights, "may refer to the entire record of the prior proceeding and [is] not . . . bound by the indictment alone." *Id.* (internal quotation marks omitted); *see also Olmeda*, 461 F.3d at 282 ("[A] court must ascertain whether a reasonable person *familiar with the totality of the facts and circumstances* would construe the initial indictment, at the time jeopardy attached in the first case, to cover the offense that is charged in the subsequent prosecution." (emphasis added)). Second, the Second Circuit has suggested that, when it is clear that the

---

[33] Gross also argues that "[t]he mischarged conspiracy . . . opened the door to the admission of numerous 'co-conspirator' statements against ... Gross that were not made in furtherance of the conspiracy the government actually sought to prove at trial." Def. Br. at 33. It is unclear what the purchase of this argument is: it is well-settled that "the conspiracy which serves as the vehicle for the introduction of a vicarious admission by a co-conspirator need not be charged in the indictment." *United States v. Lyles*, 593 F.2d 182, 194 (2d Cir. 1979); *see also United States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002) (affirming this principle); *United States v. Gotti*, 644 F.Supp. 370, 374 (E.D.N.Y. 1986) (collecting cases).

Government will not attempt to exploit a particular ambiguity in an indictment to secure another conviction, a claim of prejudice arising out of such ambiguity should be rejected. *See Dupre*, 462 F.3d at 142 n.12 (noting, in determining whether a variance substantially prejudiced a defendant, that there was no ambiguity as to the contours of the indictment and that, "[i]n any event, the prosecution, both at oral argument and in its supplemental briefing, ha[d] represented to [the court] that it [would] not seek to obtain any additional wire fraud charges against defendants relating to the Roberta Project" – i.e. that it would not take advantage of any ambiguity in the indictment's scope to seek to secure a second conviction).

Here, the Court sees no substantial prejudice for several reasons. First, it is clear what the Government's theory of the indictment is: the Government, as it argued at trial, and as it continues to argue to this Court (notwithstanding the Court's own prophylactic limiting instruction) is that the entire conspiracy involving KapCharge and the Collectables Club – including the post-fallout work between Gross and KapCharge – is encompassed within the charged conspiracy. *See, e.g.*, Gov't Opp. at 38-39. There is no reason to believe there is any danger that the Government will later shift its position and argue that – notwithstanding its copious arguments at trial *and* in its opposition to the instant motion – it understands the Indictment to have alleged a narrower conspiracy.

Second, and for the same reason, there is no danger that a subsequent court would permit the Government to pursue such a course. As noted, any future assessment of a subsequent prosecution would ask, in interpreting the scope of the Government's S6 Indictment, "whether a reasonable person *familiar with the totality of the facts and circumstances* would construe the initial indictment, at the time jeopardy attached in the first case, to cover the offense that is charged in the subsequent prosecution." *Olmeda*, 461 F.3d at 282 (emphasis added). Gross

76

argues that "[a] reasonable person who was familiar with the facts and circumstances of this case, [the undersigned], has already determined that the scope of the conspiracy that the government is attempting to defend encompasses conduct that goes beyond the bounds of a 'fair reading' of the Indictment." Def. Reply at 17 (quoting Tr. at 3488-89). But in making this argument, Gross conflates two inquiries: the determination that this Court made to protect Gross's grand jury rights, and any subsequent determination another court would make to protect his Double Jeopardy rights. In assessing the contours of the Indictment's core of criminality, the Court did not rely on its knowledge of the "facts and circumstances of the case," *Olmeda*, 461 F.3d at 282, nor the "record of the [present] proceeding[s]," *Jaswal*, 47 F.3d at 543. It relied solely on the face of – and language of – the Indictment, as is the consistent practice in constructive amendment cases. *See, e.g.*, *United States v. Weiss*, 752 F.2d 777, 789 (2d Cir. 1985) ("Appellant also argues that a constructive amendment occurred because the 'plain import' of the indictment was that Weiss personally enriched himself at the expense of the Warner shareholders. We must reject this interpretation. The language of the indictment is conspicuously silent on the ultimate destination of the fraudulently obtained funds."). Looking solely to the language of the indictment is necessary to protect a defendant's grand jury rights, and to avoid impinging on the role of the grand jury. *See United States v. Ferguson*, 681 F.3d 826, 831 (6th Cir. 2012) (refusing, in the context of a constructive amendment, to consider the Government's own interpretation of the indictment, as "the interpretation of an indictment in other contexts is generally limited to its four corners" and such a rule was necessary to avoid "infring[ing] upon the grand jury's function"); *United States v. Goldstein*, 386 F.Supp. 833, 840-41 (D. Del. 1973) ("[W]here the difference between the proof and the indictment is such that there is no reasonable assurance on the face of the indictment that the grand jury considered and

reached an affirmative conclusion upon the existence of each of the essential elements of the crime of which the petit jury was asked to convict, the indictment has been amended."). Further, the Court construed any ambiguity in the S6 Indictment in favor of Gross – to protect his grand jury rights. Such a choice followed from the basic principle that "as between the government and the defendant, the government, being the party that drafts indictments, should bear any burden resulting from imprecise language." *Olmeda*, 461 F.3d at 283.[34]

In contrast, a subsequent court assessing the same ambiguities in the Indictment will, as noted, look to the entirety of the facts and proceedings in this case. *See Olmeda*, 461 F.3d at 282; *Jaswal*, 47 F.3d at 543. Further, that court will also construe ambiguities against the Government, which, in the context of the Double Jeopardy analysis (in contrast to the constructive amendment analysis), means the Court will read the first indictment more *broadly* than it might otherwise do. *See Olmeda*, 451 F.3d at 283 (noting that, because of the principle that ambiguities are construed against the drafter, in the context of a Double Jeopardy challenge, "the defendant must first make a colorable objective showing that a reasonable person familiar with the totality of the facts and circumstances would construe the first indictment, at the time jeopardy attached, to cover the offense that was charged in the subsequent prosecution," at which point, "the government [must] demonstrate, by a preponderance of the evidence, that [that same reasonable person] would not, in fact, construe the initial indictment, at the time jeopardy attached, to cover the offense that was charged in the subsequent prosecution" (emphasis omitted)). Applying this wholly distinct standard, were the Government to attempt to prosecute Gross, in the future, for conduct that falls under the understanding of the conspiracy it has

---

[34] As the Court has continuously stated, the Government's arguments as to the scope of the conspiracy are persuasive, and in adopting a narrower version of the conspiracy the Court acted prophylactically to protect the Defendant.

consistently proffered in this case, a subsequent court would dismiss the prosecution to protect Gross's constitutional rights.

The Court thus concludes that, because Gross has not shown "substantial prejudice" arising out of any variance in this case, his motion for reversal on that ground must be denied. *Rigas*, 490 F.3d at 226 (internal quotation marks omitted); *Salmonese,* 352 F.3d at 621 (internal quotation marks omitted).

## IV. Sufficiency of the Evidence

Gross next challenges the sufficiency of the evidence to convict him of the conspiracy and bribery counts. First, he argues that there was insufficient evidence of venue as to both counts. *See* Def. Br. at 33-38. Second, he argues that there was insufficient evidence for the jury to convict him, substantively, of the conspiracy and bribery counts. *See id.* at 38-40.[35] The Court addresses each argument in turn and finds them without merit.

### A. Legal Standard

As already noted, "[i]n assessing a factual sufficiency challenge," the court "review[s] the evidence in its totality, and in the light most favorable to the prosecution, mindful that the task of choosing among permissible competing inferences is for the jury, not a reviewing court." *Salmonese*, 352 F.3d at 618 (internal citations omitted). As to venue, the Court will affirm the jury's verdict so long it is proved "by a preponderance of the evidence." *United States v. Davis*, 689 F.3d 179, 185 (2d Cir. 2012). As to the substantive elements of a crime, the Court "will affirm the jury's guilty verdict if '*any* rational trier of fact could have found the essential

---

[35] Gross, in his heading, suggests that his substantive challenge to his bribery conviction is merely a venue challenge. *See* Def. Br. at 40. A review of the text of that section of his brief indicates that he indeed intends to challenge that conviction both substantively *and* as to the venue evidence presented. *See id.*

elements' of the charged crime 'beyond a reasonable doubt.'" *Salmonese*, 352 F.3d at 618

(quoting *Jackson v. Virginia*, 443 U.S. 307, 319, (1979)). "A defendant who challenges the

sufficiency of the evidence to support his conviction 'bears a heavy burden.'" *Jackson*, 335 F.3d

at 180 (quoting *United States v. Finley*, 245 F.3d 199, 202 (2d Cir. 2001)); *see also United States

v. Pica*, 692 F.3d 79, 86 (2d Cir. 2012) (referring to this burden as an "exceedingly deferential

standard of review" (quoting *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008))). In

particular, the Second Circuit has specified that "[t]he traditional deference accorded to a jury's

verdict 'is especially important when reviewing a conviction for conspiracy . . . because a

conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a

conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" *Jackson*, 335

F.3d at 180 (quoting *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir.1992)). Finally, in the

context of a conspiracy charge with multiple objects, the Second Circuit has held that "a

conviction will be upheld so long as evidence is sufficient to show that an appellant agreed to

accomplish at least *one* of the criminal objectives." *Fawwaz*, 2017 WL 2399329, at *1 (quoting

*Papadakis*, 510 F.2d at 297); *but see id.* (qualifying that statement and noting, "with the 'caveat'

that 'an overwhelming amount of evidence relevant only to the unproved part of the conspiracy

may have [so] prejudiced the jury' that a conviction cannot stand," although suggesting that if

"the evidence admitted was relevant to proving the crime charged" then no such prejudice

occurred (quoting *Papadakis*, 510 F.2d at 297)).

### B. A Reasonable Jury Could Have Found Venue As to the Conspiracy and Bribery Counts in the Southern District of New York

First, the Court concludes that a reasonable jury could have found that the Government

met its burden of proving venue as to the substantive bribery and conspiracy counts by a

preponderance of the evidence.

### 1. Legal Standard As to Venue

"Both the Sixth Amendment and Fed.R.Crim.P. 18 require that a defendant be tried in the district where his crime was 'committed.'" *Tzolov*, 642 F.3d at 318 (citing U.S. Const. amend. IV; Fed. R. Crim. P. 18). Although the Government bears the burden of proving, at trial, the existence of venue, a court assessing a challenge to the sufficiency of the evidence after a jury verdict "review[s] the sufficiency of the evidence as to venue in the light most favorable to the government, crediting 'every inference that could have been drawn in its favor.'" *Id.* (quoting *United States v. Rosa*, 17 F.3d 1531, 1542 (2d Cir. 1994)). Venue must be proper as to each count. *See id.*

"When a federal statute defining an offense does not specify how to determine where the crime was committed," the Supreme Court has held that "'[t]he *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it.'" *Id.* (quoting *United States v. Cabrales*, 524 U.S. 1, 6-7 (1998)). In such a case, "[v]enue is proper only where the acts constituting the offense—the crime's 'essential conduct elements'—took place." *Id.* "Although statutory language necessarily informs the first step of the analysis," however "the Supreme Court has 'rejected a rigid verb test that unduly limits the inquiry into the nature of the offense and thereby creates a danger that certain conduct prohibited by statute will be missed.'" *Davis*, 689 F.3d at 185 (quoting *United States v. Saavedra,* 223 F.3d 85, 90 (2d Cir. 2000)). Finally, even as to substantive (i.e. non-conspiracy counts), "a defendant [need not have had] actual knowledge that particular acts would occur in a particular district to support venue at that location." *Id.* at 186. Nevertheless, "there must be some 'sense of [venue] having been freely chosen' by the defendant." *Id.* (alteration in original) (quoting *United States v. Reed*, 773 F.2d 477, 481 (2d Cir. 1985)). Thus, an "occurrence in the district of venue [must] have been

81

reasonably foreseeable" to a defendant to make venue lie in that district. *See id.* (quoting *United States v. Rommy*, 506 F.3d 108, 123 (2d Cir. 2007). In assessing whether it would be reasonably forseeable for an act in furtherance of a conspiracy or substantive crime to occur in the district of venue, a reasonable jury may consider the specific characteristics, qualifications, and knowledge of the defendant in question. *See United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003) ("In the instant case, there is nothing in the record to indicate that Robles intended the trades in question to be executed on either NYSE or AMEX. However, the fact that Robles was a savvy investor means that he could reasonably foresee that his trades would likely be executed on either NYSE or AMEX. More importantly, however, Robles had actual notice that his trades were being executed on NYSE and AMEX . . . .").

In determining whether venue lies in a particular district, the "law recognizes that not all crimes consist of a single, non-continuing act, so as to locate venue in a single district" alone. *Davis*, 689 F.3d at 185. "Venue may lie in more than one place if 'the acts constituting the crime and the nature of the crime charged implicate more than one location.'" *United States v. Lange,* 834 F.3d 58, 68-69 (2d Cir. 2016), (quoting *Reed*, 773 F.2d at 480), *cert. denied sub nom. Russell v. United States,* 137 S. Ct. 677 (2017), and *cert. denied,* 137 S. Ct. 685 (2017). As to such a continuing crime, venue is proper "in any district in which an offense was 'begun, continued or completed.'" *Id.* at 69 (quoting *Reed*, 773 F.2d at 483 n.4)); *see also Davis*, 689 F.3d at 185-86 ("In such circumstances, Congress has instructed that venue properly lies in 'any district' in which the charged offense 'was begun, continued, or completed.'" (quoting 18 U.S.C. § 3237(a))).

As to the substantive bribery count, under 18 U.S.C. § 215, the Government admits that the Second Circuit has not directly addressed whether this count is a continuing offense for

determining venue. *See* Gov't Opp. at 54. Nevertheless, the Government correctly notes that the Second Circuit has treated analogous bribery counts as continuing offenses, and argues that a violation of § 215 should be treated the same way. *See, e.g.*, *United States v. Stephenson*, 895 F.2d 867, 874-75 (2d Cir. 1990) (treating a conviction under 18 U.S.C. § 201 (criminalizing a public official's acceptance or solicitation of a bribe) as a continuing violation)). Gross does not respond to or dispute this argument in his reply brief, *see* Def. Reply at 35-37, and the Court agrees that § 215 describes a continuing offense. As to the conspiracy count, it is well-established that "[a] conspiracy is a continuing offense." *United States v. Rutigliano*, 790 F.3d 389, 395-96 (2d Cir. 2015). Venue for a conspiracy charge "is [thus] proper in [any] district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue [and it does]." *United States v. Royer*, 549 F.3d 886, 894 (2d Cir. 2008) (alteration in original) (quoting *Svoboda*, 347 F.3d at 483).

Additionally, in determining whether an act is part of the essential conduct of a continuing offense, or in furtherance of a conspiracy, a court must distinguish between acts that are "part of the actual charged crime," and acts that are "merely steps preparatory to the crime." *Davis*, 689 F.3d at 186.

Finally, in assessing the sufficiency of venue, the Second Circuit has "[o]n occasion," "'supplemented [its] venue inquiry with a substantial contacts test that takes into account a number of factors,' including the 'site of the defendant's acts' and 'the locus of the effect of the criminal conduct.'" *Rutigliano*, 790 F.3d at 399 (quoting *United States v. Coplan*, 703 F.3d 46, 80 (2d Cir. 2012)). The Second Circuit has clarified, however, that such an "inquiry is made only if 'the defendant argues that his prosecution in the contested district will result in a hardship

83

to him, prejudice him, or undermine the fairness of his trial.'" *Id.* (quoting *Coplan*, 703 F.3d at

80)); *see also Lange*, 834 F.3d at 75 (citing *Rutigliano*). As the Second Circuit has made clear

(and as is self-evident) – the question is not whether, as a formal matter, the defendant

affirmatively made an argument that a given forum would prejudice him (by, for instance,

moving for severance or transfer), but whether such an argument has *merit*. *See Rutigliano*, 790

F.3d at 400 (noting that the court "need not be concerned about jeopardizing the values

underlying the substantial contacts tests because [the defendants cannot] argue that being

prosecuted in the Southern District imposed an additional hardship on [them], prejudiced [them],

or undermined the fairness of [their] trial." *Id.* (alterations in original) (quoting *United States v.

Ramirez*, 420 F.3d 134, 143 (2d Cir. 2005)). This limitation arises directly out of the purpose of

the substantial contacts test: to safeguard against hardship to the defendant that may arise when a

continuing offense lays venue in numerous districts, some of which are remote. *See Saavedra,*

223 F.3d at 89 ("[W]e must ask whether the criminal activities in question bear 'substantial

contacts' to the Southern District of New York, in order to ensure that the policies and

considerations underlying the Constitution's commands respecting venue have been preserved.");

*id.* at 88 ("[I]n early common law, actions were thought of as local or transitory. Local when the

cause of action could not have occurred in any other place; transitory when it could have arisen

in one or more places. The rule permitting plaintiff in the case of a transitory action to lay venue

wherever he wanted to caused such hardship to defendants that it was decreed by statute in

England that venue should be laid where the cause of action arose."); *Davis*, 689 F.3d at 185

(noting that the venue "requirement derives from colonial grievances against the Crown, which

had sometimes transported American colonists across the sea to stand trial in England," and that

the requirement was thus "adopted to shield a federal defendant from 'the unfairness and

hardship' of prosecution 'in a remote place'" (quoting *United States v. Cores*, 356 U.S. 405, 407 (1958))). In the absence of a showing of hardship, the substantial contacts test does not disturb the general rule that "prosecution for a continuing offense, 'committed in more than one district,' may occur 'in any district in which such offense was begun, continued, or completed.'" *Rutigliano*, 790 F.3d at 399 (quoting 18 U.S.C. § 3237(a)).

### 2.     Analysis

The Government, in its opposition brief, cites a number of discrete acts, as to both the substantive and conspiracy convictions, that it claims a reasonable jury could have found by a preponderance of the evidence to establish venue in the Southern District of New York. *See* Gov't Opp. at 53-69. The Court need not determine whether *each* of these acts would be sufficient, as it agrees that at least three evidentiary theories were independently sufficient for the jury to conclude that venue existed on both the substantive and conspiracy counts.

#### a.     Gross's June 6-7, 2014 e-mails

First, a reasonable jury could have found that several e-mails sent by Trevon Gross between June 6 and 7, 2017 established venue over both counts. *See* Ex. 1157; 1793; *see also Lange*, 834 F.3d at 70 ("[V]enue lies both in the district where a telephonic communication in furtherance of a crime was made and where it was received."); *id.* ("Venue is also proper in the district where an electronic communication was received."). On June 6, 2014, Gross wrote to Murgio, copying Lebedev and Hill, providing Lebedev information to gain access to HOPE FCU's server at Dream Host, in order to facilitate Lebedev getting a new website for the credit union "up and running" in the near future. *See* Ex. 1157. Second, on June 7, 2014, at 11:44 a.m., Gross wrote to Murgio, addressing whether he had received all the necessary information

about the various candidates for the board of HOPE FCU to prepare for the June 21, 2014 meeting where those members would be formally elected to the Board. *See* Ex. 1793. Responding to Murgio's question whether "all of the[] members ha[d] submitted all proper info," Gross responded "I think we are just missing Rico." *Id.* He then noted that he was "[i]n a major conference this weekend so responses will be slower." *Id.*

Drawing all inferences in favor of the Government, a reasonable jury could have found by a preponderance of the evidence that Gross sent these e-mails while in the Southern District of New York, and that they were essential to the substantive crime of bribery *and*, by extension, the conspiracy.

First, a reasonable jury could have found that Gross sent these e-mails while in the Southern District of New York. Gross – although he challenges the Government's proof that numerous other e-mails and communications were sent or received from or in this district, does not make any meaningful argument that *these* e-mails were not sent from the Southern District of New York. *See* Def. Br. at 36; Def. Reply at 30-31 (arguing that the Government's evidence failed to show that Gross was in New York on June 11, 2014, but primarily arguing simply that the June 6 and 7 emails failed to establish venue because of their content, not where they were sent). A reasonable jury could, in any case, have found these e-mails to have emanated from the Southern District. Gross himself testified that, in June 2014, he was in New York City for "a conference" – i.e. the conference he mentioned in his June 7, 2014 e-mail. Tr. at 3544. Further, in his testimony, Gross referenced a credit card receipt for a meal at Rosa Mexicano, a restaurant in New York City, and stated that the receipt "represent[ed] [he and others] going out to eat as pastors" as part of that conference. *Id.* The Government presented evidence that this meal occurred on June 6, 2014, by way of a credit card receipt. *See* Ex. 900 at 39.

Instead of challenging where Gross was when he sent these e-mails, Gross downplays the significance of the emails to the crimes of conviction. He highlights, for instance, the fact that he told Murgio that he could not "communicate with him because he [was] going to be in the Southern District of New York." Def. Reply at 31. A reasonable jury could have concluded that these emails were, however, essential acts in part of the continuing schemes. In each e-mail, Gross sent information actively facilitating a key event that was to occur only weeks later: the June 21st election of the members of the collectables Club to the board of the HOPE FCU and the transfer of power to the Collectables Club. That was particularly true as to Gross's email addressing whether he had received the necessary information as to each board member, and indicating to Murgio that he had not. Evidence at trial was sufficient for a reasonable jury to conclude that Gross understood it as necessary to receive information as to each Board member to successfully facilitate this transfer of power. *See, e.g.*, Tr. at 1288 (in which Hill testifies that "[a]ll of the [prospective board members]" had to submit information to Gross in the "lead[] up to becoming . . . board member[s]"); *see also* Tr. at 1284 ("Q. Now, so let's talk about the other half of this plan. How is it that Murgio would actually get control of the credit union? Hill: Trevon would ensure that we were nominated to be voted on the board, and then we would have the vote, and in turn, eventually have complete control of the credit union."); Ex. 1155-B (in which Jose Freundt emailed that "[i]n order to finalize the board and to continue forth with the process we need to complete all forms. . . . It is imperative that Trevon has all this information including a picture of [each board member] holding your state issued ID."). These emails were thus essential to ensuring the success of the *key* event in the central quid pro quo arrangement, as although Murgio had promised gross $150,000, Gross's largest payment, $120,000, was tied to this June 21st meeting. *See, e.g.*, 1108-A (in which, on May 12, 2014, Gross tells Murgio: "The

87

[Credit Union's] Executive board has placed in nomination the six names. This Saturday they will be confirmed to be placed on the ballot for the June annual meeting. A couple of things need to happen ASAP," including the "Final installment on Current [Memorandum of Understanding] (wired to PNC Bank) [Hope Cathedral's operating and payroll account]."). Further, Gross had not received this payment yet at the time that he sent his June 6 and June 7 e-mails; he did not receive the payment until *after* the election of the Board, providing additional evidence that the payment was tied explicitly to the successful accomplishment of this goal. *See* Ex. 1317-B; Ex. 1317-E; Ex. 1317-F; Ex. 1317-H; Ex. 800-B; Ex. 800-D.

Given this context, Gross's June 6 and June 7 acts could have been viewed by a reasonable jury as essential to the bribery scheme in at least two respects. First, they were acts necessary to ensure that the election process was successful and that power effectively transferred to the Collectables Club over the credit union. And second, they demonstrated Gross's good faith efforts to demonstrate to the Collectables Club members that he was actively working towards this goal – to lay the groundwork for his ultimate receipt of the largest bribe payment. Indeed, the very statement that counsel for Gross highlights to *downplay* the relevance of the e-mails could have suggested, to a reasonable jury, their importance. Gross notes that he wrote to Murgio that he was "[i]n a major conference this weekend so responses will be slower." Ex. 1793. Gross characterizes this statement as his telling Murgio that he could not communicate with him. *See* Def. Reply at 31. In fact, a reasonable jury could see the statement as an attempt, ex ante, to ensure Murgio would not interpret any subsequent delay in Gross's response time as evidence that he was not invested in the ongoing scheme – i.e. the jury could have found it to be a statement designed to assure a co-conspirator of Gross's continued belief in the objectives of the plan.

Nor were these emails merely preparatory acts, as an analysis of *United States v. Stephenson*, an analogous Second Circuit case, makes clear. *See* 895 F.2d at 874-75. In *Stephenson*, the defendant, an export licensing officer at the United States Department of Commerce, in Washington, D.C., did not physically enter New York City (the district of venue) as part of the bribery scheme proved. *See id.* at 874. Instead, in an effort to lay the groundwork for soliciting bribes from an exporting company located in New York City, Stephenson called the vice president of that company (while the vice president was in New York) and accused him of submitting a licensing application replete with errors. *See id.* Later, Stephenson spoke with the president of the company, again emphasizing that the applications could be denied. *See id.* The Second Circuit ultimately held that these conversations – which Stephenson made knowing he was communicating with individuals in New York City – were sufficient to establish venue. That is because "[t]he[] telephone conversations were crucial components of, not merely preparatory to, the bribery scheme that culminated in the November 19 meeting in Washington, D.C." *Id.* Explaining this conclusion, the Second Circuit noted that, although Stephenson did not literally demand or accept a bribe during these conversations, his "exaggeration of the seriousness of the deficiencies in [the] application and his dire predictions that [the president and vice president] would be prosecuted . . . were designed to make [the company] so anxious to obtain Stephenson's 'help' that its officers would be willing to pay him a bribe." *Id.* at 874-85. Thus, these conversations were "crucial components of, not merely preparatory to, the bribery scheme that culminated in the . . . meeting in Washington, D.C." – i.e., not New York – where Stephenson asked for payment. *Id.* at 874; *see also Royer*, 549 F.3d at 894-95 (noting that acts "crucial to the success of the scheme" established venue and were not merely preparatory).

For the same reasons, a reasonable jury could have found that Gross's e-mails established venue over the substantive bribery count and conspiracy bribery objects, in laying the necessary groundwork for the central quid pro quo arrangement at the heart of the bribery scheme: the $120,000 Gross stood to receive should his work with Murgio continue, and should he succeed in placing members of the Collectables Club on the board of the HOPE FCU and transferring control of his credit union to those individuals.

### b.    Gross's Solicitation of a $6,000 Consulting Payment on November 24, 2014

Second, evidence at trial would have permitted a reasonable jury to conclude by a preponderance that Gross solicited or agreed to accept, from Ricardo Hill, a $6,000 bribe payment on November 24, 2014, between 1:50 p.m. and 2:10 p.m, when Gross was in the Southern District of New York.  In a whatsapp chat in evidence, Freundt indicated, between 1:50 and 2:10 p.m., that he was texting with Trevon Gross.  Ex. 4501 at PK 4736-56.  He stated that, as to a final $6,000 consulting payment not yet provided to Gross, Freundt had "asked [Gross] to give [Freundt] the chance to prove that [Freundt's] word has weight," and stated, later, that Gross "informed [Freundt] he [was] done playing games and quite frankly [Freundt did not] blame [Gross]."  Ex. 4501 at PK 4751, 4756.  Murgio asked Freundt to inform Gross that the money had already been wired – a fact which, in turn, suggested that Gross was not yet certain that the money had been sent, and not yet in receipt of it.  Ex. 4501 at PK 4752-54.  The evidence ultimately established that the Collectables Club did send Gross this $6,000 payment and, although Gross rejected a subsequent $50,000 payment, he did not return the $6,000.  *See* Tr. at 1526, 2131-32.  Again, a reasonable jury could conclude that Gross was in the Southern District of New York during these text conversations, and that they were essential to the bribery conduct.

First, a reasonable jury could conclude that Gross was in the Southern District of New York during the described conversations. As Gross concedes, receipts show a room at the Marriot Marquis in New York City was booked in Gross's name on the night of November 23, 2014. Ex. 761. Gross notes that there was no evidence that, although booked in his name, it was *he* who stayed at the hotel, and further cites evidence that Gross would book rooms for other individuals, such as visiting pastors, in his name. *See* Def. Reply at 33 (collecting evidence). Be that as it may, Gross himself did not offer any evidence at trial that he was not in New York on the night of November 23, 2014, nor that someone else was staying in that room. And other evidence would have permitted a jury to conclude that the Government met its burden of showing it was Gross who stayed in the room. In particular, in a whatsapp chat with Anthony Murgio, on November 24, 2014, at 5:54 p.m., Murgio asked Gross whether he was in New Jersey or at Church. Ex. 4509 at PK 4972-73. Gross responded that he was "not in [New Jersey]" at 6:11 p.m. Ex. 4509 at PK 4982. Murgio asked where he had gone and when he would be back, and Gross responded only "[l]ate tonight." Ex. 4509 at PK 4985. Faced with evidence that a room was booked at the Marriott Marquis in New York City on the night of November 23, 2014, in Gross's name, and evidence that Gross was not in New Jersey on the day of November 24, a reasonable jury could have found that Gross was in New York City on the day of November 24, 2014.

So too could a reasonable jury conclude that the texts on November 24 between Gross and Freundt were essential conduct in furtherance of the bribery scheme. A reasonable jury could have found that Gross had not received the $6,000 payment, and that whatever he communicated to Freundt made Freundt particularly eager to ensure Gross received this payment. Indeed, a reasonable jury could have concluded that – to the degree that Gross

suggested to Freundt that he was displeased with the Collectables Club or otherwise unwilling to continue to work with the Collectables Club – such communication was a tactic which was designed to (and ultimately did) ensure payment of the $6,000 payment. Further, a reasonable jury could have concluded that Gross, in his communications with Freundt, manifested that he would accept the $6,000 payment. A reasonable jury, in short, could have found venue on this alternative ground as well.

### c.    Murgio's Emails to Gross

Finally, the Government presented evidence that Murgio sent numerous emails furthering the bribery scheme to Gross while Murgio was in the Southern District of New York. *See* Gov't Opp. at 65-66 (collecting examples). Gross correctly points out that a reasonable jury could not have concluded that Gross was aware that any one of those emails was sent from this district. However, there was evidence that Gross knew that Murgio traveled to New Jersey with some frequency and knew that he traveled to Manhattan at various times. *See, e.g.*, Ex. 1152-B (in which Murgio, upon finding out Gross would be in Manhattan for the June 7 conference, suggested that they might be able to meet up – or, if not, could meet up the following week). Even if it was not reasonably foreseeable that any *one* of these emails would be sent from Manhattan, then, a reasonable jury could have concluded by a preponderance that it was reasonably foreseeable to Gross that, over the course of the bribery scheme and conspiracy, he would receive some essential e-mails from Murgio while Murgio was in this district. The Second Circuit has found a reasonable jury could find venue in similar circumstances. *See United States v. Boruch*, 550 F. App'x 30, 33 (2d Cir. 2013) (summary order) ("Moreover, the law does not require proof that Boruch had actual knowledge of overt acts in Manhattan to support venue in the Southern District. The proximity of Manhattan to Brooklyn and Queens and

the conspirators' transfer of hundreds of thousands of dollars in cash admitted a preponderance finding that Boruch could reasonably have foreseen that his coconspirators transported at least some of the money at issue to Brooklyn and Queens from Manhattan.").

On these three bases, then, a reasonable jury could have found venue in the Southern District of New York.

### 3. Substantial Contacts Test

Finally, and notwithstanding Gross's arguments to the contrary, the substantial contacts test does not command an alternative result. As noted, this test applies only if the defendant can "argue that [his prosecution in the contested district] imposed an additional hardship on [him], prejudiced [him], or undermined the fairness of [his] trial.'" *Rutigliano*, 790 F.3d at 400 (quoting *Ramirez*, 420 F.3d at 143). Here, the Southern District of New York is not far from New Jersey – a point the Court emphasized in denying Gross's earlier motion to transfer. *See* Dkt. No. 353 at 46-47. Gross provides no compelling argument why trying him in the Southern District would thus pose a hardship to him, prejudice him, or undermine the fairness of his trial. *See Lange*, 834 F.3d at 75 ("[T]he district court did not err in concluding that the Eastern District was no less suitable for accurate factfinding than any other district involved in the scheme's implementation. While another venue may have been more convenient for defendants, 'where the acts constituting the crime and the nature of the crime charged implicate more than one location, the [C]onstitution does not command a single exclusive venue.'" (second alteration in original) (quoting *Reed*, 773 F.2d at 480)). Indeed, the Second Circuit has previously held that, when defendants who could have been tried in the Eastern District of New York challenged venue in the Southern District, the Defendants could not make a showing of hardship. *See Rutigliano*, 790 F.3d at 400.

In any event, the Court finds that – even assuming the substantial contacts test must be applied – there were substantial contacts with the Southern District of New York. As noted, the jury could reasonably have found venue on the basis of several evidentiary theories. *See Tzolov*, 642 F.3d at 321 (finding the substantial contacts test satisfied where the defendant "committed overt acts in furtherance of the conspiracies in the [district of conviction]").

In sum, then, the Court finds that a reasonable jury could have found that the Government met its burden of proving venue by a preponderance of the evidence as to the substantive bribery count and the conspiracy count, and denies Gross's motion to reverse his convictions for insufficient evidence of venue.

### C. A Reasonable Jury Could Have Found Gross Guilty of the Bribery and Conspiracy Counts

Finally, Gross challenges the sufficiency of the evidence to convict him of the conspiracy count and substantive bribery counts on two bases: first, that the Government failed to prove any meeting of the minds (i.e. that Gross "knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it," Def. Br. at 38 (quoting *United States v. Rodriguez*, 392 F.3d 539, 545 (2d Cir. 2004), and second, that the Government failed to prove Gross's corrupt intent in accepting the donations to his church, *id.* at 39-40, or the materiality of any false statements. The Court disagrees.

First, in arguing that there was no meeting of the minds, Gross repeats the arguments he made at trial as to the scope of the conspiracy: he argues that the conspiracy's essential object was the furtherance of an illegal bitcoin exchange, and that, assuming the Government failed to prove Gross's knowledge of the "unlawful objectives of the conspiracy," it failed to prove a meeting of the minds. *Id.* at 39. As the Court explained in detail, *infra*, the language of the indictment did not allege the existence of an agreement to further the ends of an illegal bitcoin

94

exchange, and nothing in the law required that the Government either allege or prove at trial that the parties specifically agreed to further the illegal end of processing bitcoin transactions for Coin.mx. A reasonable jury instead could have found that the Government proved that Gross and his co-conspirators agreed that Gross would accept bribes to pass control of his credit union to the Collectables Club, and that they would make false statements and obstruct an NCUA examination in furtherance of that end.

Further, and as already noted, nothing in the legal contours of the bribery or conspiracy counts required that the Government show that either the conspiracy, generally, or the substantive bribe count, specifically, involved pursuit of an end inherently illegal in itself. *See McElroy*, 910 F.2d at 1021 (explaining that to act "corruptly" in the context of § 215 means to act with "the bad purpose of accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means"). It follows, for this reason as well (as the Court has already explained), that the furtherance of an illegal bitcoin exchange was no more essential to the Government's proof at trial than to its indictment. *See, e.g., Boruch*, 550 F. App'x at 31 ("Boruch maintains that the evidence supporting his conviction is insufficient as a matter of law because his two alleged coconspirators testified that they were unfamiliar with CTRs and sought to conceal from Boruch the illegal source of the cash that, for a fee, Boruch converted into WebMoney, a form of digital currency ideal for maintaining user anonymity. Boruch's knowledge of the alleged source of the cash at issue was not a required element of a § 371 conspiracy to avoid CTR reporting and, thus, is irrelevant to our sufficiency review.").

Second, Gross argues that the Government has failed to show his corrupt intent in accepting donations to his church on the basis that it failed to prove he had knowledge of the illegal bitcoin exchange. Def. Br. at 39. As already noted, the Government did not need to

prove such knowledge to show Gross's corrupt intent: it was sufficient for the Government to prove, as a reasonable jury could have found that it did, that Gross provided Murgio and the Collectables Club control of his credit union (including permitting them to bring KapCharge on board and process ACH transactions for KapCharge) in *exchange* for – rather than irrespective of – the donations made to the church – which the Government proved largely by showing that Gross's willingness to allow dangerous and unsafe practices at his credit union were consistent with his acting under the influence of bribes.

Next, Gross argues that the Government failed to prove beyond a reasonable doubt that Gross "personally benefited from the payments to the Hope Cathedral." Def. Br. at 39. In particular, he argues that the Government's evidence – presented via a summary witness, John Rollins – did not establish that Gross spent the funds provided to the church on personal expenses. *Id.* at 39-40. It is true that the Government relied, in part, on such evidence to suggest that Gross acted corruptly in accepting bribes. But the Government also correctly argued at trial that the jury did not need to conclude that any particular payment made to the church was then used by Gross to pay for personal expenses to find that he acted corruptly. As the Government stated, and the Court correctly instructed, under § 215, "[t]he motive to act corruptly is ordinarily a hope or expectation of either financial gain or other benefit to oneself or some profit or benefit to another." *McElroy*, 901 F.2d at 1021 (internal quotation marks omitted); Tr. at 4178 (including this legal definition in the charge). The Government made clear to the jury that it need not credit Rollins' analysis or the evidence underlying it to find corruption. *See* Tr. at 3950-51 ("[Y]ou don't have to rely on the fact that Trevon Gross made personal purchases that flowed through from those bribe payments that were paid to the church to know that he was acting corruptly. You don't have to go through the accounting exercise that Mr. Rollins did to

see where every last dollar went. . . . [I]t is obvious and evident that Mr. Gross' finances depended on the finances of Hope Cathedral. It's simple: Mr. Gross doesn't get paid unless there's enough in the coffers at the church to pay him."). And beyond this argument, the Government also repeatedly – and correctly – made clear to the jury that Gross's desire to use his position at the credit union to effect a benefit to his church through the soliciting of bribes would also be corrupt, even if he did not use that money to pay personal expenses. *See id.* at 3907 ("With regard to Trevon Gross, you know that Gross took money from Collectables Club and KapCharge, those payments to his own church, because he put the interests of his church and himself over the interests of his credit union."); Tr. at 3951 ("I expect that Judge Nathan will explain to you that the motive to act corruptly is ordinarily . . . simply a hope or expectation of some gain, profit, or benefit to either yourself or to another. So it does not matter whether the payments at issue went to buy something illegal, or went towards a lavish spending spree, or went to charity, because, ultimately, that's not the question before you."); *accord* Tr. at 3952; see also Tr. at 4178 (Jury Charge: "The motive to act corruptly is ordinarily a hope expectation [sic] of either financial gain or some other benefit to oneself or some profit or benefit to another.").

The jury could thus reasonably have found, beyond a reasonable doubt, that Gross accepted donations to his church in exchange for being influenced in his decisionmaking as the head of a federal credit union – and thus that the payments were corrupt. Even assuming, *arguendo*, then that Gross is correct – that the Government did not prove his knowledge of an illegal bitcoin exchange, nor that he spent the money that went to his church on specific personal expenses – there was sufficient evidence for the jury to find he acted corruptly.

Finally, Gross argues that the Government failed to establish the materiality of any false statement. Def. Br. at 40. First, given that there was sufficient evidence to convict Gross of the

bribery object of the conspiracy, even were there insufficient evidence of the materiality of any false statement (i.e. the false statement object), that would not provide a basis to vacate his conviction. *See Fawwaz*, 2017 WL 2399329, at *1. In any event, as described in detail in the fact section, a reasonable jury could have found any of a number of false statements to be material. *See infra* I.B(6). In arguing otherwise, Gross suggests, *inter alia*, that false statements relating to KapCharge and the Florida branch of HOPE FCU, even if material, related only to KapCharge's involvement in the conspiracy and thus cannot satisfy the Government's burden. Def. Reply at 40. Even were he correct as to this premise, however, the Government proved numerous misrepresentations a reasonable jury could have found were material and related to the Collectables Club. *See infra* I.B(6). And further, as already noted, a reasonable jury could have found that statements facilitating KapCharge's membership in the credit union furthered the central quid pro quo arrangement by ensuring that Murgio had the funds to pay Gross for control of his credit union. In other words, a reasonable jury could have relied on such statements to convict.

The Court thus denies Gross's motions for acquittal as to the conspiracy and bribery counts for lack of sufficient evidence of conviction.

## V.    Conclusion

In conclusion, the Court denies Gross's Rule 29 and Rule 33 motions in their entirety. This resolves docket numbers 455 and 524.

SO ORDERED.

Dated:  October 18, 2017
        New York, New York

_____
ALISON J. NATHAN
United States District Judge